UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cr-00005 |
| | ) | |
| REX HAMMOND | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE TO SUPPRESS CELLULAR TELEPHONE EVIDENCE, LOCATION INFORMATION, AND ALL TRAFFIC STOP EVIDENCE

In support of his Motion in Limine to Suppress Cellular Telephone Data, Location Information, and Other Evidence, the Defendant, Rex Hammond, submits this Memorandum.

### 1. Introduction

On January 10, 2018, the Defendant, Rex Hammond, was charged in an eight-count Indictment. Counts 1 through 5 allege violation of the Hobbs Act, specifically accusing Mr. Hammond of robberies of gas stations and a liquor store. Counts 6 and 7 charge Mr. Hammond with using, carrying and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. §924(c)(1)(A). In Count 8, Mr. Hammond is charged with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §922(g)(1). In addition, the Indictment contains a forfeiture allegation.

In the course of investigating a string of robberies of gas stations and liquor stores in Indiana and Michigan, law enforcement became aware of a telephone

number they believed was linked to a person involved in the robberies.  Without obtaining a search warrant or court order, a detective in Michigan sent a request to AT&T for records related to that number, including geographic location information for the telephone associated with the number.  The same detective in Michigan, also acting without a warrant or court order, tracked the phone in real time, pointing Indiana police officers to Mr. Hammond's specific location.

After the Indiana police officers followed Mr. Hammond's car for an unusually long time, a Marshall County Sheriff's Deputy was directed by Indiana State Police to initiate a traffic stop on Mr. Hammond's vehicle if the vehicle was located by the officer.  The Marshall County Sheriff's Deputy initiated a traffic stop on Mr. Hammond's vehicle for not using a turn signal in a roundabout and for speeding.  During the traffic stop a felony arrest was effected on Mr. Hammond.  Mr. Hammond was arrested along with his vehicle's passenger.  The car, its contents, the clothes Mr. Hammond was wearing, and the contents of his pockets, as well as the clothes of the passenger were seized.  Additionally, a cell phone and Garmin GPS unit were seized and warrants were obtained to search these devices.  Further, Mr. Hammond's passenger, Alexandra Latendrosse, was also arrested and questioned and provided a statement against Mr. Hammond.

On June 22, 2018, the United States Supreme Court handed down its decision in *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018), in which it held that "the Government must generally obtain a warrant supported by probable cause before acquiring [cell-site location information] records."

Following the holding of *Carpenter*, all of the cell-site location information (CSLI) received from AT&T without a warrant was obtained illegally, in violation of the Fourth Amendment to the United States Constitution.  Therefore, it is inadmissible at any trial of Mr. Hammond.

Additionally, prior to the *Carpenter* decision, it was illegal for officers in Indiana to obtain track cell phone geolocation data without a warrant pursuant to IND. CODE § 35-33-5-12.

Furthermore, law enforcement would not have located Mr. Hammond when and where he was without the use of illegally obtained cell phone geographic information, thus doing GPS surveillance through real-time "pinging" of Mr. Hammond's phone without a search warrant or court order.  Thus, all the clothing he was wearing, and items on his person at the time, as well as his car, and all of its contents, and the clothing and possessions of his passenger, and all statements obtained following the arrest of Mr. Hammond and Alexandra Latendrosse must also be excluded from evidence under the Fruit of the Poisonous Tree Doctrine.

## 2.  Background

During an armed robbery of liquor store in Kalamazoo, Michigan on October 10, 2017, the suspect used a Hi-Point .45 caliber handgun.  At a point during the robbery, the suspect set the gun down on the counter while collecting money from the cash register.  Before the suspect could retrieve it, the store clerk knocked the gun off the counter.  The suspect fled, leaving the gun behind.

ATF agents traced the ownership of the pistol, starting with the original

purchaser, and interviewing a chain of subsequent buyers.  One of the individuals told ATF agents he had sold the Hi-Point to a person who he only knew as "Rex."  While he did not know Rex's last name, the seller did have a telephone number for Rex, (574) 333-9522 (the "Cell Number").  An Auburn, Indiana, police officer put the Cell Number into a database and determined it belonged to Rex Hammond.

The Cell Number and Mr. Hammond's name were provided to Cory Ghiringhelli, a Detective with the Kalamazoo Department of Public Safety ("KDPS").  Det. Ghiringhelli determined that the service provider for the Cell Number was AT&T.  Without seeking a search warrant or court order, Det. Ghiringhelli contacted AT&T, and obtained subscriber information and historical records, including cell tower location data.  Det. Ghiringehelli also received the ability to "ping" the location of the cell phone in real time from AT&T.  He also did not seek a warrant or court order to obtain real-time location information.

### 3.    Cell-Site Location Information (CSLI)

In an *amicus* brief which was favorably cited by the Supreme Court in *Carpenter*, The Electronic Freedom Foundation ("EFF") described how cell phone service providers collect data from cell phone users.  The EFF explained, "[c]ell phones send and receive radio signals via base stations, known as cell towers.  Towers typically have multiple cell 'sites' facing in three or four different directions, each containing antennae that detect radio signals emanating from phones and that connect the phones to the cellular network."  Brief for Electronic Frontier Foundation, et al., as *Amicus Curiae* Supporting Petitioners at 6-7, *Carpenter v.*

*United States*, 138 S. Ct. 2206 (2018) (hereafter, Brief for EFF).

When a cell phone connects to a tower, cell-site location information (CSLI) is generated. According to the EFF, CSLI is "a record of the location of the cell tower the phone connected to at a specific moment in time. Modern cell phones, particularly smartphones, generate vast amounts of CSLI because they routinely send and receive data whenever the phone is on." Brief for EFF at 10. The EFF notes that "[c]ell phones connect with towers to exchange data on average every seven to nine minutes but can attempt to connect as frequently as every seven seconds." Brief for EFF at 11. This is important because with a record of the location of the tower, and the time of the connection, CSLI reveals "where the phone and by proxy, its owner, has traveled. Cell providers store this data for up to five years and can also track CSLI in near real-time." Id.

In its brief, the EFF reveals that because of the concentration of cell towers, and modern cell technology, CSLI can triangulate the location of a phone, and "by 'correlating the precise time and angle at which a given device's signal arrives at multiple sector base stations'" a phone can be tracked "down to within 50 meters." Brief for EFF at 12.

4. *Carpenter v. United States*, 138 S. Ct. 2206 (2018).

Against this backdrop, the United States Supreme Court ruled that the use of CSLI constituted an invasion of privacy so invasive as to constitute a search under the Fourth Amendment to the United States Constitution. The Fourth Amendment generally allows a search only after obtaining a warrant supported by probable

cause.

In *Carpenter*, four men were arrested on suspicion of robbing Radio Shack and T-Mobile stores in Detroit.  One of the men confessed to nine robberies of different stores in Michigan and Ohio.  He identified 15 accomplices, and gave the FBI some of their cell phone numbers.  The Government then took those numbers, and obtained court orders from Federal Magistrate Judges, under the Stored Communications Act, for cell phone records, including those belonging to Timothy Carpenter.  In response MetroPCS and Sprint produced records covering 134 days. "Altogether the Government obtained 12,898 location points cataloging Carpenter's movements, an average of 101 data points per day." *Carpenter* at 516.

At Carpenter's trial, CSLI was highlighted by the Government to show "that Carpenter was 'right where the . . . robbery was at the exact time of the robbery.'" *Id*.

To begin his analysis, Chief Justice Roberts explained, "[t]he Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'  The 'basic purpose of this Amendment,' our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter* at 516-17.

The Chief Justice continued:

> More recently, the Court has recognized that "property rights are not the sole measure of Fourth Amendment violations." In *Katz v. United States*, we established that "the Fourth Amendment protects people, not places," and expanded our conception of the Amendment to protect

certain expectations of privacy as well.  When an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.

*Carpenter* at 517 (internal citations omitted).

The Supreme Court observed that this expectation of privacy is not limited to purely private business:

A person does not surrender all Fourth Amendment protection by venturing into the public sphere.  To the contrary, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  A majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements.  Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so "for any extended period of time was difficult and costly and therefore rarely undertaken."  For that reason, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period."

*Carpenter* at 521 (internal citations omitted).

The all-encompassing nature of the information that CSLI could reveal, not just about a person's whereabouts, but the intimate details of their life, created a significant concern for the Supreme Court:

Allowing government access to cell-site records contravenes that expectation. Although such records are generated for commercial purposes, that distinction does not negate Carpenter's anticipation of privacy in his physical location.  Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts.  As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations." These location records "hold for many Americans the 'privacies of life.'"

*Carpenter* at 521-22.

The Supreme Court noted that modern technology has erased financial and logistical challenges that previously constrained law enforcement, which had benefitted personal privacy.  "With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense." *Carpenter* at 522.  "Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id*.

The Supreme Court pulled no punches in describing the invasiveness of CSLI:  "when the Government accessed CSLI from the wireless carriers, it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements." *Carpenter* at 523.

Ultimately, the Supreme Court found that the "Government's acquisition of the cell-site records was a search within the meaning of the Fourth Amendment." *Carpenter* at 525.  And, further, "[h]aving found that the acquisition of Carpenter's CSLI was a search, we also conclude that the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Id*.

### 5.    Det. Ghiringhelli's acquisition of CSLI.

Having obtained the Cell Number from the ATF and Mr. Hammond's name from the Auburn, Indiana Police, Det. Cory Ghiringhelli, of the Kalamazoo Department of Public Safety, contacted AT&T.  Det. Ghiringhelli did not seek a search warrant nor did he seek a court order under the Stored Communications Act.  According to his report, attached as ***Exhibit 1***, he:

> Contacted AT&T and conducted an exigency request on the phone number (574) 333-9522, which was identified as the phone number belonging to Hammond.  I had verified through fonefinder.net that this phone number belonged to AT&T.  In the exigency request, I requested subscriber information and historical records to include cell tower location dating back to 10/7/17, which I believed was the date of the first known robbery committed by this suspect in Indiana.

Det. Ghiringhelli merely asked AT&T for comprehensive information that he believed would reveal Mr. Hammond's every movement, and they sent it to him. There was no judicial permission or supervision sought or received for this request. Even without the *Carpenter* decision, Det. Ghiringhelli's request would have been illegal.  He made no attempt to comply with the Stored Communications Act. Without a court order, AT&T's decision to voluntarily provide this information may have also been illegal.

After *Carpenter*, the suppression of CSLI obtained by Det. Ghiringhelli should be straightforward.  He sought the same type of information which the government obtained in *Carpenter*.  He neither sought, nor obtained a search warrant.  The same reasoning applied by the Supreme Court applies here.  The acquisition of Mr. Hammond's CSLI was a search.  A search conducted without a warrant supported by probable cause is presumptively unreasonable.  "[T]he exclusionary rule generally requires suppression of the evidence obtained from such searches." *United States v. McGraw*, 571 F.3d 624, 628 (7th Cir. 2009).

Although Det. Ghiringhelli's warrantless search was conducted via what he called an "exigency request" that does not create an exception to the exclusionary rule.

In *Carpenter*, the Supreme Court volunteered that "the exigencies of the

situation" could create a circumstance in which a warrantless search might be "objectively reasonable under the Fourth Amendment." *Carpenter* at 527.

Examples of "exigencies" provided by the Supreme Court "include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Id.* The Court allowed that "if law enforcement is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of CSLI.  Lower courts, for instance, have approved warrantless searches related to **bomb threats**, **active shootings**, and **child abductions**.  Our decision today does not call into doubt warrantless access to CSLI in such circumstances." *Id.*

The exigent circumstances that would make a warrantless search "objectively reasonable under the Fourth Amendment" involve a bomb with a literal ticking clock, bullets flying though the air, and kidnapped children.  While Det. Ghiringhelli may have been concerned that a robbery may occur at some indeterminate time in the future, he was pursuing a fleeing suspect.  This was not a situation where threats of imminent harm were so immediate and so critical that there was no time to spare to apply for a search warrant.

The Supreme Court in *Carpenter* made clear, "our cases establish that warrantless searches are typically unreasonable where 'a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing.'"  *Id.*  In this case, Det. Ghiringhelli was looking for evidence, not intervening into an ongoing emergency situation.  This was what Chief Justice Roberts called a "mine-run

criminal investigation" where "police must get a warrant when collecting CSLI." *Id.*

All of the information received from AT&T related to the Cell Number is not admissible and must be suppressed at any trial of Mr. Hammond.

### 6.    The Telecommunications Act (47 U.S.C. § 222).

The Telecommunications Act (47 U.S.C. § 222) clearly defines CSLI as "customer proprietary network information ("CPNI").  This CSLI is also sanctioned by the Federal Communications Commission as the customer's property.  Further, this Act outlines that the service provider cannot, without the customer's approval and consent, disclose, use or disseminate this information.

To further protect CSLI as the customer's property, in 1999 Congress amended the Telecommunications Act "by prohibiting service providers from using or disclosing it 'without the express prior authorization of the customer.'"  In addition, Congress also implemented a mechanism that allows customers to seek "a civil remedy against service providers" if the service provider violates the Act.  In 2007, Congress once again amended this Act to further protect the customer's property.  In doing so, Congress "made it a crime for any person to obtain or attempt to obtain that information by fraudulent means."

### 7.    United States Application for Order Pursuant to 18 U.S.C. §2703(d).

On January 10, 2018, the same day Mr. Hammond was indicted, an Assistant United States Attorney filed a request with this Court seeking essentially all available information related to the Cell Number.  The same day the application was submitted a United States Magistrate Judge approved it.  A copy of the

Government's Application is attached as *Exhibit 2*, and the Court's Order is attached as *Exhibit 3*.

While, unlike Det. Ghiringhelli, the Government followed the procedures of the Stored Communications Act, found at 18 U.S.C. §2703(d), the scope of information sought, and the time frame covered was even more invasive than the KDPS request.

The Magistrate Judge ordered AT&T to turn over not just CSLI, but also web browsing history, and telephone connection records.  In all, AT&T was ordered to supply 60 days of data, from September 6, 2017 to October 31, 2017.

This is exactly the same type of order at issue in *Carpenter*.  The government sought this information for exactly the same reason: to obtain evidence to be used in the criminal prosecution of a person who had already been investigated.

All the information received from AT&T in response to this request is squarely within the heart of *Carpenter*.  It was obtained in violation of the Fourth Amendment, is inadmissible, and must be suppressed in any trial of Mr. Hammond.

**8.    The use of real-time location data to arrest Mr. Hammond.**

Once law enforcement had Mr. Hammond's CSLI, they did not use that information solely to build a case against him, but also exploited their ability to track his movements.

Trooper Jake Quick of the Indiana State Police relates that he was contacted by Det. Ghiringhelli on October 31, 2017, who was actively "pinging" the Cell Number.  A copy of Trooper Quick's report is attached as *Exhibit 4*.

Det. Ghiringhelli told Trooper Quick that he had an "active 'cell phone ping' for Mr. Hammond's telephone" in Elkhart, Indiana.  Trooper Quick, working with Det. Stacey Sexton of the Auburn Police Department, went to the address at about 8:00 p.m., but when he arrived, the vehicle they were looking for was gone.  It appears that the two officers were driving separate vehicles.

Det. Sexton reported that "Det. Ghiringhelli had been receiving pings every 15 minutes."  According to Det. Sexton, he and Trooper Quick "stayed in Elkhart for some time.  We continued to receive ping locations on Hammond's phone from Det. Ghringhelli.  We would receive the ping location and then find the location on Google maps."  A copy of Det. Sexton's report is attached as *Exhibit 5*.

Trooper Quick and Det. Sexton then were told by Det. Ghiringhelli that he had pinged Mr. Hammond's phone at the Quality Inn at 120 North Dixie Way in South Bend.  Once there, Trooper Quick and Det. Stacy Sexton of the Auburn Police Department found what they believed to Mr. Hammond's car.

About the time Trooper Quick and Det. Sexton arrived at the Quality Inn, while Trooper Quick was attempting to bring in other police officers to make an arrest, the car left the parking lot.  The two officers followed.  They followed Mr. Hammond's car all the way from South Bend to Plymouth, Indiana.  Det. Sexton noted that "[t]his was a very long distance for one unit to follow a suspect."

At that time Det. Sexton "broke off from the detail at 1:15AM."  Trooper Quick then made contact with Marshall County Deputy Kerry Brouyette, who he asked to attempt to locate Mr. Hammond's car.  Trooper Quick told Deputy

Brouyette that he was trying to set up another ping on the Cell Number. While talking to Trooper Quick, Deputy Brouyette believed he saw a vehicle matching the description of Hammond's car pass by. Deputy Brouyette followed the car from the intersection of Hoham Drive and Michigan Street all the way to a roundabout at the intersection of Michigan Road and Veteran's Parkway. A copy of Deputy Brouyette's report is attached as *Exhibit 6*.

In his report Deputy Brouyette notes that the vehicle failed to signal a turn when exiting the roundabout onto Veterans Parkway. Notably, there is no Indiana law which requires a driver to signal a turn when exiting a roundabout.

The only Indiana statutes which govern travel through a roundabout are IND. CODE § 9-21-8-10, which states that "[a] vehicle passing around a roundabout shall be driven only to the right of the roundabout's central island," and IND. CODE §9-21-8-10.5 which governs rights-of-way in roundabouts. Last year, the Common Council of the City of Carmel Indiana considered a local ordinance, proposed Ordinance No. D-2356-17, which would have required drivers to signal when leaving a roundabout. However, the Common Council voted down the proposed ordinance.

To the extent Deputy Brouyette pulled over Mr. Hammond based on a failure to signal when leaving a roundabout, it was an illegal traffic stop.

Once on Veterans Parkway, Deputy Brouyette also used his radar unit to determine that the vehicle was traveling at 58 miles per hour, up to 60 miles per hour, in a 50 mile per hour speed zone. He then decided to make a traffic stop, due to "receiving investigatory information from Detective Quick and the moving traffic

violations in the presence of this Officer."

Rather than write Mr. Hammond a ticket for the legal act of leaving a roundabout without signaling, and driving between 8 and 10 miles per hour above the posted speed limit, Deputy Brouyette called in several other Marshall County and Plymouth officers, and initiated a full-fledged felony arrest.  Deputy Brouyette reported that he was instructed to arrest Mr. Hammond by Trooper Quick, on behalf of the Logansport Police Department even though there was no warrant for Mr. Hammond's arrest.

While Mr. Hammond was being patted down, methamphetamine was found in his pants pocket.  While searching the car, Deputy Brouyette found what he described as "another methamphetamine pipe/ smoking device and a red 'straw' used as a smoking device to introduce illegal narcotics into the body."  He also found a "firearm (handgun)" that "was positioned on the floorboard in front of the driver's seat in plain view."  The cylinder of the revolver contained .22 caliber ammunition.

**9.   Search Warrants obtained after Mr. Hammond's arrest.**

After Mr. Hammond was arrested, Trooper Quick obtained search warrants for Mr. Hammond's car, a cell phone, and Garmin GPS unit found in the car, from Judge in DeKalb County.  Copies of the Search Warrant Applications and Search Warrants are attached as ***Exhibits 7 & 8***.

It appears that numerous items were recovered from Mr. Hammond's car.  In addition to the items "used as a smoking device to introduce illegal narcotics into the body," law enforcement seized the car itself, and additional .22 caliber

ammunition, a brown hand cloth, clothing, footwear, papers and other items.

It appears that law enforcement was unable to obtain any information from the black Samsung Galaxy Note cell phone found in the car. While some data seems to have been extracted from the GPS device, there is a handwritten note on a copy of the search warrant for the devices that says, "Verification of data unsuccessful due to inability to access source device."  A copy of the Search Warrant with the note is attached as *Exhibit 9*.

### 10.    The Fruit of the Poisonous Tree Doctrine

In *Wong Sun v. United States*, 371 U.S. 471 (1963), the Supreme Court considered the convictions of James Wah Toy and Wong Sun for violation of federal narcotics laws.  The Supreme Court determined that both Toy and Wong Sun were unlawfully arrested without probable cause.  When he was being arrested in his bedroom, Toy was accused by federal narcotics agents of selling drugs.  He told them he didn't sell drugs, but knew someone named "Johnny" who did.  He also told the agents that Johnny had about an ounce of heroin at his house, some of which he and Johnny had smoked the night before. *Wong Sun* at 474, 410, 447.

Toy was then charged with fraudulent and knowing transportation and concealment of illegally imported heroin in violation of then-in-force 21 U.S.C. § 174.  A few days later he met with an agent from the federal Narcotics Bureau, William Wong.  Together, Toy and Wong crafted a statement in which Toy admitted to driving Wong Sun to Johnny Yee's house where Wong would buy heroin.  He also admitted receiving heroin from Johnny on multiple occasions.  Toy made

handwritten corrections on the statement written by Agent Wong, but refused to sign it.

The Supreme Court found that Toy's confessions should have been inadmissible because they were "'fruits' of the agents' unlawful" arrest. *Wong Sun* at 484, 416, 453. Justice Brennan explained:

> In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions."

*Id.*

The *Wong Sun* Court quoted Justice Holmes' articulation of the exclusionary rule in his opinion in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed."

*Wong Sun* at 485, 416, 453-54.

The Supreme Court held that Toy's statement immediately upon being arrested should have been excluded because it followed "closely consequent upon the invasion which we hold unlawful," and that there was no intervening act sufficient to "purge the primary taint of the unlawful invasion." *Wong Sun* at 486, 416, 454 and 486, 417, 454.

The narcotics discovered based on Toy's statement, were also determined to

be inadmissible.  The Supreme Court observed, that "this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence 'from an independent source;' nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'"

*Wong Sun* at 487, 417, 455.

> In summary, the Supreme Court stated:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun* at 487-88, 417, 455.

Where law enforcement obtains evidence illegally, that evidence must be suppressed. Additional evidence, that is subsequently discovered as a product of the original illegality must also be suppressed, unless an exception exists.

### 11.   Exceptions to the Exclusionary Rule under the Fruit of the Poisonous Tree Doctrine

There are four primary exceptions to the Fruit of the Poisonous Tree Doctrine: (1) discovery through an independent source; (2) inevitable discovery; (3) attenuation; and (4) the good faith exception.

The independent source exception is explained above. If the Government can obtain the same evidence from an independent source, untainted by the Government's own illegal act, the independently obtained evidence may be

admissible.

"Under the inevitable discovery doctrine, illegally obtained evidence that is normally suppressed under the exclusionary rule may be admitted if it would have been discovered even without the unlawful police activity." *United States v. Fialk*, 5 F.3d 250, 252 (7th Cir. 1993).  In *Nix v. Williams*, 467 U.S. 431 (1984), the defendant, Williams, was being questioned by police, but requested counsel.  Upon further questioning, he was nonetheless coaxed into revealing the location of a dead child.  Although the conversation which caused Williams to guide police to the location was illegal, search parties in the area were close to discovering the body without Williams' information.

The Supreme Court held, that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, here the volunteers' search, then the deterrence rationale has so little basis that the evidence should be received." *Nix* at 444, 2509, 387-88.

In *Murray v. United States*, 487 U.S. 533 (1988), the Supreme Court explained:

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search.  Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is  the product of the primary evidence, or that is otherwise  acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint."

In *United States v. Ivory*, 67 F. Supp. 3d 1011, 1015-16 (E.D. Wis. 2014),

Judge Adelman explained that the "type of intervening events that serve to

attenuate official misconduct are those that sever the causal connection between the

illegal arrest and the discovery of the evidence." He provided several examples from

other cases, such as:

> a confession made several days after the illegal arrest, preceded by
> arraignment and release from custody; the discovery of other
> incriminating evidence implicating the defendant and causing the
> defendant to confess spontaneously; the defendant freely agreeing to
> speak to the police at a site away from the scene of the illegal arrest,
> driving his own vehicle to the meeting; a proper arrest on unrelated
> charges following the initial illegal arrest; and the defendant's
> subsequent release from custody, appearance before a magistrate judge,
> discussions with counsel, or subsequent convictions on unrelated
> charges.

*Id.,* (internal citations omitted).

In *United States v. Leon*, 468 U.S. 897, 900 (1984), the Supreme Court

established the good faith exception to the exclusionary rule:  that "evidence

obtained by officers acting in reasonable reliance on a search warrant issued by a

detached and neutral magistrate but ultimately found to be unsupported by

probable cause" could be admissible.  However, in *United States v. Oakley*, 944 F.2d

384, 386 (7th Cir. 1991), the Seventh Circuit explained that "evidence discovered

pursuant to a warrant will be inadmissible if the warrant was secured from a

judicial officer through the use of illegally acquired information."

In *United States v. Downey*, No. 1:08-cr-134-DFH-KPF, 2009 U.S. Dist.

LEXIS 62412 (S.D. Ind. July 21, 2009), Judge Hamilton distinguished good faith

reliance on an error by a judge who issues a defective warrant, from arguing that

law enforcement officers relied, in good faith, on the validity of a warrant supported

by illegally obtained evidence.  He observed that the Fruit of the Poisonous Tree

Doctrine

> is designed to protect the core constitutional protections of the Fourth Amendment by preventing law enforcement from taking advantage of violations of Fourth Amendment rights. Allowing police officers to use information they obtain by violating the Fourth Amendment to obtain a search warrant, and then to rely on the warrant and the good faith exception, would create an enormous loophole that would put the privacy rights of all Americans at risk. Police would be free to push their way into a home over the objections of the residents, look around, question the occupants, and then call in their findings to colleagues who would only then obtain a search warrant.

*Downey* at 23-24.

### 12. Exclusion of the evidence seized in connection with Mr. Hammond's arrest.

In his report, Det. Ghiringhelli does not specify the particular means by which he was "pinging" Mr. Hammond's phone on October 30, 2017 and into the early morning of October 31, 2017, while Trooper Quick and Det. Sexton were following his directions toward Mr. Hammond's car.  Presumably, it was a further benefit of his "exigency request" to AT&T.  However, Det. Ghiringhelli was tracking Mr. Hammond's movements, it was done without the benefit of a search warrant supported by probable cause, without a court order, and without judicial knowledge or supervision.

Although the Supreme Court in *Carpenter* deferred on any questions related to the use of real-time CSLI, it is apparent that pinging a cell phone in the manner which Det. Ghiringhelli did is just as much of a search as obtaining historical CSLI.

The *Carpenter* Court expressed the concern that "when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had

attached an ankle monitor to the phone's user." *Carpenter* at 522. Det. Ghiringhelli sitting in an office in southern Michigan, receiving an update on Mr. Hammond's precise location every 15 minutes, as he traveled through Elkhart, St. Joseph and Marshall Counties in Indiana, is essentially indistinguishable from the "near perfect surveillance" that an ankle monitor would provide.

The Court in *Carpenter* noted a concern raised in an earlier case, *United States v. Jones*, 565 U.S. 400 (2012). In that case FBI agents, acting without a warrant, installed a GPS tracking device on the defendant's vehicle, and then used the device to track his movements on public streets. The case was decided on the fact that the FBI trespassed against Jones' Jeep when they installed the GPS monitor.

Chief Justice Roberts pointed out that "five Justices agreed that related privacy concerns would be raised by, for example, 'surreptitiously activating a stolen vehicle detection system' in Jones's car to track Jones himself, or conducting GPS tracking of his cell phone." *Carpenter* at 519, citing *Jones* at 426, 428, (Alito, J., concurring in judgment). "This GPS tracking of his cell phone" is exactly what Det. Ghiringdelli did to Mr. Hammond."

In *Tracey v. State*, 152 So. 3d 504 (Fla. 2014), the Supreme Court of Florida considered whether the use of real-time cell-site location information to track an individual's movements, without first obtaining a warrant supported by probable cause, violated the Fourth Amendment to the United States Constitution. The Florida Supreme Court determined that the use of real time CSLI is a search, and a

finding of probable cause is required.

The Florida Supreme Court noted that there was a division among both state and federal courts on the question.  It adopted the analysis of the Superior Court of Massachusetts in *Commonwealth v. Pitt*, 29 Mass. L. Rep. 445 (2012), on the divergence:

> The first line of cases holds that whether use of CSLI requires a warrant depends on whether the location information revealed a cell phone user's location in a public area.  Hewing closely to the distinction between the use of beeper surveillance in *Karo* versus the use of that surveillance in *Knotts*, these courts have emphasized that the Fourth Amendment offers strong protection to homes and other locations withdrawn from public view, but that a citizen has no expectation of privacy in information concerning his location in a public place.  *Therefore, under this line of cases, the government is free to obtain CSLI without a warrant, but if it does so, any information about a cell phone user's location in his home or a similar location withdrawn from public view will be subject to suppression.*
>
> The second line of cases holds that CSLI represents a serious encroachment on the Fourth Amendment rights of citizens.  Indeed, in some ways, the use of CSLI represents a truly unprecedented incursion into cell phone users' privacy interests.  *Recognizing the invasive nature of this type of surveillance, this line of cases requires the government to obtain a warrant before making use of CSLI.  On balance, this court concludes that this line of reasoning offers the closest fidelity to the purpose and spirit of the Fourth Amendment.*

*Tracey* at 518-19 (italics added by the Florida Supreme Court).

The reasoning of the cases that declined to extend the warrant requirement to real time CSLI are similar to the arguments rejected in *Carpenter,* "the Fourth Amendment protects people, not places," or the Sixth Circuit's holding that "Carpenter lacked a reasonable expectation of privacy in the location information collected by the FBI because he had shared that information with his wireless carriers" and that "cell phone users voluntarily convey cell-site data to their carriers

as 'a means of establishing communication,' the court concluded that the resulting business records are not entitled to Fourth Amendment protection." *Carpenter* at 516, 517.

Ultimately, the Florida Supreme Court held "that regardless of Tracey's location on public roads, the use of his cell site location information emanating from his cell phone in order to track him in real time was a search within the purview of the Fourth Amendment for which probable cause was required." *Tracey* at 526. Therefore, "[b]ecause probable cause did not support the search in this case, and no warrant based on probable cause authorized the use of Tracey's real time cell site location information to track him, the evidence obtained as a result of that search was subject to suppression. *Id.*

Det. Ghiringhelli would not have been able to track Mr. Hammond's movements on October 30, 2017, and into the early morning of October 31, 2017, without exploiting the illegally obtained CSLI from AT&T.  Without that information he would not have been able to direct Trooper Quick and Det. Sexton in a manner that allowed them to find Mr. Hammond on that day.  Without those officers following Mr. Hammond from the Quality Inn in South Bend to Plymouth, he would not have been arrested by Deputy Brouyette.  Mr. Hammond's arrest was the direct result of the use of illegally obtained evidence.  The search warrants that were obtained after he was arrested could not have been issued or executed without the benefit of the product of that evidence.

Additionally, independent of the illegal "exigency request" for historical

CSLI, tracking Mr. Hammond's movements in real time, by pinging his cell phone, was itself a search.  Doing so without first obtaining a warrant supported by probable cause violated the Fourth Amendment.

None of the exceptions to the exclusionary rule apply.

No independent evidence of Mr. Hammond's location on October 30, 2017, and into October 31, 2017 was ever developed.  Although he was pulled over for speeding, he would not have been tracked for hours, across three counties, without the use of illegally obtained CSLI.  Without the benefit of illegally obtained evidence, a person pulled over for driving 8 to 10 miles per hour over the speed limit on Veterans Parkway would not have been subject to a felony arrest, and search and seizure of the contents of his pockets and his car.

While it is possible Mr. Hammond could have been arrested eventually, that hypothetical future arrest was not inevitable.  It was certainly not inevitable that he would have been arrested with the same tangible objects that were seized from his person and from his car.

There was no attenuation between obtaining Mr. Hammond's CSLI, and his arrest.  Nothing like the examples described by Judge Adelman *Ivory* took place here.  Det. Ghiringhelli requested data from AT&T without a court order or warrant.  AT&T sent him the information.  He promptly began pinging Mr. Hammond's phone, and directed the Indiana officers to a place where they could arrest him.  No event or circumstance intervened to dissipate the taint of the illegally obtained information.

As in *Downey*, and the cases cited by Judge Hamilton in support of his decision on the motion to suppress in that case, the good faith rule does not give law enforcement the luxury of relying on search warrants supported by illegally obtained evidence.  The fact that *Carpenter* had not been decided at the time Mr. Hammond was arrested does not create a good faith exception for the actions of law enforcement in this matter, any more than it does for the FBI agents who obtained Timothy Carpenter's CSLI without a warrant.  Even without the *Carpenter* ruling, Det. Ghiringhelli, ISP Det. Quick, and Det. Sexton violated the Stored Communications Act and Mr. Hammond's constitutional due process right.

All of the evidence seized in connection with Mr. Hammond's arrest, described in Paragraph 7 of his Motion in Limine should be suppressed.

**13.   Officers failed to comply with Indiana law (IND. CODE § 35-33-5-12) by failing to obtain a court order prior to using real time tracking to obtain Mr. Hammond's geolocation information concerning a cellular device.**

Officers failed to comply with Indiana law prior to obtaining Mr. Hammond's cell phone geolocation information.  Ind. Code § 35-33-5-12 provides:

(a) A law enforcement officer or law enforcement agency may not use a real time tracking instrument that is capable of obtaining geolocation information concerning a cellular device or a device connected to a cellular network unless:

(1) the law enforcement officer or law enforcement agency has obtained an order issued by a court based upon a finding of probable cause to use the tracking instrument; or

(2) exigent circumstances exist that necessitate using the tracking instrument without first obtaining a court order.

(b) If a law enforcement officer or law enforcement agency uses a real time tracking instrument described in subsection (a) based upon the

existence of exigent circumstances, the law enforcement officer or law enforcement agency shall seek to obtain an order issued by a court based upon a finding of probable cause not later than seventy-two (72) hours after the initial use of the real time tracking instrument.

In this case, officers did not obtain a court order prior to obtaining and using Mr. Hammond's cell phone geolocation data. IND. CODE § 35-33-5-12 became law in 2014, well before officers illegally obtained Mr. Hammond's cell phone geolocation information. Additionally, officers claim exigent circumstances necessitated obtaining the cell phone data without a warrant or court order, a point strongly disputed by Mr. Hammond, yet the officers still failed to obtain a court order finding probable cause not later than seventy-two (72) hours. Therefore, all evidence obtained as a result of the illegally obtained cell phone geolocation data must be suppressed.

14. **Mr. Hammond's arrest during the traffic stop was not supported by probable cause.**

Even if this Court finds Mr. Hammond's cell phone geolocation information was properly obtained, this Court must still suppress all evidence obtained as a result of the traffic stop because the officers lacked probable cause to arrest Mr. Hammond during the traffic stop. First, the officer initiating the traffic stop unlawfully prolonged the purpose of the original traffic stop. Mr. Hammond was allegedly pulled over for failing to signal in a roundabout (which is not illegal) and speeding. The length of the traffic stop was unlawfully extended beyond the reasonable time necessary to issue a traffic citation for speeding. Second, the officer made a warrantless "felony" arrest at the request of other officers. No exigent circumstances warranted Mr. Hammond's arrest. Additionally, there was no

warrant for Mr. Hammond's arrest at the time Mr. Hammond was arrested.

Therefore, this is an additional basis to suppress all evidence obtained as a result of

Mr. Hammond's arrest following the traffic stop.

## Conclusion

For the reasons set forth in this Memorandum, the Motion in Limine to

Suppress Cellular Telephone Data, Location Information, and Other Evidence, filed

by the Defendant, Rex Hammond, should be granted.

Respectfully submitted,

NEWBY LEWIS KAMINSKI & JONES, LLP

By:  /s/ Nicholas T. Otis
        Nicholas T. Otis, # 27992-64
        Attorney for Defendant
        916 Lincolnway, P.O. Box 1816
        La Porte, IN  46350
        Telephone: (219) 362-1577
        NTOtis@nlkj.com

## Certificate of Service

I certify that on September 7, 2018, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Molly Donnelly; Molly.Donnelly@usdoj.gov

NEWBY LEWIS KAMINSKI & JONES, LLP

By /s/ Nicholas T. Otis
      Nicholas T. Otis