UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| vs. | ) | CAUSE NO. 3:18-CR-5 RLM-MGG |
| | ) | |
| REX HAMMOND | ) | |

OPINION AND ORDER

Defendant Rex Hammond moves to suppress certain evidence in connection to his January 10, 2018 indictment and subsequent arrest. Mr. Hammond is charged with five counts of violating the Hobbs Act, 18 U.S.C. § 1951, two counts of using, carrying and brandishing a firearm during the commission of a crime in violation of 18 U.S.C. § 924(c), and one count of being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g). The indictment alleges that these violations occurred during multiple robberies of Indiana and Michigan gas stations and at least one liquor store. A hearing on Mr. Hammond's motion to suppress was held on October 9, 2018. For the following reasons, the court denies Mr. Hammond's motion

*I. Background*

Between October 6 and 10, 2018, armed robberies were committed at convenience stores in the Indiana towns of Logansport, Peru, and Auburn, and in the Michigan towns of Portage and Kalamazoo. In each instance, the robber had roughly the same build, wore roughly the same clothes, took roughly the

same actions, and carried a handgun that was unusual because it was tan. Agent Andrew Badowski of the Bureau of Alcohol, Tobacco and Firearms called a meeting in Coldwater, Michigan of law enforcement officers who were investigating those robberies. After viewing the surveillance videos, the officers concluded that a single robber had committed all of the crimes. They also viewed surveillance videos from nearby businesses and saw what they thought might be the getaway vehicle (a light-colored mid-sized American car) and a person who they thought might have been the robber without his mask.

Each of the attending officers resumed their investigations. On the same day as the Coldwater meeting, a convenience store was robbed at gunpoint in Decatur, Indiana; another armed robbery took place two days later at a Logansport liquor store. Those robberies bore the hallmarks of the robberies discussed at the Coldwater law enforcement meeting.

Agent Badowski undertook the tracing of the firearm. During the Kalamazoo robbery, the perpetrator had set the handgun on the counter to collect money, and the cashier knocked the gun onto the cashier side of the counter; the robber fled with the money but without the gun. Agent Badowski traced the gun's serial number to the last federally licensed dealer to have it, and worked from purchaser to purchaser until, on October 28, he spoke with a man who said he had sold the gun to a man he knew only as "Rex" and was able to provide "Rex's" phone number. Agent Badowski passed that information on to Indiana State Police Detective Jacob Quick the next day, Sunday, October 29.

Detective Quick asked an Auburn police officer to run the number through a program ("Whooster") to obtain the name identified with it, and learned the number was assigned to a Rex Hammond. Detective Quick accessed motor vehicle records and got copies of Rex Hammond's most recent driver's license, and the registration for a light-colored Chrysler Concorde that the officers thought might have been the getaway car. The photograph, height and weight on Rex Hammond's driver's license was consistent with what the officers had seen in the videos. Detective Quick sent the information around to the other investigators.

Kalamazoo Police Detective Cory Ghiringhelli was one of the investigators who received the information from Detective Quick. On Monday, October 30, Detective Ghiringhelli learned from the internet that Mr. Hammond's phone number was associated with AT&T, so he asked AT&T to "ping" the phone – meaning to identify the phone's location. Detective Ghiringhelli didn't have a warrant, but asked AT&T to provide the pinging service on the basis of an exigency: the robber had been entering places of business with his finger on or just adjacent to the trigger of a handgun, had handled the handgun unsafely in the Kalamazoo robbery when he laid it on the counter, and had committed an armed robbery two days before and two days before that, suggesting the next armed robbery might be imminent. AT&T agreed to provide the service. AT&T started "pinging" Mr. Hammond's phone at about 6:00 p.m. AT&T would report the phone's location every 15 minutes.

Detective Ghiringhelli notified Detective Quick that the "ping" showed Mr. Hammond's phone first in, then moving away from, Elkhart. Detective Quick and Auburn police detective Stacy Sexton set out in separate unmarked vehicles to track Mr. Hammond's phone. After getting to South Bend, they saw Mr. Hammond's car headed southbound and pursued it, radioing for assistance as they did. Given the time of night and the frequency of the robberies, Detective Quick believed that Mr. Hammond was going to commit another one that night. Mr. Hammond turned off the highway in Marshall County (about 35 miles into the pursuit) and Detective Sexton reported that Mr. Hammond had realized he was being followed. Detective Quick radioed other officers that they had lost Mr. Hammond.

Later that evening, Patrolman Ryan Hollopeter of the Marshall County Police reported seeing the car and that he was going to stop it. By the time Detective Quick arrived, Mr. Hammond's car was parked with several Marshall County Police cars behind it. Mr. Hammond was ordered out of the car. Logansport Police Detective Tyler Preston, who had been traveling toward the reported pings arrived, told everyone on the scene that his county's prosecutor had issued an "arrest on sight" order with respect to Mr. Hammond. Mr. Hammond was taken to jail, and Detective Preston arrived the next day with an arrest warrant for Mr. Hammond on the two Logansport robberies.

Police found a gun, masks, grocery bags (the robber had a grocery bag attached to his wrist to collect the money) and other items of evidentiary value.

On January 10, 2018, the United States Attorney's office applied for a warrant under 18 U.S.C. §2703(d) for phone records from September 6 through October 31, 2017. Magistrate Judge Michael Gotsch Sr. issued the warrant.

*II. Discussion*

A. Evidence gathered from warrantless search

Mr. Hammond moved to suppress everything that flows from the "ping" information obtained from AT&T, including the items found in his car after his arrest. He also moved to suppress information acquired through the 2018 warrant for phone records. Mr. Hammond's argument is based on Carpenter v. United States, 138 S. Ct. 2206, 2221 (2018), in which the Supreme Court held that the Fourth Amendment requires a warrant for police to get certain cell phone information. See also Utah v. Strieff, 136 S. Ct. 2056 (the Constitution protects against unreasonable searches and seizures). Mr. Hammond contends that the historic data and "ping" information obtained by Detective Ghiringhelli is inadmissible because it violates the constitutional protections guaranteed to him by the Fourth Amendment. Mr. Hammond further argues that searches stemming from the use of this data are "fruit from the poisonous tree" and so should also be suppressed. Nardone v. United States, 308 U.S. 338, 341 (1939); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920).

The government doesn't dispute Mr. Hammond's argument that Carpenter v. United States applies to real time or "ping" data, as well as historical data. The government concedes that in light of Carpenter v. United States, a search

5

warrant should have been acquired before accessing the "ping" information, but points to United States v. Curtis, 901 F.3d 846 (7th Cir. 2018), in which the court of appeals held that a warrantless acquisition of the phone information can be admissible under the "good-faith" exception to the warrant requirement. In Curtis, the government conducted a search via court order pursuant to the Stored Communications Act. United States v. Curtis, 901 F.3d at 847-848. Detective Ghiringhelli's October 30 request to AT&T for "ping information" was also made pursuant to the Stored Communications Act, specifically 18 U.S.C. § 2702(c)(4):

> (c) Exceptions for disclosure of customer records. -- A provider described in subsection (a) may divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by subsection (a)(1) or (a)(2)) --
>
> * * *
>
> (4) to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency . . .

Resolution of this issue is straightforward: if Mr. Hammond's phone data was collected in a good-faith reliance on the Stored Communications Act, the evidence needn't be suppressed. United States v. Curtis, 901 F.3d at 847-848. Detective Ghiringhelli requested Mr. Hammond's historical phone data and "ping" information believing that there were exigent circumstances to do so. AT&T, an entity familiar with these types of requests, also made the determination that circumstances warranted the release of the phone data. Detective Ghiringhelli had a good faith belief that an emergency was at hand.

6

The robber thought to be Mr. Hammond had entered several places the public visits to shop and did so with his finger on (or at least adjacent to) the trigger. The timing of the previous robberies supported at least a strong possibility that another robbery would occur soon. Detective Ghiringhelli also was troubled by the video in which the robber set the handgun on the counter to collect money; Detective Ghiringhelli viewed that as unsafe handling of a firearm, which could pose a further risk to the public.

Mr. Hammond argues that no emergency existed because Detective Ghiringhelli had plenty of time to get a warrant. But a warrant wouldn't have addressed the emergency, because it wouldn't have located Mr. Hammond. Given Detective Ghiringhelli's belief that there was a strong possibility that Mr. Hammond would endanger the public soon by engaging in another armed robbery, finding Mr. Hammond was just as important as arresting him. The information Detective Ghiringhelli acquired from AT&T filled that purpose.

"Whether the exigent circumstances exception justifies warrantless action is judged by an objective standard: we ask whether it was reasonable for the police officers on the scene to believe, considering the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant." Sutterfield v. City of Milwaukee, 751 F.3d 542, 557 (7th Cir. 2014) (citing Mich. v. Tyler, 436 U.S. 499, 509 (1978)). Detective Ghiringhelli reasonably thought that he, other officers, and the public faced a compelling need to act without a warrant. A willingness to use a weapon can be one such circumstance that can compel exigency. United States v. Daws, 711 F.3d 725, 728 (citing Estate of Bing v. City

7

of Whitehall, 456 F.3d 555, 564 (6th Cir. 2006)). In United States v. Daws, the court found that officers reasonably believed that exigent circumstances existed to obtain a warrantless search when the defendant had committed armed robbery while brandishing a firearm. 711 F.3d at 728. The exigent circumstances exception isn't limited to physical searches; it applies to all types of searches and seizures under the Fourth Amendment, including searches of phone data. United States v. Banks, 884 F.3d 998, 1011-1012 (10th Cir. 2018).

Detective Ghiringhelli believed in good faith that a federal statute allowed him to act as he did, based on what he (and AT&T) believed to be an emergency, rather than obtaining a warrant. Application of an exclusionary rule is unnecessary under those circumstances. *See* United States v. Curtis, 901 F.3d at 849. Accordingly, the court needn't address the parties' arguments about whether the eventual stop of Mr. Hammond's car was sufficiently attenuated from the unconstitutional use of the "ping" information; because of the good faith exception to the warrant requirement, the "ping" information wasn't illegally obtained.

B. Indiana State Law

Mr. Hammond also contends that officers failed to comply with Ind. Code § 35-33-5-12 which requires a court order to obtain certain phone data. The statute has a built in exigent circumstances exception analogous to the Fourth Amendment jurisprudence discussed above. It is also a general view that in federal courts, "[v]iolations of state law do not justify suppression in federal

prosecutions. United States v. Castetter, 865 F.3d 977, 978-979 (7th Cir. 2016) ("federal courts do not use the exclusionary rule to enforce state-law doctrines.").

C. The Government's 18 U.S.C. § 2703(d) warrant

Mr. Hammond also contends that the government's application for the January search warrant under 18 U.S.C. § 2703(d) was defective, but he bases that argument on the application's having contained information the government obtained through the "ping" request. Because there was nothing unlawful about the "ping" request, Mr. Hammond's challenge to the January warrant can't succeed, either.

D. Traffic Stop

Mr. Hammond argues that evidence seized in connection with his traffic stop should be suppressed. He contends that the only way the stop could have been effectuated is via the information provided by Detective Ghiringhelli's warrantless search. Generally, if their officers have an "articulable and reasonable suspicion" that a traffic violation was or did occur, a stop is proper. United States v. Rodriguez-Escalera, 884 F.3d 661, 667–668 (7th Cir. 2018) (quoting Delaware v. Prouse, 440 U.S. 648, 663 (1979)).

Once Marshall County Sheriff deputies found Mr. Hammond, they took him into custody without a warrant. They had probable cause to do so, even apart from the "arrest on sight" directive from Logansport. When evaluating whether law enforcement officers have probable cause to arrest, the knowledge

9

of all the information is attributed to each of the officers. United States v. Nafzger, 974 F.2d 906, 911 (7th Cir. 1992); United States v. Williams, 672 F.3d 247, 252 (7th Cir. 2008) ("[t]here is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest – or the collective knowledge of the agency for which he works – is sufficient to constitute probable cause."). In United States v. Williams a federal drug enforcement agent requested local police to stop a vehicle even though the local police officer had no knowledge of the facts on which the underlying probable cause was based on. United States v. Williams, 672 F.3d at 253. Collectively, the officers knew that a white male had committed several armed robberies; that the 10 gun the robber had used in the earlier robberies traced back to a person named "Rex"; that "Rex's" phone number belonged to Rex Hammond; that Rex Hammond had several previous convictions for armed robberies; that the person described by Rex Hammond's driver's license was consistent with the race, height, weight, and build of the robber shown in the various videos; and that a car similar to what the videos suggested was the getaway car in the robberies was registered to Mr. Hammond. Collectively, the officers had probable cause to arrest Mr. Hammond.

But why, Mr. Hammond asks, didn't they have a warrant for his arrest by the time they stopped him? Virtually all the information giving rise to probable cause was known to the various officers before noon on October 30, leaving ample time to obtain a warrant. As already discussed, the officers and detectives had probable cause to arrest Mr. Hammond for at least some of the robberies. "[P]olice officers may constitutionally arrest an individual in a public place (e.g.,

outside) without a warrant, if they have probable cause." Haney v. City of Chicago, 702 F.3d 916, 924 (7th Cir. 2012); *quoting* Sparing v. Village of Olympia Fields, 266 F.3d 684, 688 (7th Cir.2001). They already had the authority to arrest Mr. Hammond; their time was best spent finding him so they could do so.

Even assuming arguendo that the court did not find that probable cause existed, this case presents an example of a classic *Terry* stop. Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); Jewett v. Anders, 521 F.3d 818, 823-24 (7th Cir. 2008). In Terry v. Ohio the Supreme Court "considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures." Arizona v. Johnson, 555 U.S. 323, 326, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009) (discussing Terry v. Ohio). If the officer "reasonably suspects reasonably suspects that the person apprehended is committing or has committed a criminal offense" then the investigatory stop does not violate the Fourth Amendment. Arizona v. Johnson, 555 U.S. at 326-327; Huff v. Reichert, 744 F.3d 999, 1009 (7th Cir. 2014); Courts will engage in a "fact-specific inquiry" that considers the "totality of the circumstances" to determine if reasonable suspicion existed for the investigatory stop. United States v. Tinnie, 629 F.3d 749, 751 (7th Cir. 2011).

Before officers pulled Mr. Hammond over, they were informed that he was a suspect in several alleged robberies. Police dispatch alerted on-duty officers of Mr. Hammond's potential presence in the area as well as specific information about Mr. Hammond, his vehicle, and the circumstances surrounding the

robberies. Police dispatch information can support an officer's finding of reasonable suspicion. D.Z. v. Buell, 796 F.3d 749, 754 (7th Cir. 2015); United States v. Ford, 872 F.3d 412, 415 (7th Cir. 2017) (department email alert). Officers following Mr. Hammond confirmed his license plate and were instructed by police detectives seeking Mr. Hammond that he should be arrested if pulled over. These detectives even arrived onsite soon after the traffic stop was made and directed that Mr. Hammond should be taken into custody based on various active police investigations. Considering the totality of these facts, the officers who stopped and detained Mr. Hammond had reasonable suspicion to believe he was sought in connection with the robberies he is now alleged to have committed. United States v. Tinnie, 629 F.3d at 751; Arizona v. Johnson, 555 U.S. at 326-327.

Considering the court's probable cause determination and its alternative reasonable suspicion finding, there is no basis for suppression of the events of October 30 and early October 31 or of the items found in the car Mr. Hammond was driving.

### *III. Conclusion*

For the reasons stated above, the court DENIES Mr. Hammond's motion to suppress. [Doc. No. 30].

SO ORDERED

ENTERED:  October 24, 2018

                                                           /s/ Robert L. Miller, Jr.
                                              Judge, United States District Court