1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF INDIANA
2                     SOUTH BEND DIVISION

3
    UNITED STATES OF AMERICA      CAUSE NUMBER 3:18cr00005
4
          vs.
5
    REX HAMMOND,
6                                  OCTOBER 9, 2018
            Defendant.
7

8

9                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT L. MILLER, JR.
10

11  APPEARANCES:

12

13  For the Government:    MS. MOLLY DONNELLY
                           Assistant United States Attorney
14                         204 South Main Street
                           South Bend, Indiana 46601
15

16  For the Defendant:    MR. NICHOLAS OTIS
                          Newby, Lewis, Kaminski & Jones
17                        916 Lincolnway
                          LaPorte, Indiana 46350
18

19                       *DEBRA J. BONK*
                 *Federal Certified Realtime Reporter*
20                  *United States District Court*
                  *204 South Main Street - Room 323*
21                  *South Bend, Indiana 46601*
                   *debra_bonk@innd.uscourts.gov*
22                     *574-246-8039*

23

24  *Proceedings reported in machine shorthand.  Transcript*
    *produced by Computer-Aided Transcription - ECLIPSE*
25

1                            **INDEX**

2   **ANDREW BADOWSKI**
    DIRECT EXAMINATION BY MS. DONNELLY..........PAGE    5
3   CROSS-EXAMINATION BY MR. OTIS...............PAGE   28
    REDIRECT EXAMINATION BY  MS. DONNELLY.......PAGE   37
4   RECROSS-EXAMINATION BY MR. OTIS.............PAGE   38
    **CORY GHIRINGHELLI**
5   DIRECT EXAMINATION BY MR. REILANDER.........PAGE 42
    CROSS-EXAMINATION BY MR. OTIS...............PAGE 52
6   REDIRECT EXAMINATION BY MR. REILANDER.......PAGE 60
    RECROSS-EXAMINATION BY MR. REILANDER........PAGE 61
7   **STACEY SEXTON**
    DIRECT EXAMINATION BY MS. DONNELLY.........PAGE   64
8   CROSS-EXAMINATION BY MR. OTIS...............PAGE   77
    REDIRECT EXAMINATION BY  MS. DONNELLY.......PAGE   84
9   RECROSS-EXAMINATION BY MR. OTIS.............PAGE   85
    **JACOB J. QUICK**
10  DIRECT EXAMINATION BY MS. DONNELLY.........PAGE   86
    CROSS-EXAMINATION BY MR. OTIS...............PAGE 114
11  REDIRECT EXAMINATION BY  MS. DONNELLY.......PAGE 128
    RECROSS-EXAMINATION BY MR. OTIS.............PAGE 129
12  **TYLER PRESTON**
    DIRECT EXAMINATION BY MR. REILANDER........PAGE 130
13  CROSS-EXAMINATION BY MR. OTIS...............PAGE 137
    **RYAN HOLLOPETER**
14  DIRECT EXAMINATION BY MS. DONNELLY.........PAGE 146
    CROSS-EXAMINATION BY MR. OTIS...............PAGE 160
15  REDIRECT EXAMINATION BY  MS. DONNELLY.......PAGE 166

16

17

18

19

20

21

22

23

24

25

 1          **THE COURT:**  Good morning.

 2          This is Criminal Cause 18cr00005, **United States**

 3  **versus Rex Hammond,** and we are gathered for hearing on the

 4  Defendant's motion in limine, which I think is -- I'm trying to

 5  turn on the computer as I speak, and that's not always a good

 6  idea.

 7          DeAndra, could you e-mail the IT people and find out

 8  what the password is for Miller Bench?  Apparently it's no

 9  longer my -- do you have that, Debra?

10          **(Discussion held off the record.)**

11          **THE COURT:**  Okay.  This is 18cr00005, **United States**

12  **versus Rex Hammond.**  We are gathered on the motion to suppress

13  filed by Mr. Hammond.  I have read your briefs.

14          Did the Government wish to make any kind of opening

15  statement?

16          **MS. DONNELLY:**  No, Your Honor, just a few matters,

17  first.

18          Initially, I would apologize to the Court.  After

19  filing our response, I realized it was a page beyond the local

20  rules limit, so I do apologize to the Court for that.

21          **THE COURT:**  You were responding to a 29-pager, so --

22          **MS. DONNELLY:**  And, secondly, Your Honor, both our

23  response and the initial motion discussed the 2703(d) order and

24  application.  I anticipate that that will be getting into

25  evidence for Your Honor to review in full.  It is still marked

1  as sealed so, at this point, I would just be asking that the

2  application and order both be unsealed in their entirety.

3          **THE COURT:**  Motion is granted.

4          **MS. DONNELLY:**  And, otherwise, Your Honor, I believe

5  the response lays out our position in full, such that any type

6  of opening statement is unnecessary.  I would just note that I

7  do anticipate witnesses that we will call to clarify and get

8  into further detail regarding some of the things that are

9  mentioned in the factual background.

10          **THE COURT:**  Thank you, ma'am.

11          Mr. Otis, any desire for opening comments?

12          **MR. OTIS:**  No.

13          I would just ask that we would exclude any witnesses

14 prior to the start of testimony and that I have an opportunity

15 after the Government has rested to make an argument.

16          **THE COURT:**  Sure.

17          Motion for separation of witnesses is timely made.

18 I'll have to rely on you, folks.

19          But to all those who are asked to remain outside,

20 don't discuss your testimony or anyone else's testimony until

21 after both you and that other witness have testified.

22          **(Potential witnesses exit courtroom.)**

23          **THE COURT:**  The Government may call its first

24 witness.

25          **MS. DONNELLY:**  Thank you, Your Honor.  The Government

1    first calls Andrew Badowski.

2                            **ANDREW BADOWSKI,**

3         **Government's witness, sworn and testified as follows:**

4                            **DIRECT EXAMINATION**

5    **BY MS. DONNELLY:**

6    **Q.**    Can you please state and spell your name?

7    **A.**    It's Andrew Badowski.  A-n-d-r-e-w.  Last name,

8    B-a-d-o-w-s-k-i.

9    **Q.**    Where do you work?

10   **A.**    Bureau of Alcohol, Tobacco, Firearms & Explosives.

11   **Q.**    And how long have you been with ATF?

12   **A.**    I've been a special agent with them for just over thirteen

13   years.

14   **Q.**    What do your duties as a special agent generally entail?

15   **A.**    It's mainly the enforcement of federal firearms,

16   explosives, and arson laws.

17   **Q.**    And were you working as a special agent in October of

18   2017?

19   **A.**    Yes, I was.

20   **Q.**    Drawing your attention to October 17 of 2017, were you at

21   a meeting at the DeKalb County Prosecutor's Office when a

22   series of events came to your attention?

23   **A.**    Yes.  It's a normal monthly meeting that I attend.  During

24   the meeting, different investigations are brought up for

25   everyone to collaborate together.  And, at that time, Detective

1    Jay Quick from the State Police was there and had brought up an

2    armed robbery that happened at a Speedway gas station in

3    Auburn.

4    **Q.**   And Auburn is in DeKalb County?

5    **A.**   Yes, it is.

6    **Q.**   You said Detective Quick is with the Indiana State Police.

7          That's better known as ISP?

8    **A.**   Yes.

9    **Q.**   Did you further investigate this armed robbery?

10   **A.**   Yes.  He got me the reports from that.  As we had talked,

11   discovered that there were several other armed robberies that

12   were spread out around northern Indiana and southern Michigan

13   that all seemed to be very similar in the way the robbery was

14   carried out and the subject.  There was a very distinctive

15   firearm, and the clothing was very similar in each of the

16   robberies.

17   **Q.**   Now, on October 25th, did you attend a meeting at the

18   Coldwater, Michigan Police Department?

19   **A.**   Yes.  I had called the meeting to get all of the local

20   investigators together so we could try to figure out -- since

21   this seemed to be the same person doing the robberies, to see

22   if that was actually the case and see if anyone had any

23   suspects.

24   **Q.**   And when you say, "All the local investigators,"

25   approximately how many departments from Indiana and Michigan

1    are involved that attended that meeting on October 25th?

2    **A.**    I believe, at that time, I believe it was five or six

3    different agencies.

4    **Q.**    And you mentioned various armed robberies.

5              Did the departments who were at that meeting all

6    bring surveillance video from the armed robberies that had

7    occurred in their respective jurisdictions?

8    **A.**    Yes, they did.  They brought video and also any reports or

9    other paperwork that they had been working with.

10   **Q.**    And did all of the investigators and agents there view the

11   various videos to compare the incidents?

12   **A.**    Yes.

13   **Q.**    And have you previously viewed those videos themselves, as

14   well as screen shots from those videos?

15   **A.**    Yes, I have.

16   **Q.**    I'd like to show you what's been marked as Government's

17   Exhibits 1A through E, five still shots from those videos, on

18   the ELMO screen here.

19             Now, you've previously looked at these five

20   photographs; is that correct?

21   **A.**    Yes.

22   **Q.**    And do those all truly and accurately reflect the still

23   shots of the videos as you viewed them on October 25th and have

24   viewed them since that time?

25   **A.**    Yes.

1        **MS. DONNELLY:**  Your Honor, I would seek to admit

2   Exhibits 1A through E into evidence.

3        **THE COURT:**  Any objection, Mr. Otis?

4        **MR. OTIS:**  I guess if there could just be a

5   foundation as to where these each took place.

6        **MS. DONNELLY:**  Sure.

7   **Q.**   Now, Special Agent Badowski, looking, first, at

8   Government's Exhibit 1A, the time, obviously, depicted on the

9   top is October 6th of 2017.

10       Are all five of these in chronological order?

11  **A.**   Yes, they are.

12  **Q.**   And the first one, on October 6th of 2017, was that

13  actually in Logansport, Indiana?

14  **A.**   Yes, it was.

15  **Q.**   Looking to Government's 1B, the second date on there, as

16  well, October 7th of 2017, was that one in Peru, Indiana?

17  **A.**   Yes, it was.

18  **Q.**   Looking at Government's 1C, October 9th of 2017, was that

19  in Auburn, Indiana?

20  **A.**   Yes, it was.

21  **Q.**   And then the next, Government's Exhibit 1D,

22  October 10th of 2017, at that point, is that one in Portage,

23  Michigan?

24  **A.**   Yes.

25  **Q.**   And, finally, Government Exhibit's 1E, also on

1  October 10th of 2017, was that in Kalamazoo, Michigan?

2  **A.**   Yes, it was.

3  **Q.**   And Logansport, Peru, and Auburn, those are all in the

4  Northern District of Indiana?

5  **A.**   Yes, they are.

6        **MS. DONNELLY:**   Your Honor, I would seek, at this

7  time, to admit the group exhibit.

8        **MR. OTIS:**   No objection.

9        **THE COURT:**   Without objection, Government's Exhibits

10  1A through 1E are admitted into evidence?

11  **BY MS. DONNELLY:**

12  **Q.**   Now, Special Agent Badowski, what exactly was it about

13  each of these that led you to believe that it was the same

14  person committing all of these?

15  **A.**   There were multiple reasons.  All of them, as you can tell

16  from the stills from the video, that appears to be a white

17  male.  The clothing was very similar.  He's got the gray top

18  on.  Sometimes the mask and hat would change.  Two things that

19  were very distinctive about this was that there was a tan

20  handgun used, which is not very common, and also the subject

21  wore blue shoes, so they were kind of a royal blue shoe.

22  **Q.**   Tennis shoes or dress shoes?

23  **A.**   Tennis shoes.

24  **Q.**   Was there something that the suspect brought with him, in

25  terms of how he would get the money, that was also distinctive?

1   **A.**    Yes.  We had to watch the video several times, but it

2   appeared that, each time, he would take a plastic grocery-type

3   bag and actually have it tied around his wrist so that, when he

4   went into the store, he didn't have to rely on the store just

5   giving him money or giving him a bag.  He could pull it right

6   off his wrist or up the sleeve of his shirt to pull it off for

7   the clerk to put the money in.

8   **Q.**    Now, did you learn whether the -- first, starting with the

9   Auburn robbery.  There was surveillance video that showed

10  something beyond just the suspect, the tan handgun, and the

11  other circumstances that you've described?

12  **A.**    Yes.  In Auburn, they canvassed the surrounding

13  businesses, and there was a business across the street that

14  captured video -- I can't remember.  Shortly before or after

15  the robbery -- of a vehicle driving through the parking lot.

16  **Q.**    And you saw that surveillance video or at least a still

17  shot of that surveillance video?  You've seen that previously?

18  **A.**    Yes, I have.

19  **Q.**    I'm showing you now what's been marked as Government's

20  Exhibit 2.

21          Do you recognize that photograph?

22  **A.**    Yes.  That's the still shot from the video of the business

23  across the street in Auburn.

24  **Q.**    And that was from the October 9th robbery?

25  **A.**    Yes.

1      **MS. DONNELLY:**  Your Honor, I would seek, at this

2  time, to admit Government's Exhibit 3 or -- I'm sorry -- 2.

3      **MR. OTIS:**  No objection.

4      **THE COURT:**  Without objection, Government's 2 is

5  admitted.

6  BY MS. DONNELLY:

7  **Q.**   And Special Agent Badowski, we've talked, in general,

8  about the fact that robberies happened at each of the various

9  locations we've mentioned.

10         Can you explain to the Court, generally, how each of

11  those robberies proceeded in terms of what the suspect would

12  come into each of the convenience stores and do?

13  **A.**   He was very, I guess, methodical, almost the same every

14  time.  Would walk in.  Every time, I believe, the stores were

15  empty, other than the clerks.  In one of the stores, there was

16  a customer who came in while it was happening and then walked

17  out.  But came in, approached the clerk immediately.  When he

18  went into the store, his face was already covered.  The handgun

19  was already out.  Walked up to the employee with the handgun

20  pointed at them.  And wherever they were at, if they weren't at

21  the cash register, then had them go to the cash register.

22  Money was given to them.  I believe, in some of the instances,

23  they had the clerk lay on the floor, and then the subject

24  would, after getting the money, then exit the business.

25  **Q.**   And did that all generally take, with each of the

 1  robberies, under a minute?

 2  **A.**    Yes.  It was very quick.

 3  **Q.**    Now, in Portage, Michigan, the first, that happened on

 4  October 10th, what was different about that compared to the

 5  rest of the incidents?

 6  **A.**    As far as the incident itself, there wasn't much that was

 7  different.  But while the investigators were going around and

 8  looking at videos, they, the detectives, looked at earlier

 9  videos at some of the surrounding businesses, and there was

10  actually video of a subject wearing very similar clothing to

11  the subject who did the armed robbery.  It was earlier.  I

12  believe it was less than an hour earlier.  And, at that time,

13  that subject did not have anything covering his face or his

14  head.

15  **Q.**    And -- I'm sorry -- that was the second -- was that the

16  Kalamazoo, Michigan --

17  **A.**    I'm sorry.  Yes, that was the Kalamazoo, not the Portage.

18  **Q.**    So, in Kalamazoo, from a nearby business, investigators

19  saw video of what they believed was the suspect without the

20  mask or without the mask and the hat on?

21  **A.**    Yes.

22  **Q.**    And, in Portage, had the suspect successfully completed

23  the robbery?

24  **A.**    No.  That was the difference.  In the Portage one, the

25  clerk became frightened and ran out of the store, and the video

 1  shows that then the suspect was not able to open the cash

 2  register, and then the subject just left the store.

 3  **Q.**   So, essentially, from Portage, he wasn't able to get any

 4  money; so, then, a couple hours later, the Kalamazoo robbery

 5  happened?

 6  **A.**   Yes.

 7  **Q.**   Now, you already mentioned the camera that caught the

 8  unmasked suspect or who was thought to be the unmasked suspect

 9  in Kalamazoo.

10         Have you seen still shots of that surveillance video

11  previously?

12  **A.**   Yes, I have.

13  **Q.**   And you've seen a couple different angles of that?

14  **A.**   Yes, I have.

15  **Q.**   I'm showing you now what's been previously marked.  This

16  is Government's Exhibit 4.

17         Can you identify those three photographs?

18  **A.**   Those are the photographs from the surveillance footage in

19  the parking lot of the gas station.

20         The thing that we noted about that that made it look

21  -- that we thought it was our suspect was that, one, it has the

22  dark-colored shoes.  Also, in each of the robberies, the

23  suspect was wearing blue jeans, but that in and of itself

24  wasn't something that was all that unusual.  We couldn't figure

25  out what the white -- we thought it was a white bandanna, at

 1   first, on the wrist, and then we, later, as we watched more

 2   videos, realized that it was likely a white plastic bag.

 3          The shirt that that subject is wearing, if you look

 4   in the middle photo, we're trying to figure out -- everything

 5   seems to be the same, the white logo up in the corner or on the

 6   chest of the top.  It seems as if the sleeves of the

 7   sweatshirt, or whatever it was, was rolled up.  Because we were

 8   wondering how they were, you know, same color, with the same

 9   logo, but they were shorter, with the crease in the -- what

10   would be the left arm, that they were rolled up.  But you could

11   see that there was something underneath the dark-colored -- it

12   doesn't look like just a collar.  It looks like there's

13   something, another piece of clothing around the neck.  And then

14   the white also was -- whether that was a hood or was that

15   another type of something that went around the neck.

16   Q.   And the other piece around the neck you believe

17   potentially to be the mask?

18   A.   Yes.

19   Q.   In Kalamazoo, was there, also, from the nearby business's

20   surveillance video, vehicles that were believed to possibly

21   have been the getaway car?

22   A.   Yes.

23   Q.   And you've seen those still shots previously?

24   A.   Yes, I have.

25   Q.   Showing you what's been marked as Government's Exhibit 3,

 1   is this one of the photographs from Kalamazoo of a possible

 2   suspected getaway vehicle?

 3   **A.**   Yes.  We looked at quite a few vehicles.  And from what we

 4   could, as we started to narrow down, and especially after the

 5   Auburn robbery, was that it was a mid-sized sedan, most likely

 6   an American-made one, that was light in color, whether it would

 7   be gray or a light green.  We had some differing photos and

 8   lighting and so it was hard to nail down the exact color of the

 9   vehicle.

10   **Q.**   Now, inside Kalamazoo, was there something different that

11   the clerk did that happened during that robbery?

12   **A.**   Yes.  During that robbery, the clerk was just taking money

13   from the cash register and throwing it onto the counter.  As he

14   was doing that, the money was starting to spread out.  At that

15   time, the suspect actually put the gun down onto the counter to

16   grab the money, to throw it into the bag.  As he went to grab

17   the money, the clerk went and swept the gun off of the counter

18   and onto the floor, and so, at that point, the suspect just

19   grabbed the money that he had in the bag and ran out the door

20   and did not attempt to recover the firearm.

21   **Q.**   So law enforcement that responded to that scene actually

22   recovered that tan handgun?

23   **A.**   Yes, they did.

24              **THE COURT:**  Which one was this, sir?  Where?

25              **THE WITNESS:**  That was Kalamazoo.

1        **THE COURT:**  Thank you.

2    **BY MS. DONNELLY:**

3    **Q.**    So, at the Coldwater, Michigan meeting -- you mentioned

4    the number of departments.  There's two states that are

5    involved -- was there any single lead detective or was that

6    more a collaborative effort?

7    **A.**    It was more of a collaborative effort.  We were all

8    trying -- everyone has their bosses and everything, who want

9    them to do things, and everybody has different evidence in

10   their cases, and we're still trying to determine whether it was

11   the same suspect or not.  It looked very similar, but we

12   weren't sure.

13   **Q.**    So, given that a handgun had been recovered on October

14   10th in Kalamazoo, what was the role in the investigation that

15   you took on?

16   **A.**    Originally, I came in, and I was going to help them trace

17   the firearm.  I had found out that an ATF task force officer in

18   Michigan had traced that firearm previously.  It was not a

19   traditional trace of a firearm.  It took a different path than

20   normal.  But we found the last federal firearms licensee, the

21   last gun store that purchased it was in Bremen, Indiana.  And,

22   so, from there, I got paperwork from that gun dealer and went

23   down the road of talking to the purchaser of that firearm,

24   trying to find the trail of where that firearm ended up.

25   **Q.**    And do you conduct several interviews over the course of

1   the next few days after October 25th of, first, the purchaser

2   from the federally licensed firearms dealer, who he sold it to,

3   who that person sold it to, et cetera, et cetera?

4   **A.**   Yes.

5   **Q.**   Now, as you're doing that, did two more robberies happen

6   in Indiana?

7   **A.**   Yes, they did.

8   **Q.**   And were those on October 25th in Decatur and

9   October 27th in Logansport?

10  **A.**   Yes.

11  **Q.**   Was the same person suspected of having committed those

12  robberies?

13  **A.**   Yes.  The outfit was -- I believe the top was slightly

14  different, but the way the robberies were carried out, the

15  handgun was obviously different because the suspect no longer

16  had the tan handgun.  But coming in with the bag, the way it

17  was so quick, everything like that, we believed it was the same

18  person.

19  **Q.**   And did one of those -- namely, Decatur, on

20  October 25th -- but not the other, have surveillance video?

21  **A.**   Yes, the Decatur gas station did have video.

22  **Q.**   And you viewed that surveillance video and screen shots of

23  it previously?

24  **A.**   Yes, I have.

25  **Q.**   Showing you what's been marked as Government's Exhibit 5,

1    is that photograph one of the screen shots of the Decatur,

2    October 25th, robbery?

3    **A.**    Yes.

4    **Q.**    And does it truly and accurately depict the video as

5    you've seen it?

6    **A.**    Yes.

7              **MS. DONNELLY:**  Your Honor, I'd seek to admit

8    Government's Exhibit 5.

9              **MR. OTIS:**  No objection.

10             **THE COURT:**  Without objection, Government's 5 is

11   admitted into evidence.

12   **BY MS. DONNELLY:**

13   **Q.**    Now, you mentioned some of the things.

14             But, in the picture, you can actually also see the

15   similar shoes; that there's a mask, hat, et cetera?

16   **A.**    Correct.

17   **Q.**    Now, in terms of going back to your trace of the gun

18   itself, drawing your attention -- and by "gun," I mean the

19   first gun recovered, the tan handgun.

20   **A.**    Yes.

21   **Q.**    During the Decatur and Logansport October 27th robberies,

22   what type of firearm was the suspect using during those?

23   **A.**    It was a black revolver.

24   **Q.**    Now, with the tan handgun, on October 28th of 2017, did

25   you talk to a person who said that they had sold the gun within

1    the past one or two months?

2    **A.**    Yes.

3    **Q.**    And what was the substance of that conversation?

4    **A.**    Had talked to the subject, who was several interviews into

5    it.  The subject stated that they knew someone who wanted a

6    handgun so they made contact with someone else, went down,

7    purchased a handgun, I believe the statement was, around like

8    lunchtime.  And then before end of the day, that that subject

9    had then sold it to a friend of -- a friend or acquaintance

10   that he only knew as Rex.

11   **Q.**    And did you talk to the person who sold it to a man by the

12   name of Rex?

13   **A.**    Yes.

14   **Q.**    And what, if any, other information did he give you about

15   Rex, who he had sold the tan handgun to?

16   **A.**    Gave us a phone number for Rex and how -- I asked him

17   about the phone number, and that was -- he said he had known

18   him for several months, and that's how he normally got hold of

19   him, and that is -- that was the phone that he used to call him

20   to let him know he had the gun.

21   **Q.**    And was the phone number (574)333-9522?

22   **A.**    Yes.

23   **Q.**    Did you, on the evening of October 28th, 2017, share

24   certain information from your interviews with ISP Detective

25   Quick?

1   **A.**   Yes, I did.

2   **Q.**   And can you explain what information you shared with him

3   then and then the following day what happened?

4   **A.**   I let him know that we had gotten a phone number for the

5   next purchaser and that we didn't know a location; all we had

6   was a first name and a phone number.  The next day, Detective

7   Quick had gotten with an investigator, ran the phone number

8   through a database and found out that the phone was registered

9   to a Rex Hammond.

10  **Q.**   Now, as these conversations are happening --

11  October 28th was a Saturday, and October 29, a Sunday; is that

12  right --

13  **A.**   Yes.

14  **Q.**   And Detective Quick, on that Sunday, when you talked to

15  him, again, because it was the weekend, were there certain

16  resources he had to try and run a phone number that you

17  wouldn't have had until Monday, the 30th?

18  **A.**   Yes.

19  **Q.**   So, on October 29th, you had told him the phone number,

20  and he ran the phone number and comes back to you and says, "It

21  comes back to a Rex Hammond"?

22  **A.**   Yes.

23  **Q.**   And is that late on the 29th that you get that information

24  from him, if you recall?

25  **A.**   I believe so.  I believe it was pretty late in the

1    evening.

2    **Q.**   Was there other information about Rex Hammond that

3    Detective Quick told you about?

4    **A.**   We had gotten a -- from the Rex Hammond they had run

5    through the Indiana Bureau of Motor Vehicles, we got a driver's

6    license, a photograph, and also a vehicle that was registered

7    to Mr. Hammond.

8    **Q.**   Now, you mentioned the Bureau of Motor Vehicles'

9    photograph.  I'm showing you what's been marked as Government's

10   Exhibit 6.

11           Do you recognize that photograph and what is it?

12   **A.**   That is the Indiana Bureau of Motor Vehicles' photograph

13   of Rex Hammond.

14   **Q.**   And that depicts what you saw when Detective Quick

15   provided you with the information?

16   **A.**   Yes.

17           **MS. DONNELLY:**  Your Honor, I'd seek to admit

18   Government's 6.

19           **MR. OTIS:**  No objection.

20           **THE COURT:**  Without objection, Government's 6 is

21   admitted into evidence.

22   **BY MS. DONNELLY:**

23   **Q.**   What was relevant about that photograph?

24   **A.**   Well, the photograph itself was -- the age of the

25   photograph, I believe, was a little bit earlier.  But when we

```
 1  compared this photograph to the snapshot of the video where we
 2  had the unmasked suspect with the gray goatee, the short-cut
 3  hair, the height and weight that were in the Bureau of Motor
 4  Vehicles, all seemed to be something that -- this subject did
 5  seem to match the physical description of the unmasked suspect
 6  that was possibly our suspect in the armed robberies.
 7  Q.   And was there any information from the Bureau of Motor
 8  Vehicles that Detective Quick told you about that was relevant
 9  for purposes of the investigation?
10  A.    The vehicle that was being driven.  I believe it was a
11  Chrysler.  I don't know if, at the time, it was called a
12  Concord or a 200, but it was a mid-sized American-made sedan,
13  which seemed to match the vehicles that we were suspecting in
14  the other -- a couple of the other armed robberies.
15  Q.   And when you say the Chrysler Concord, was there a
16  Chrysler Concord registered to Rex Hammond?
17  A.    Yes.
18  Q.   Now, was there anything you learned about Rex Hammond's
19  prior criminal history?
20  A.    Yes, that Mr. Hammond had several convictions in the State
21  of Indiana for armed robberies.
22  Q.   And, so, at that point, Rex Hammond you believe to have
23  been sold the gun that was used for the first five armed
24  robberies?
25  A.    Yes.
```

1   **Q.**   Now, the following day is Monday, October 30th.

2        Did Detective Quick contact you later in the day?

3   **A.**   Yes, very late in the day.  I believe it was like 10:00 at

4   night.

5   **Q.**   And was there -- at that point in time, what was Detective

6   Quick doing, in terms of the investigation?

7   **A.**   Detective Quick had gotten a phone call from Detective

8   Cory -- his last name is Ghiringhelli -- from Kalamazoo

9   Department of Public Safety up in Michigan.  Kalamazoo had

10  gotten a ping, an exigent ping from AT&T, and they had the

11  location of Mr. -- and the ping was for the phone number that

12  we associated with Mr. Hammond.  Got that located.  I believe

13  it was South Bend or Elkhart that the phone was pinging at, and

14  it was stationary.

15  **Q.**   Now, you did not actually go to either of those locations

16  on October 30th or 31st; is that correct?

17  **A.**   I did not.

18  **Q.**   Did you later learn that, in the early-morning hours of

19  October 31st, Rex Hammond was taken into custody?

20  **A.**   Yes, at a traffic stop in Plymouth, Indiana.

21  **Q.**   And did you also learn that certain items of evidence were

22  recovered from the car that he was in?

23  **A.**   Yes.  In the car that Mr. Hammond was driving, on the

24  driver's side floorboard, was a black revolver.  Also, he was

25  wearing clothing that matched the last two armed robberies, as

1   far as the jacket, the blue jeans, and the blue shoes.  And in

2   the car -- I don't remember if it was back seat or trunk -- was

3   a top that matched the same gray top with the white logo on the

4   chest and also a light-colored hat, because I believe the hat

5   that -- or mask -- it was, I believe, a hat with the top cut

6   off -- that was either -- in the car that he was wearing.

7   **Q.**   Also, a white plastic grocery bag in the car?

8   **A.**   Yes, and there were also -- one other thing, from all the

9   robberies.  The suspect was always wearing plastic gloves, not

10  so much surgical gloves -- I'd call them Subway gloves, that

11  they're the loose-fitting latex gloves -- and those were also

12  found in the car.

13  **Q.**   Now, you mentioned that Rex Hammond was arrested wearing a

14  similar outfit to the suspect in the October 25th Decatur and

15  October 27th Logansport armed robberies.

16          Have you since seen a photograph of what Mr. Hammond

17  was wearing at the time of his arrest?

18  **A.**   Yes, I have.

19  **Q.**   And is that the photograph that you have considered in

20  terms of your investigation?

21  **A.**   Yes.

22  **Q.**   Showing you what's been marked as Government's Exhibit 7,

23  what is that photograph?

24  **A.**   That is a photograph of Mr. Hammond in Marshall County.

25  Excuse me.  Before they took him into the jail, they snapped a

1   photograph of him, which has the dark blue shoes, and also the

2   gray top, which has the black strip not only on the outside of

3   the arm but also underneath the arm and down the side of the

4   body.

5          **MS. DONNELLY:**  And, Your Honor, I'd seek to admit

6   that into evidence.

7          **THE COURT:**  Any objection?

8          **MR. OTIS:**  No objection.

9          **THE COURT:**  Without objection, Government's 7 is

10  admitted into evidence.

11  **BY MS. DONNELLY:**

12  **Q.**   After Rex Hammond's arrest, did your investigation

13  continue?

14  **A.**   Yes, it did.

15  **Q.**   And did you, in fact, assist me in preparing an

16  application for a 2703(d) order?

17  **A.**   Yes, I did.

18  **Q.**   Is it your understanding that the application was

19  presented to a magistrate judge here, who issued the order on

20  January 10th of 2018?

21  **A.**   Yes.

22  **Q.**   And did you -- in fact, once the order was signed, was ATF

23  the agency that served that order on AT&T?

24  **A.**   Yes, it was, and the order was for the phone number that

25  we suspected as Rex Hammond's.

1  **Q.**   That being the (574)333-9522 number?

2  **A.**   Yes.

3  **Q.**   And that was registered to AT&T, which is why that was the

4  cell phone provider contacted, correct?

5  **A.**   Yes.

6         **MS. DONNELLY:**  Now, Your Honor, I would seek to admit

7  Government Exhibit 8, which is, first, the application and

8  then, at the back, the actual order for the 2703(d) order.

9         **MR. OTIS:**  No objection.

10        **THE COURT:**  Without objection, Government's 8 is

11  admitted into evidence.

12  **BY MS. DONNELLY:**

13  **Q.**   That order, that was for the limited period from

14  September 6th to October 31st of 2017?

15  **A.**   Yes, it was.

16  **Q.**   Why was September 6th used as the starting point?

17  **A.**   I had contacted, spoke to, I guess, more experienced

18  investigators, as far as -- excuse me -- cell phones, in my

19  office and with the FBI, and stated whatever our time frame was

20  for the crime, that to help the investigation, to go

21  approximately thirty days in front of and behind the last known

22  crimes, because that could help determine some patterns that

23  the suspects were making to see whether to exonerate them, so

24  that we're not chasing the wrong suspect, as far as patterns of

25  travel and where the phone is going, as opposed to -- you know,

1    it's an unusual pattern of -- during our time frame.

2    **Q.**   And that information is contained within the application?

3    **A.**   Yes.

4    **Q.**   Now, here, the thirty days following the final incident

5    weren't included because, at that point in time, the phone was

6    in law enforcement custody; is that right?

7    **A.**   Yes.  It would have -- if they would have waited thirty

8    days, it would have been sitting in our custody.

9    **Q.**   Now, the order, the last three pages of Government's 8,

10   the order that was served on AT&T, did AT&T, in fact, respond

11   with over a thousand pages of records?

12   **A.**   Yes.

13   **Q.**   And were those records relevant to your investigation?

14   **A.**   Very much so.

15   **Q.**   And, specifically, did those records include cell site

16   location information?

17   **A.**   Yes.

18        **MS. DONNELLY:**  Your Honor, I don't believe that I

19   have any further questions of Agent Badowski.

20        If I could have one moment?

21        Pertaining to Government's Exhibits 3 and 4, if I did

22   not do so already, I would seek, at this point, to admit those

23   into evidence.

24        **THE COURT:**  I don't believe you had offered them.

25        Any objection?

1          **MR. OTIS:**  Just one.

2          If you could, just identify, again, for the record,

3    what they were.

4          **MS. DONNELLY:**  Sure.  Sure.

5          First, showing you Government's Exhibit Number 3, the

6    Kalamazoo suspected getaway vehicle exhibits, and then

7    Government's 4 is the Kalamazoo unmasked suspect photo.

8          **MR. OTIS:**  No objection.

9          **THE COURT:**  Without objection, Government's 3 and 4

10   are admitted into evidence.

11          **MS. DONNELLY:**  And if I could have one moment,

12   Your Honor?

13          **(Discussion held out of reporter's hearing.)**

14          **MS. DONNELLY:**  Your Honor, I have no further

15   questions.

16          I would seek leave to approach the bench just to

17   tender Government's 1 through 8.

18          **THE COURT:**  You may.

19          Thank you.

20          Mr. Otis, any Cross?

21          **MR. OTIS:**  Yes.

22                      **CROSS-EXAMINATION**

23   **BY MR. OTIS:**

24   **Q.**   Agent Badowski, you testified during Direct Examination

25   that, once you obtained the driver's license photo of

1    Mr. Hammond, that was important to you because there was a

2    photo that seemed to match the same description of him in

3    Kalamazoo, Michigan around the time of the robbery; is that

4    correct?

5    **A.**    Yes.

6    **Q.**    Okay.  I noticed that you did not mention that it matched

7    the description of the armed -- I guess the surveillance videos

8    from the robbery, any of the robberies; is that correct?

9    **A.**    Correct, because the suspect is wearing a mask and a hat,

10   so it's hard to see facial features.

11   **Q.**    So you weren't able to compare -- because the individual

12   was wearing the mask, you were not able to compare photos from

13   the armed robberies to Mr. Hammond; is that correct?

14   **A.**    Correct, not for the face.

15   **Q.**    Ms. Donnelly said you helped prepare the 2703 motion or

16   request with the magistrate judge; is that correct?

17   **A.**    Yes, sir.

18   **Q.**    So where it says, "The driver's license photograph of

19   Hammond appears to match the subject captured by the security

20   camera systems during the armed robberies in Logansport

21   Indiana; Peru, Indiana; Auburn, Indiana; Portage, Michigan; and

22   Kalamazoo, Michigan," that's not accurate; is that correct?

23   **A.**    As far as the photograph, the photograph does not match

24   the suspect because we can't see his face.

25   **Q.**    So that statement in that request is not accurate,

1    correct?

2    **A.**    Not to the full extent, no.

3    **Q.**    And that was in Paragraph 12.

4          And, again, that statement is reiterated in

5    Paragraph 16, correct, "The driver's license photograph of

6    Hammond appears to match the subject captured by the security

7    camera system during the armed robbery in Decatur, Indiana."

8          You could not see the individual's face in the armed

9    robbery, correct?

10   **A.**    Correct.

11   **Q.**    So that statement is not correct either?

12   **A.**    Correct.

13   **Q.**    And Paragraph 18 of that petition, you also mentioned or,

14   I guess, the petition mentioned that Mr. Hammond was arrested

15   on October 31st, 2017, and he's been in custody; partial phone

16   records for the target phone were pinged by Kalamazoo, Michigan

17   Department of Public Safety investigators; is that correct?

18   **A.**    Yes, sir.

19   **Q.**    One of the tasks you were charged with during this

20   investigation was to look into the weapon recovered in

21   Kalamazoo, Michigan; is that correct?

22   **A.**    Yes, sir.

23   **Q.**    And that kind of sent you down talking to various

24   individuals, correct?

25   **A.**    Yes, sir.

1       **MR. OTIS:**  If I could have one minute, Your Honor?

2   **Q.**   It was determined that that weapon had last been at

3   Tactical Components in Bremen, Indiana; is that correct?

4   **A.**   That was the last firearms dealer who had the firearm?

5   **Q.**   Yes.

6   **A.**   Correct.

7   **Q.**   The last firearms dealer that had the weapon was Tactical

8   Components in Bremen, Indiana?

9   **A.**   Yes, sir.

10  **Q.**   And they had sold it to an individual named Marshall Hill;

11  is that correct?

12  **A.**   Yes, sir.

13  **Q.**   And then your investigation revealed, it appeared,

14  Mr. Hill, when he spoke with you, was very honest and

15  comfortable in talking with you and said, "I sold this to Phil

16  Sporner;" is that right?

17  **A.**   Yes.

18  **Q.**   Then, your investigation -- you spoke with Phil Sporner;

19  is that correct?

20  **A.**   Yes, I did.

21  **Q.**   And he initially denied that he had bought the weapon,

22  correct?

23  **A.**   I don't want to say he denied it.  I guess, because of the

24  age of it, he didn't realize that he had sold it.  When I

25  explained to him to, I guess, make him remember better, I mean,

1    something that happened, I believe it was, like a year ago, he

2    did say, then, he remembered selling it.  But you could call it

3    denial, if you'd like.

4    **Q.**   And then he stated he sold it to an individual he

5    identified as Tommy Maxwell; is that correct?

6    **A.**   He said, originally said, he sold it to Tommy Maxwell and

7    then corrected himself and stated that he had sold it to

8    Tommy's wife, Wendy.

9    **Q.**   And I guess that's relevant because Mr. Maxwell was on,

10   was it, federal probation; is that correct?

11   **A.**   He was just released from federal probation.

12   **Q.**   So he was a prohibited firearm owner, is that correct,

13   Tommy Maxwell?

14   **A.**   Yes.  Yes, he was then and still is.

15   **Q.**   And you interviewed Wendy Maxwell; is that correct?

16   **A.**   Yes, I did.

17   **Q.**   Now, did she deny ever owning that weapon?

18   **A.**   Yes.

19   **Q.**   How did you then determine that the last -- Todd Forsyth

20   acquired the weapon?

21   **A.**   Through the investigation, we found out -- although, you

22   had stated that Wendy denied owning that firearm -- Wendy had

23   gone to buy the firearm from Mr. Sporner, didn't like it

24   because of the size of it.  She then had, I believe, at a later

25   date, bought a different firearm from him.

```
 1              When we left the Maxwell's house, Tommy Maxwell had
 2   called his wife, and they just talked about everything that was
 3   going on, which then sparked Tommy's memory about thinking of
 4   the tan firearm.  And he had, I believe it was, a couple months
 5   earlier, gotten a call from another friend of his, asking about
 6   if he had any firearms for sale.  Told him he didn't, but knew
 7   that his wife had gone down to Phil Sporner's house and had
 8   looked at several firearms.  And there was a firearm that she
 9   looked at that she did not buy, was not sure if Mr. Sporner
10   still had that firearm or not.  And that was the end of the
11   conversation with those two.
12   Q.   And how did you learn that Todd Forsyth had acquired the
13   weapon, though?
14   A.   Mr. Maxwell had met up -- I don't recall if he met up with
15   him or just talked to him on the phone about the firearm, said
16   that investigators had been talking to him.  And when
17   Mr. Maxwell told Mr. Forsyth about what the firearm had been
18   used for and why they were investigating it, Mr. Forsyth stated
19   that he would be willing to talk to investigators.  And so,
20   then, therefore, I called and interviewed him.
21   Q.   And is Todd Forsyth a convicted felon?
22   A.   Yes, he is.
23   Q.   And in the petition that was submitted to the magistrate
24   judge, it was not referenced that this gun had passed
25   potentially through two prohibited firearms owners; is that
```

1    correct?

2    **A.**    I'd have to look.  I don't recall.

3    **Q.**    I'll show you, at the bottom of the page there where

4    Paragraph 11 starts, reference in the petition.  Let me know

5    when you've finished reading that.

6    **A.**    Okay.  Done with 11.

7              It mentions the subjects by initials only, doesn't

8    give any of their history.  I did not mention the history of --

9    **Q.**    Their criminal history?

10   **A.**    No.

11   **Q.**    Or that they were prohibited firearms owners, correct?

12   **A.**    None of the subjects I mentioned their criminal history.

13   **Q.**    And I believe it was your testimony, on 10/29/18, it was

14   learned that the phone number that Todd Forsyth provided you

15   was registered to Rex Hammond; is that correct?

16   **A.**    Yes, sir.

17   **Q.**    And just so I'm clear, you obtained the phone number from

18   Todd Forsyth?

19   **A.**    Yes.

20   **Q.**    And what day would that have been?  Was that 10/28?

21   **A.**    That was the evening of 10/28, yes.

22   **Q.**    And then you called Detective Quick at the Indiana State

23   Police and provided him with that information?

24   **A.**    Yes.

25   **Q.**    And this was over a weekend; is that fair?

1  **A.**    Yes, sir, obtained it the -- I believe the interview was

2  late in the evening, like 10:00 time, on Saturday night, and I

3  don't recall if it was immediately Saturday night or on Sunday

4  morning where I got hold of Detective Quick and let him know

5  what the phone number was.

6  **Q.**    And then he got back to you on that Sunday with the

7  information about that phone number; is that right?

8  **A.**    Yes, that Sunday evening.

9  **Q.**    And did you or Detective Quick make any attempt to obtain

10  a warrant at that point?

11  **A.**    No.

12  **Q.**    And then the following day, a detective from Kalamazoo,

13  Ghiringhelli -- I can't pronounce his name either.

14  Ghiringhelli; is that fair to say?

15  **A.**    That's close, yes.

16  **Q.**    -- he did some sort of exigency request to get cell phone

17  records; is that correct?

18  **A.**    Correct.

19  **Q.**    You didn't participate in that, correct?

20  **A.**    I did not.

21  **Q.**    To your knowledge, no warrant was obtained to get those

22  cell phone records; is that correct?

23  **A.**    Correct.

24  **Q.**    Was there anything prohibiting you, on October 30th, from

25  getting a search warrant?

1    **A.**    No.

2    **Q.**    I'm sorry.  When did Detective Quick call you about the

3    cell phone ping?

4    **A.**    I would say in the late evening of the 30th, so it would

5    have been like 10:00 at night.

6    **Q.**    I come from the Central Time Zone.

7              This is all Eastern Time, though, correct?

8    **A.**    Yes, sir.

9    **Q.**    Okay.  And, again, no warrant was obtained at that point

10   either, correct?

11   **A.**    No.

12   **Q.**    And nothing prohibited you or any other officers from

13   obtaining a warrant at that point, correct?

14   **A.**    No.  With Officer Ghiringhelli doing it, since he was

15   getting the ping, we were kind of -- as we had all been doing

16   our own thing with the investigations, he went down that path,

17   and we were leaving it up to him.

18   **Q.**    So you solely relied on him obtaining that cell phone

19   information, correct?

20   **A.**    Yes.  Since he had gotten the exigent ping, that then

21   anything that would be done, he would be following up on it.

22             **MR. OTIS:**  Pass the witness.

23             **THE COURT:**  Thank you, Mr. Otis.

24             Any Redirect, Ms. Donnelly?

25             **MS. DONNELLY:**  Just one moment, Your Honor.

1          **(Discussion held out of reporter's hearing.)**

2                    **REDIRECT EXAMINATION**

3     **BY MS. DONNELLY:**

4     **Q.**    Now, Special Agent Badowski, I think this is clear, but

5     just to be clear about it.  The records from AT&T that

6     Detective Ghiringhelli obtained are different from the AT&T

7     records that came back to ATF from the 2703(d) order; is that

8     right?

9     **A.**    Very much so.  Kalamazoo's request was very narrow to

10    their investigation.  And when -- in the 2703, when we

11    requested, it was for a larger period of time to encompass all

12    of the investigation, plus prior time to the first robbery that

13    we knew of.

14    **Q.**    And there was additional information in that order or the

15    application, rather, other than what we've just discussed on

16    the record; is that right?

17    **A.**    Correct.

18    **Q.**    From October of 2017 till the time that you assisted in

19    the preparation of that application, had you, in fact,

20    interviewed witnesses who identified Rex Hammond or said it

21    looks like Rex Hammond as the person in some of the masked

22    surveillance videos?

23    **A.**    Yes, by his -- the individuals we had talked to were going

24    by his physical appearance.

25    **Q.**    And in terms of the reference to the driver's license

1    photo of Hammond, now, there was also weight and build

2    information that appeared to match the various depicted

3    suspects in the surveillance video; is that correct?

4    **A.**    Correct.

5    **Q.**    And that matched Hammond's driver's license information?

6    **A.**    Yes, it did, with, I mean, some variation of the age of

7    the driver's license, and things can change, people's weight

8    and stuff like that.  But as far as relative heighth and

9    relative build, from the weight that was listed, it seemed to

10   match the same physical characteristics, yes.

11   **Q.**    And each of the surveillance video still shots and photos

12   you had of the suspect were all suspected to be that same one

13   unmasked person from the Kalamazoo video, right?

14   **A.**    Yes.

15   **Q.**    And that photograph matched the driver's license

16   photograph of Hammond or appeared to be similar?

17   **A.**    Yes.

18              **(Discussion held out of reporter's hearing.)**

19              **MS. DONNELLY:**  Nothing further, Your Honor.

20              **THE COURT:**  Thank you, Ms. Donnelly.

21              Any Recross, Mr. Otis?

22              **MR. OTIS:**  Quick.

23                          **RECROSS-EXAMINATION**

24   **BY MR. OTIS:**

25   **Q.**    Ms. Donnelly just asked you about the weight and build

1    information.

2            Weight and height information for Mr. Hammond seemed

3    to match what the witnesses identified; is that correct?

4    **A.**    Yes, sir.

5    **Q.**    But you didn't put that -- that was not in the petition,

6    correct?

7    **A.**    Correct.

8    **Q.**    It specifically referenced that the photograph from his

9    driver's license matched the individual in the security camera

10   footage, correct?

11   **A.**    Yes.

12   **Q.**    Were you aware of any specific Indiana laws regarding

13   court orders for real time tracking?

14           **MS. DONNELLY:**   Objection.   Relevance of the Indiana

15   orders.

16           **MR. OTIS:**   I think it goes to good faith, Your Honor,

17   and I know that the Government raised the argument in their

18   response that, in federal court, state laws don't apply.   I

19   don't agree with that, and I think that's something we'll take

20   up in argument, so I think it's relevant to his good faith of

21   complying with the law.

22           **THE COURT:**   I'm not sure when he would have been

23   complying.   You're talking about him complying with the law.

24           On what occasion?

25           **MR. OTIS:**   In using any cell phone information,

```
 1    there's a court -- Indiana Code 35-33-5-12, court order for

 2    real time tracking:  Law enforcement officer or law enforcement

 3    agency may not use a real time tracking instrument that is

 4    capable of obtaining geolocation information concerning a

 5    cellular device or a device connected to a cellular network

 6    unless:  The law enforcement officer or law enforcement agency

 7    has obtained an order issued by a court based upon a finding of

 8    probable cause to use the tracking instrument, or exigent

 9    circumstances exist that necessitate using the tracking

10    instrument without first obtaining a court order.

11         THE COURT:  Okay.  And I'm not sure how that would

12    affect the good faith, because -- help me out, how that would

13    affect the good faith argument.

14         MR. OTIS:  Well, their argument is that, at the time

15    that all of this happened, Carpenter had not been decided, the

16    U.S. Supreme Court case that was in June of 2018, and there's a

17    Seventh Circuit case, Curtis, that came down after Carpenter

18    that talks about good faith because, at the time, the statute

19    had not been ruled unconstitutional.  But this state law is a

20    law that is applicable to officers, and I'm asking if he was

21    aware of it and had to follow it.

22         THE COURT:  I'm going to allow the question, largely

23    because we're spending more time addressing the question than

24    it would take for him to answer it.

25         You may answer, sir.
```

1  BY MR. OTIS:

2  **Q.**    I guess, were you aware of that statute?

3  **A.**    After the fact, yes.  I had spoken to Detective Quick

4  about it.

5  **Q.**    At the time, you were not?  When you say, "After the

6  fact," after the fact of what?

7  **A.**    After the fact that he had told me that they had gotten

8  the ping, we had discussed -- because we discussed -- I thought

9  he had gotten the ping, and he said he did not, that Kalamazoo

10  had gotten the ping, and so I asked him about, you know,

11  obtaining the ping and what they had done, and they were,

12  again, relying on just the detectives up in Kalamazoo.  They

13  were following whatever they were supposed to follow up in

14  Michigan.

15  **Q.**    And at the time that the ping and the cell phone

16  information for Mr. Hammond was obtained, there had been no

17  forensic evidence identifying Rex Hammond; is that correct?

18  **A.**    Correct.

19  **Q.**    And no eyewitnesses identifying Rex Hammond; is that

20  correct?

21  **A.**    (No response.)

22  **Q.**    None of the people at the robberies identified --

23  specifically identified Rex Hammond, correct?

24  **A.**    No, none of the suspects at the robberies or -- I'm

25  sorry -- the victims at the robberies had identified him.

```
 1              MR. OTIS:  Pass the witness.

 2              THE COURT:  Thank you, sir.

 3         You may step down, Agent.  Thank you.

 4              THE WITNESS:  Thank you.

 5              (Witness excused.)

 6              MS. DONNELLY:  And, Your Honor, we will call our next

 7    witness.

 8              Typically, I would ask Special Agent Badowski to

 9    remain in the room, since he was the lead investigator on the

10    case.  Given the motion to exclude, I would just ask the Court

11    and counsel whether that's okay or whether --

12              THE COURT:  I think you're free to designate one.

13              MR. OTIS:  Yeah, I think they're allowed to have one

14    person in the room.

15              THE COURT:  That's your one person.

16              MS. DONNELLY:  Thank you, Your Honor.

17                        CORY GHIRINGHELLI,

18         Government's witness, sworn and testified as follows:

19                        DIRECT EXAMINATION

20    BY MR. REILANDER:

21    Q.   Would you, please, state your name and spell your name for

22    the record?

23    A.   Cory Ghiringhelli.  First name is C-o-r-y.  Last name,

24    G-h-i-r-i-n-g-h-e-l-l-i.

25    Q.   And what do you do for a living?
```

1    **A.**    I'm sorry?

2    **Q.**    What do you do for a living?

3    **A.**    I'm a detective employed by the Kalamazoo Department of

4    Public Safety in Kalamazoo, Michigan.

5    **Q.**    And how long have you been with that law enforcement

6    agency?

7    **A.**    Just over twenty years, about twenty years and six months.

8    **Q.**    What are your duties in that capacity?

9    **A.**    Currently, I'm assigned to the Major Crimes Division.  We

10   investigate major crimes such as:  Homicides, armed robberies,

11   bank robberies, kidnappings.

12   **Q.**    Were you acting as an investigator in that capacity in

13   October of 2017?

14   **A.**    Yes, I was.

15   **Q.**    Turn your attention to October 10 of 2017.

16          Was there a robbery at a location in your Kalamazoo

17   jurisdiction?

18   **A.**    Yes, there was.

19   **Q.**    Did you start investigating that robbery?

20   **A.**    I was -- so the incident happened on October 10th, 2017.

21   I was assigned the investigation the morning of October 11th.

22   So, the following morning, I began.

23   **Q.**    Real briefly, what happened in that robbery?

24   **A.**    A white male entered the business, which is a party store

25   just outside of Western University Michigan's campus.  The

| | |
|---|---|
| 1 | subject displayed a gun, demanded money from the clerk, and the |
| 2 | subject set the gun down on the counter of the business.  And, |
| 3 | after doing so, the clerk, who was behind the register, grabbed |
| 4 | the plastic mat that was on the counter and pulled the mat |
| 5 | backwards towards the clerk and subsequently pulled the gun |
| 6 | behind the counter.  The person that entered -- the suspect |
| 7 | that entered the store left the store with money in hand and |
| 8 | fled on foot. |
| 9 | **Q.**   Was the gun in that robbery recovered by your agency? |
| 10 | **A.**   Yes, it was. |
| 11 | **Q.**   Sometime after that, did you become aware that there were |
| 12 | other robberies in the Indiana/Michigan area that seemed to be |
| 13 | similar to the one that had occurred? |
| 14 | **A.**   Yes.  I was made aware of that, yes. |
| 15 | **Q.**   And, so, were you in attendance at a meeting on |
| 16 | October 25, 2017, in Coldwater, Michigan? |
| 17 | **A.**   Yes, I was. |
| 18 | **Q.**   What was the purpose of that meeting? |
| 19 | **A.**   It was to get together with the different jurisdictions |
| 20 | that had had armed robberies occur in their jurisdiction which |
| 21 | all appeared to be similar.  And based on video and |
| 22 | surveillance photos, it appeared to be the same suspect |
| 23 | involved in each case. |
| 24 | **Q.**   Did all law enforcement agencies share that information? |
| 25 | **A.**   Yes.  There was a meeting to share the reports and any |

1   other information that the investigating officers or detectives

2   had.

3   **Q.**   And by that time, did you have reason to think that the

4   suspect was the same in all these different robberies?

5   **A.**   Yes.

6   **Q.**   And what was the reason to think so?

7   **A.**   Based on surveillance video and still images from each

8   robbery.

9   **Q.**   Is that the look of the robber and what he was wearing?

10  **A.**   Yes.  He appeared to be wearing the same clothing during

11  all of the robberies, except the one that happened the morning

12  of the 25th.  The shoes matched the prior one, but just not the

13  other clothing.

14  **Q.**   By October 30th, were you sent additional information

15  regarding a possible identity to that suspect?

16  **A.**   Yes, I was.

17  **Q.**   And how did you get that information and what was that

18  information?

19  **A.**   So, during -- from, I guess, October 11th up until

20  October 30th, I had had e-mail and telephone correspondence

21  with detectives from Indiana, an agent from the ATF.  And the

22  information identifying our suspect came over the weekend.  I

23  believe it came the evening of the 28th, which was a Saturday.

24  It either came the 28th or 29th.  It was that weekend.  So, I

25  had been in phone and e-mail correspondence, and that's how I

1    received the information.

2    **Q.**   Who was the -- what was the identity of the suspect that

3    you had gotten?

4    **A.**   The person was identified as Rex Evan Hammond.

5    **Q.**   Now, were you provided information that Mr. Hammond had

6    previous armed robbery convictions?

7    **A.**   Yes, I was made aware that he had five prior armed robbery

8    convictions.

9    **Q.**   Were you made aware that Mr. Hammond had been identified

10   based on DMV information --

11   **A.**   Yes.

12   **Q.**   -- Bureau of Motor Vehicle information?

13   **A.**   Yes.

14   **Q.**   And what was that, in particular?

15   **A.**   I was provided with that image, also, and that image

16   appeared to match the photos from other surveillance to include

17   the Kalamazoo robbery.

18   **Q.**   The image you're referring to, is that an image from the

19   BMV paperwork associated with Mr. Hammond?

20   **A.**   Yes, from the State of Indiana.

21   **Q.**   Were you provided information that appeared Mr. Hammond

22   had been the last purchaser of that gun recovered in the

23   Kalamazoo robbery?

24   **A.**   That is correct, yes.

25   **Q.**   At this point, in your mind, did you have probable cause

1   to arrest Mr. Hammond, if he had been located in Michigan?

2   **A.**   Yes.

3           **MR. OTIS:**  Objection.  Legal conclusion.

4           **THE COURT:**  No, I'll allow the question as to what he

5   believed.  Obviously, whether probable cause existed would be

6   my call, but I think what he believed would be pertinent, as

7   well.

8   **BY MR. REILANDER:**

9   **Q.**   Can you explain?

10  **A.**   Yes, I did believe that, if we had located him in

11  Michigan, we would have arrested him on probable cause for the

12  armed robbery -- two armed robberies, the one that occurred in

13  Portage, Michigan, and the one that occurred in Kalamazoo,

14  Michigan.

15  **Q.**   And just for the record, did that Portage robbery occur

16  also on October 10, 2017?

17  **A.**   Yes.  Yes, it did.

18  **Q.**   Was that the same day as the Kalamazoo robbery that you

19  were primarily investigating?

20  **A.**   Yes.

21  **Q.**   Did that occur earlier in the day before the Kalamazoo

22  robbery?

23  **A.**   Yeah, I believe it was an hour-and-a-half to two hours

24  prior.

25  **Q.**   So, by October 30th -- this was a Monday, correct?

1   **A.**   Yes, it was.

2   **Q.**   And you had an identity of Mr. Hammond and his phone

3   number at that time; is that correct?

4   **A.**   Yes.  Yes, we did.

5   **Q.**   What did you then do with that information yourself?

6   **A.**   I received the phone number.  I logged onto a website,

7   phonefinder.net, and that identified a phone carrier.  You can

8   plug in the phone number, and it will identify the carrier for

9   a phone.  I verified that the number was registered through

10  AT&T.  I then contacted AT&T to request an exigency request for

11  phone records dated back to October 7th, and then I also

12  requested AT&T to ping the phone.

13  **Q.**   Why did you think that there was exigency in this case?

14  **A.**   Well, based on the Kalamazoo robbery, the suspect had

15  entered the store with a loaded weapon, was very careless, left

16  the gun on the counter.  The gun was recovered.

17          And then after that, after that robbery on the 10th,

18  there were additional robberies that occurred in the State of

19  Indiana.  There was one that occurred on the 25th of October,

20  the day that we had the meeting, and it was in one of those

21  robberies where I had seen video and/or still images where

22  Mr. Hammond had entered the business, pointed the gun at the

23  clerk at the business, and I recall his finger was either on

24  the trigger or just off the trigger of the gun.  And there had

25  been some delay.

```
 1                So that robbery happened.  Then there was a few days
 2   where there were no robberies occurring.  It was believed that
 3   he was going to commit another robbery in the very near future.
 4   I felt that the general public was in danger with Mr. Hammond
 5   out.
 6   Q.   Did you make that exigency request on Monday,
 7   October 30th?
 8   A.   Yes, I did.
 9   Q.   Where were you at when you made that request?
10   A.   In my office at the Kalamazoo Department of Public Safety.
11   Q.   Tell us then what happened later that day with regard to
12   that request.
13   A.   So, I contacted AT&T.  And then shortly after contacting
14   AT&T to make the exigency request, I received the phone records
15   back from AT&T.  Like I said, I had requested the records back
16   to October 7th.  I immediately looked at the phone records
17   pertaining to October 10th, which was the Portage and Kalamazoo
18   robberies, and I was immediately able to place Mr. Hammond's
19   phone within the vicinity of each robbery at the time that each
20   robbery was committed.
21   Q.   Did you, on October 30th, start receiving ping information
22   from AT&T?
23   A.   I did, yes.
24   Q.   Can you describe what happened?
25   A.   So, I started receiving the pings via e-mail.  I believe
```

1    they came in every fifteen minutes.  And the ping information

2    would provide a latitude and longitude, and it would also

3    provide an accuracy of the ping, as in the distance, and the

4    distance would be in meters.

5    **Q.**   Now, latitude and longitude, would that be the location of

6    the cell phone tower that the cell phone was pinging off of,

7    based on your understanding?

8    **A.**   Yes.  Well, it would provide -- it would provide the

9    location of the device, and then the distance would be from the

10   cell phone towers.

11   **Q.**   I see.

12        Okay.  So, when you were receiving this ping

13   information, were you sharing that ping information with

14   anybody else?

15   **A.**   Yes, I was.

16   **Q.**   And who, in particular?

17   **A.**   I would -- once I received a ping, I would immediately

18   e-mail it to Detective Jay Quick from the Indiana State Police.

19   **Q.**   Were you in contact with Detective Quick throughout the

20   rest of Monday, October 30th?

21   **A.**   Yes, I was.

22   **Q.**   And, in particular, did you share with him, at one point,

23   that there was a ping in Elkhart?

24   **A.**   Yes, I did.

25   **Q.**   And, then, did you share with him pings moving away from

1   Elkhart?

2   **A.**    Yes.

3   **Q.**    And did you share with him a ping with a target being in

4   South Bend?

5   **A.**    Yes.

6   **Q.**    Were you later informed, I guess, the next morning, early

7   the next morning, October 31st, they had located somebody, that

8   they had stopped somebody?

9   **A.**    Yes.  I was notified, yes.

10  **Q.**    And was that Detective Quick that informed you of that?

11  **A.**    Yes.

12  **Q.**    And what did he say?

13  **A.**    I was notified that a traffic stop was done, that

14  Mr. Hammond was driving a vehicle, that a white plastic bag was

15  inside the vehicle, and there was also a firearm located within

16  the vehicle, and there was also a female who was also present

17  inside the vehicle.

18           **MR. REILANDER:**  One moment, Your Honor.

19           **(Discussion held out of reporter's hearing.)**

20  **BY MR. REILANDER:**

21  **Q.**    Going back to the timing of the pings, can you just

22  explain more what the timing was for when you were receiving

23  pings and what they responded to?

24  **A.**    The pings would come in, I believe it was, every fifteen

25  minutes from the time that I had first requested them.  So once

1   I would receive an e-mail with that ping information, I would

2   forward that e-mail on to Detective Quick.  And, then,

3   subsequently, another ping would come in fifteen minutes later,

4   and I would share that e-mail, also.

5   **Q.**   To the best of your understanding, when that ping

6   information would come on your e-mail, would that show a ping

7   on the cell phone tower near or shortly before that e-mail?

8   **A.**   I believe it was supposed to be the time.  They would come

9   every fifteen minutes.  I don't know if there was a delay that

10  they would send it to me.  But as soon as I received it, I

11  would forward it on, so I don't know how much of a delay there

12  was in between AT&T pinging the phone and then putting together

13  the e-mail to send it to me.

14  **Q.**   The exigency request that you make to AT&T, is it your

15  understanding that AT&T then has to agree whether there's

16  exigency there in order to give you that information?

17  **A.**   Yes, they do.

18          **MR. REILANDER:**  Nothing further, Your Honor.

19          **THE COURT:**  Thank you, Mr. Reilander.

20          Any Cross, Mr. Otis?

21          **MR. OTIS:**  Yes.

22                          **CROSS-EXAMINATION**

23  **BY MR. OTIS:**

24  **Q.**   Can you pronounce your last name?  I don't want to butcher

25  it.

1    **A.**    Ghiringhelli.

2    **Q.**    Ghiringhelli.

3             Detective Ghiringhelli, you work at, is it, Kalamazoo

4    County or Kalamazoo -- what department do you work for?

5    **A.**    It's the City of Kalamazoo Department of Public Safety.

6    **Q.**    Is that also in Kalamazoo County?

7    **A.**    I'm sorry?

8    **Q.**    Is that also Kalamazoo County or what county is that?

9    **A.**    It is Kalamazoo County, yes.

10   **Q.**    But you work for Kalamazoo City Police Department?

11   **A.**    That is correct.

12   **Q.**    So your jurisdiction is the City of Kalamazoo, correct?

13   **A.**    We're also sworn throughout the county, also, but my

14   primary duties are in the city.

15   **Q.**    So you became involved after the October 10th, 2017,

16   robbery in Kalamazoo, correct?

17   **A.**    That is correct, yes.

18   **Q.**    And there was also a robbery that you suspected the same

19   individual had committed in Portage, Michigan, on October 10th,

20   as well, correct?

21   **A.**    That's correct.

22   **Q.**    Which one was first that night?

23   **A.**    Portage.

24   **Q.**    And how far is Portage, Michigan from Kalamazoo?

25   **A.**    It's the southern suburb of Kalamazoo city, so the

1    jurisdictions, they connect.

2    **Q.**    Same county?

3    **A.**    I'm sorry?

4    **Q.**    Same county?

5    **A.**    Yes.

6    **Q.**    How far a drive would that be?

7    **A.**    From downtown Kalamazoo?

8    **Q.**    From Portage to Kalamazoo, how far is that?

9    **A.**    I mean, they connect.  There's several streets that one

10   side of the road is Portage and the other side is Kalamazoo

11   city, so --

12   **Q.**    After those two robberies, no robberies happened in your

13   jurisdiction, and then you had -- you had a meeting on

14   October 25th, correct, in Coldwater, Michigan?

15   **A.**    Yes.

16   **Q.**    And there were no robberies in your jurisdiction between

17   October 10th and October 25th, correct?

18   **A.**    Not that we believed attributed to the same person.

19   **Q.**    And between October 10th and October 25th, your

20   investigation -- you had investigated, I believe, four other

21   individuals, potential suspects in that crime; is that correct?

22   **A.**    That sounds about right, yeah.  Yes.

23   **Q.**    And one reason or another, you ruled them out, based off

24   of an alibi or working?  I think one was at your correctional

25   facility or something like that; is that correct?

**A.**    Yes; that's correct.

**Q.**    Over the weekend then of, I guess that would be -- you weren't sure if it was the 28th or 29th, but an ATF agent provided information to you about a phone number for an individual identified as Rex Hammond; is that correct?

**A.**    That's correct.

**Q.**    And that agent had been investigating the path of the weapon that had been recovered at the Kalamazoo robbery; is that correct?

**A.**    Yes.

**Q.**    You weren't involved in the investigation of the individuals that had owned that weapon, correct?

**A.**    No, I was not.

**Q.**    You didn't interview any of the witnesses, correct?

**A.**    I did not.

**Q.**    So you had to rely solely on what the ATF agent told you about that, correct?

**A.**    Yes.

**Q.**    You didn't make an independent investigation of those witnesses, correct?

**A.**    I did not.

**Q.**    You were asked on Direct Examination that you had developed probable cause to arrest Rex Hammond, correct?

**A.**    Yes.

**Q.**    What specific facts do you rely on to support that you had

1    probable cause to arrest Rex Hammond?

2    **A.**   Well, the information, Mr. Hammond was the last known

3    person to own the firearm that was recovered in Kalamazoo.  We

4    subsequently obtained a driver's license image.  The driver's

5    license image was very consistent, matched the images from

6    surveillance video from a Kalamazoo robbery.

7            I also learned that Mr. Hammond had, I believe it was

8    -- a silver-colored Buick was the initial information, I

9    believe, and that matched a vehicle -- a vehicle that was seen

10   on the surveillance video from the Kalamazoo robbery.  And then

11   once I did the exigency request, the phone records solidified

12   that.

13           Excuse me.  The phone records -- I was able to place

14   Mr. Hammond within the vicinity of the Portage robbery when it

15   occurred and the Kalamazoo robbery, so that solidified the

16   probable cause to arrest him.

17   **Q.**   So you identified, just to recap, four things?  The last

18   known person to own the gun was Rex Hammond, correct?

19   **A.**   Yes.

20   **Q.**   The driver's license image for Rex Hammond matched the

21   description of an individual, I guess, from the security

22   footage near the Kalamazoo robbery, correct?

23   **A.**   Yes.

24   **Q.**   Mr. Hammond's vehicle seemed to match the description of

25   the vehicle in the Kalamazoo robbery, correct?

1   **A.**   Yes.

2   **Q.**   And, then, fourth, the phone records that you obtained, I

3   guess, your words, solidified for you the probable cause; is

4   that correct?

5   **A.**   Yes.

6   **Q.**   Prior to obtaining the cell phone records, did you have

7   probable cause?

8   **A.**   I believe so, yes, based on the images, we were able to,

9   from the driver's license image and the vehicle information.

10  **Q.**   I'm sorry.  The driver's license -- I'm sorry.  Strike

11  that.

12          The last known person to own the gun was identified

13  as Rex Hammond, correct?

14  **A.**   Yes.

15  **Q.**   That was one thing, driver's license image and Rex

16  Hammond's vehicle?  You learned all that information from Agent

17  Badowski from the ATF, correct?

18  **A.**   Yes.

19  **Q.**   And that was on October 28th, correct?

20  **A.**   I believe it was on that Saturday, the 28th, yes.

21  **Q.**   You ever obtain arrest warrants or search warrants over

22  the weekend?

23  **A.**   Yes.

24  **Q.**   Nothing prohibited you, on October 28th or 29th, from

25  obtaining a search warrant or arrest warrant in this matter,

1    did it?

2    **A.**    I was actually in Indianapolis, Indiana for a soccer

3    tournament.  My daughter plays travel soccer, and I was out of

4    town that weekend.

5    **Q.**    Could you have obtained a telephonic warrant at that

6    point?

7    **A.**    I have never done that before.

8    **Q.**    Could you have had another officer obtain that warrant for

9    you?

10   **A.**    Actually, we have not obtained an arrest warrant over the

11   weekend because there's no way, in our jurisdiction, that the

12   warrant could be entered into LEIN, so I don't believe that we

13   could have obtained an arrest warrant for Mr. Hammond.

14   **Q.**    Now, he was arrested late, I guess, late Monday night into

15   Tuesday morning, correct?

16   **A.**    Yes.

17   **Q.**    Did anything prohibit you from obtaining a search warrant

18   or an arrest warrant on Monday, October 30th?

19   **A.**    No.  I would not have been able to obtain all the

20   information that I gathered, though, from the exigency request.

21   I would not have been -- I would not have been able to obtain

22   the phone records that placed Mr. Hammond at the scene of each

23   robbery within that time frame.

24   **Q.**    Prior to obtaining the cell phone records, you believed

25   you had probable cause, at that point, correct?

**A.**    Yes.

**Q.**    And nothing would have prohibited you from going to the judge on that Monday and asking for a search warrant for the cell phone records, correct?

**A.**    I could have done that.  I would not have received the results, depending on the carrier.  Some carriers can take days.  Some can take up to two weeks.

**Q.**    You made the request for the cell phone records to AT&T on October 30th, correct?

**A.**    Yes.

**Q.**    And obtained them that day, correct?

**A.**    Yes.

**Q.**    In the Government's response, they identify that you sought the cell phone records under -- let me make sure I've got this right here -- Section 2702(c)(4), which provides that a cell phone provider may provide, in good faith, if it believes that an emergency involving danger of death or serious injury to any person requires disclosure without delay of information relating to the emergency.

            Is that the statute under which you sought the cell phone records?

**A.**    That language would be consistent on why I sought them, yes.

**Q.**    Okay.  Did you have any specific information regarding danger of death when you sought the cell phone records?

 1   **A.**   Specific information, no.

 2   **Q.**   You had no specific information that somebody would be

 3   seriously -- serious physical injury, correct?

 4   **A.**   No specific information, no.

 5   **Q.**   And you had no specific information regarding an exigent

 6   circumstance, correct?

 7   **A.**   I believed that there was an exigent circumstance at the

 8   time.

 9   **Q.**   But you didn't leave your daughter's soccer tournament

10   that weekend, correct?

11   **A.**   Correct.

12         **MR. OTIS:**   No further questions.

13         **THE COURT:**   Thank you, Mr. Otis.

14         Mr. Reilander, any Redirect?

15         **MR. REILANDER:**   Briefly.

16                     **REDIRECT EXAMINATION**

17   **BY MR. REILANDER:**

18   **Q.**   You were asked about the information you had to base a

19   probable cause decision before you made the exigency request.

20         Did you also know at that time that Mr. Hammond had a

21   record of five previous criminal robbery convictions?

22   **A.**   I did, yes.

23   **Q.**   And you were just asked about the reasons for making that

24   exigency request.

25         Can you explain why you made that exigency request?

1   **A.**    It was my belief that the general public was in danger

2   with Mr. Hammond not in custody, and that goes to, at the

3   Kalamazoo robbery, he entered the business with a loaded

4   weapon, was reckless during that incident and set the gun down

5   on the counter, which was subsequently recovered.  There had

6   been additional robberies after that in the State of Indiana

7   where Mr. Hammond pointed the weapon at a clerk, and his finger

8   was either on or right near the trigger of the weapon.  And it

9   was obvious that, since the Kalamazoo robbery on the 10th,

10  those subsequent robberies, Mr. Hammond had access to obtain

11  another weapon because he was armed in those additional

12  robberies.

13          **MR. REILANDER:**  One moment, Your Honor?

14          **(Discussion held out of reporter's hearing.)**

15          **MR. REILANDER:**  Nothing further.

16          **THE COURT:**  Thank you, sir.

17          Any Recross, Mr. Otis?

18          **MR. OTIS:**  Real Quick.

19                      **RECROSS-EXAMINATION**

20  BY MR. OTIS:

21  **Q.**    I apologize.  I didn't ask you this on Direct.

22          You had indicated that you were getting pings every

23  fifteen minutes on October 30th, 2017, correct?

24  **A.**    I believe that's what the frequency was, yes.

25  **Q.**    When did you start receiving those pings?

1   **A.**   I don't have the time.  I know I have an e-mail with -- at

2   least one of the pings that came in was 18:09, so 6:09 p.m.,

3   but I don't know the time that the very first one came in.

4   **Q.**   You recall that it could have been earlier, but you recall

5   6:09 p.m., correct?

6   **A.**   I have that saved in my e-mail.  I requested the records.

7   AT&T responded to me at, I believe it was, between 4:15 and

8   4:22 p.m. that day with historical records and the account

9   information because I immediately forwarded that information

10   on.

11   **Q.**   How many pings, roughly, did you receive that day for

12   Mr. Hammond's cell phone?

13   **A.**   I guess, just to be safe, if it did start -- I have the

14   record of the one at 6:09, and it went just after midnight

15   sometime, so they were every fifteen minutes.

16   **Q.**   So about twenty-five, approximately, pings?

17   **A.**   At least, yes.

18   **Q.**   And, again, during this time, you did not attempt to

19   obtain a search warrant or an arrest warrant for Mr. Hammond,

20   correct?

21   **A.**   That's correct.

22   **Q.**   You had indicated that, on Monday, October 30th, I think,

23   you relayed this information to Detective Quick at the Indiana

24   State Police?

25   **A.**   I'm sorry.  What information?

1  **Q.**   Yeah, that wasn't a very good question.

2        You contacted Detective Quick on Monday,

3  October 30th, correct?

4  **A.**   Yes.

5  **Q.**   Regarding the cell phone pings?

6  **A.**   Yes.

7  **Q.**   Do you know if Detective Quick obtained -- also obtained

8  the cell phone records or were you forwarding them to him?

9  **A.**   I received the phone records to my e-mail, and then I

10  forwarded that information to several detectives.

11  **Q.**   Did you also forward that information to Detective Tyler

12  Preston at Logansport?

13  **A.**   I would have to look at my e-mail to verify if he was on

14  that list or not.

15        **MR. OTIS:**  No further questions.

16        **THE COURT:**  Thank you, sir.

17        Any Further Redirect based on that?

18        **MR. REILANDER:**  No, Your Honor.

19        **THE COURT:**  You may temp down, Detective

20  Ghiringhelli.  Thank you.

21        **THE WITNESS:**  Thank you.

22        **(Witness excused.)**

23        **THE COURT:**  Why don't we go ahead and take the

24  morning break of about fifteen minutes so that Mr. Hammond can

25  get downstairs and back with the marshals, so I will see you in

```
 1  fifteen minutes.

 2              You have four more left; is that right?

 3         MS. DONNELLY:  That's correct, Your Honor.

 4         LAW CLERK:  All rise.

 5         (All comply; short recess taken.)

 6         THE COURT:  The Government may call its next witness.

 7         MS. DONNELLY:  The Government, next, calls Stacey

 8  Sexton.

 9                         STACEY SEXTON,

10     Government's witness, sworn and testified as follows:

11                        DIRECT EXAMINATION

12  BY MS. DONNELLY:

13  Q.   Can you, please, state and spell your name?

14  A.   Stacey, S-t-a-c-e-y, Sexton, S-e-x-t-o-n.

15  Q.   And where do you work?

16  A.   Auburn Police Department.

17  Q.   How long have you been with the Auburn Police Department?

18  A.   Twenty years.

19  Q.   What's your position there, currently?

20  A.   I'm a detective.

21  Q.   And what do some of the cases that you handle as a

22  detective include?

23  A.   We handle major crimes, such as:  Sexual assault,

24  molestations, death investigations, burglaries, thefts, armed

25  robberies.
```

1  **Q.**   Were you working as a detective in October of 2017?

2  **A.**   Yes, I was.

3  **Q.**   And were you assisting Detective Quick with an

4  investigation of a robbery that happened at a Speedway gas

5  station in Auburn on October 9th of 2017?

6  **A.**   Yes, I was.

7  **Q.**   Now you're with the Auburn Police Department.  Detective

8  Quick is with the Indiana State Police.

9        How often do you two, generally speaking, speak to or

10  see each other?

11  **A.**   Every day, except for his days off.  We share an office

12  together.

13  **Q.**   Now, for the Auburn robbery, now, in addition to having

14  surveillance video inside the store for that robbery, was there

15  also information about how the suspect for that robbery fled

16  from the scene?

17  **A.**   Yes, I believe so.

18  **Q.**   And was that specifically a suspected vehicle captured on

19  nearby business video?

20  **A.**   Yes.

21  **Q.**   Now, on October 25th of 2017, did you attend a meeting in

22  Coldwater, Michigan, with multiple other law informant

23  agencies?

24  **A.**   Yes, I did.

25  **Q.**   And during that meeting, did you participate with the

1   other agencies, in terms of sharing other information, on your

2   shared -- what was suspected to be a shared suspect?

3   **A.**   Yes, we did.

4   **Q.**   And at the time of that meeting on the 25th, there were

5   five robberies discussed; is that right?

6   **A.**   I believe so, at that time.

7   **Q.**   And then you learned that another was actually committed

8   on the 25th and then another on the 27th?

9   **A.**   Yes.

10   **Q.**   Now, after the weekend of October 28th and 29th, when you

11   were at work on Monday, the 30th, what did you learn from

12   Detective Quick regarding whether a suspect had been

13   identified?

14   **A.**   He had told me that, over the weekend, he had received a

15   phone number from Special Agent Badowski in reference to that

16   phone number belonging to a subject by the name of Rex, and the

17   phone number was then ran through Whooster by our other

18   colleague, and it came back with the name of Rex Hammond.

19   **Q.**   And was there other information that you learned sometime

20   during the day or early evening of October 30th about Rex

21   Hammond that was relevant for purposes of the investigation?

22   **A.**   Yes.  At that time, I learned that he was currently in

23   Elkhart.  Michigan authorities had been pinging his phone.

24   **Q.**   And before -- so, essentially, you said Michigan

25   authorities had been pinging his phone.

1              Was it Detective Quick that told you that?

2    **A.**    Yes, it was.

3    **Q.**    And did you and Detective Quick go somewhere?

4    **A.**    We did, later on that evening.

5    **Q.**    Okay.  Now, where your offices are, is that in DeKalb

6    County?

7    **A.**    Yes, it is.

8    **Q.**    And approximately what time was it that evening that the

9    two of you left, left DeKalb?

10   **A.**    I believe it was between 7:30 and 8:00 p.m.

11   **Q.**    And before you left, what information did you have from

12   other departments regarding who was looking for Rex Hammond at

13   that time?

14   **A.**    I knew, at that time, that the Michigan authorities out of

15   Kalamazoo and, I believe, Coldwater, also, wanted him arrested

16   at the time if he was found in Michigan, and I also believe

17   that, from Logansport, we had information that they wanted him

18   picked up, as well, Logansport, Indiana.

19   **Q.**    And there were actually two robberies that had happened in

20   Logansport?

21   **A.**    Yes.

22   **Q.**    Now, regarding Rex Hammond, you said you had a name.

23              Was there other information you knew about him

24   specifically that Detective Quick had informed you from what he

25   learned from the Bureau of Motor Vehicles?

1    **A.**    Yes, a vehicle that was registered to him, a powder blue

2    Chrysler Concord.

3    **Q.**    And what was the relevance of the powder blue Chrysler

4    Concord relative to the Auburn robbery?

5    **A.**    It appeared to be the same vehicle from the video footage

6    from that robbery.

7    **Q.**    Now, what did you believe, before you and Detective Quick

8    leave DeKalb County, regarding what Rex Hammond might be doing

9    on that night of October 30th?

10   **A.**    Given the frequency of the armed robberies and their

11   occurrence of every three or four days, we were certain and had

12   a gut instinct that he was going to commit another armed

13   robbery that night.

14   **Q.**    Now, when you left DeKalb County around 7:30 or 8:00 in

15   the evening, were you and Detective Quick in the same car or

16   separate cars?

17   **A.**    We were in separate vehicles.

18   **Q.**    And what type of cars were those?  Were they unmarked or

19   something else?

20   **A.**    They're unmarked.

21   **Q.**    And what's the significance of unmarked cars, in terms of

22   whether you have any limitations as a law enforcement officer,

23   of what you're able to do in an unmarked car versus a marked

24   squad car?

25   **A.**    I myself have limitations, through Indiana Code, that I

1    cannot make any traffic stops in an unmarked vehicle, unless

2    I'm in full uniform with my badge of authority showing.

3    **Q.**    And when you're leaving DeKalb, were you in your uniform

4    or plain clothes?

5    **A.**    I was in plain clothes.

6    **Q.**    And you said Detective Quick was also in an unmarked car?

7    **A.**    Yes, he was.

8    **Q.**    Now, when you and Detective Quick left DeKalb County,

9    where was it that you were traveling to?

10   **A.**    We were traveling to Elkhart, Indiana.

11   **Q.**    And was that based on information provided by Detective

12   Quick of what he had learned from Michigan?

13   **A.**    From what he learned from Michigan.

14   **Q.**    Okay.   Approximately how long did it take to drive from

15   DeKalb to Elkhart?

16   **A.**    Forty-five minutes to an hour.

17   **Q.**    And when you got to the location in Elkhart that Detective

18   Quick directed you both to, did you find anything there?

19   **A.**    No, we did not.

20   **Q.**    Now, as you're in Elkhart -- how long were you in Elkhart,

21   before going somewhere else?

22   **A.**    I believe we were in Elkhart anywhere from forty-five

23   minutes to another hour-and-fifteen minutes.

24   **Q.**    And was there -- did you leave to go somewhere else

25   because Detective Quick, to your knowledge, got updated

1    information from Michigan?

2    **A.**    Yes.

3    **Q.**    Where did you go then?

4    **A.**    We traveled from Elkhart to U.S. 20 and traveled westbound

5    on U.S. 20 to U.S. 31 on the south edge of South Bend.

6    **Q.**    So where in the South Bend area was it that you went to,

7    based on Detective Quick's information from Michigan?

8    **A.**    Through the area commonly known as Roseland.  It's on

9    U.S. 31 near the Toll Road.

10   **Q.**    And were you directed to an exact location or a general

11   location?

12   **A.**    A general area is where we were directed to.

13   **Q.**    So, what did you -- once you got to South Bend, that

14   general area by the Toll Road in Roseland, approximately what

15   time is it?

16   **A.**    It's anywhere between 11:30 p.m. and 11:45.

17   **Q.**    What did you do?

18   **A.**    We started looking for the vehicle that would have been

19   Rex Hammond's vehicle.

20   **Q.**    And when you say "the vehicle," would that be the vehicle

21   not just from the description you had from the Bureau of Motor

22   Vehicles of what was registered to Rex Hammond, but also the

23   vehicle from the Auburn surveillance footage?

24   **A.**    Correct.

25   **Q.**    Now, how did you do that?  Were you driving around areas

1    or what did you do?

2    **A.**    Yeah, we were driving through parking lots, through

3    different hotel parking lots.

4    **Q.**    And as you're driving through hotel parking lots, what

5    happens?

6    **A.**    I believe it was Detective Quick who spotted the vehicle,

7    and he vacated the parking lot rather quickly.  His vehicle

8    would stick out being a Charger.  And then I drove through the

9    parking lot and actually obtained the registration plate off of

10   the vehicle and relayed that to Detective Quick.

11   **Q.**    So, you said Detective Quick might be noticeable.  You

12   said he was in a Dodge Charger.

13            So, that's one of the more common police unmarked

14   cars?

15   **A.**    Correct.

16   **Q.**    What type of car were you in?

17   **A.**    I was in a Dodge Ram truck.

18   **Q.**    So when you pulled up to the car, what type of car was it

19   that you saw?

20   **A.**    It was a light blue or powder blue Chrysler Concord.

21   **Q.**    And did that car look familiar to you from having watched

22   the Auburn surveillance footage?

23   **A.**    Yes, it did.

24   **Q.**    Now, you said you read the license plate number to

25   Detective Quick.

1          After you gave him that information, what did he come

2   back and tell you?

3   **A.**   He came back and told me that that was Rex Hammond's

4   vehicle.

5   **Q.**   Now, were you two in contact through police radios or

6   something else?

7   **A.**   No, we didn't have any radio communications at that time.

8   We were strictly through cell phones.

9   **Q.**   And is that, in part, because you were so far out; you're

10  away from, I guess, Auburn where your vehicles would be hooked

11  up to that transmission?

12  **A.**   Yes.  We do have certain radios that are available to us,

13  but they weren't at that time.

14  **Q.**   Now, as you -- after Detective Quick said that that was

15  Rex Hammond's car, what did you do?

16  **A.**   I left the parking lot, as well, because I was behind it,

17  right behind it, parked right behind it.

18  **Q.**   Right behind Hammond's car?

19  **A.**   Yes.

20  **Q.**   So did you drive over to where Detective Quick was or

21  somewhere else?

22  **A.**   Yeah, I drove directly across the street to where

23  Detective Quick was parked at.

24  **Q.**   So did you still have a line of sight where you were able

25  to see Hammond's car?

1    **A.**    Not necessarily see the entire car, but we would be able

2    to see it if it exited.

3    **Q.**    Was Detective Quick making any phone calls at that point

4    in time?

5    **A.**    Yes, he was.

6    **Q.**    What was he trying to do?

7    **A.**    Trying to get us some more help there.

8    **Q.**    And some more help for what reason?  What, at that point,

9    scenario did you believe you were faced with, possibly locating

10   someone who was armed and dangerous?

11   **A.**    Yes.

12   **Q.**    And, obviously, you said earlier that you suspected he

13   might be committing another robbery that night?

14   **A.**    That's correct.

15   **Q.**    Now, as Detective Quick is making these phone calls trying

16   to get back up, what happened?

17   **A.**    Detective Quick was sitting in the passenger's seat of my

18   truck, and we both looked at the same time as the vehicle was

19   exiting the lot.

20   **Q.**    Hammond's vehicle was exiting?

21   **A.**    Hammond's vehicle was exiting the lot.

22   **Q.**    So what did you do?

23   **A.**    I told Detective Quick to promptly get out of my truck and

24   to get in his vehicle, and I started to follow Rex Hammond's

25   vehicle.

1   **Q.**   And so you're -- so it's Rex Hammond, then your truck, and

2   then somewhere behind you is Detective Quick?

3   **A.**   Yes.

4   **Q.**   And from that parking lot of the hotel in Roseland in

5   South Bend, where did you follow Rex Hammond's car?

6   **A.**   Southbound on 31 through South Bend around a couple

7   roundabouts -- and I'm not very familiar with South Bend.  At

8   one point in time, I thought we were still traveling westbound,

9   until I got to an area of town that I recognized to be on the

10   south side of South Bend -- and continued to follow him out of

11   town.

12   **Q.**   And that's out of town south?

13   **A.**   South on U.S. 31.

14   **Q.**   As you're following Hammond's car south on 31 from South

15   Bend, what did you see the car doing?

16   **A.**   I noticed that he drove left of center a couple of times.

17   The exact locations, at this time, I'm not really sure of, but

18   I was relaying that information to Detective Quick, as well,

19   via cell phone.

20   **Q.**   And so you saw the car go left of center, but, at that

21   point, like you explained, with the unmarked car, you couldn't

22   actually yourself initiate a traffic stop?

23   **A.**   No, and -- no, I would not and I could not make a traffic

24   stop on him.

25   **Q.**   And would not.

1      Was that, in part, because, at that point, there's

2  only you and Detective Quick, and no other officers have come

3  yet?

4  **A.**   Correct.  Without any radio communications -- and local

5  dispatch would be in Saint Joe County, knowing where we're at,

6  what we're doing -- there would have been absolutely no way, no

7  reason for me to make a traffic stop.  It wouldn't be safe.

8  **Q.**   Did you continue following the car?

9  **A.**   Yes.

10  **Q.**   And from South Bend, from where you first saw it in

11  Roseland, how far did you follow the car?

12  **A.**   Approximately twenty-five to twenty-eight miles.

13  **Q.**   And was that in -- which county did you -- were you into

14  by that point?

15  **A.**   Marshall County.

16  **Q.**   Now, again, as you're -- throughout this whole trip from

17  South Bend down there, your line of communication is through

18  cell phones with Detective Quick?

19  **A.**   Correct.

20  **Q.**   And did you know whether he was trying to communicate with

21  anyone else?

22  **A.**   He had advised me that he was trying to get in contact

23  with authorities from Marshall County and possibly Plymouth, as

24  well.

25  **Q.**   Now, as you get into Marshall County, what happened?

1  **A.**    As we entered Marshall County, the vehicle exited to the

2  right onto Veterans Parkway and then continued westbound for a

3  short distance to a roundabout and then went through the

4  roundabout and then headed south.  I believe it would be called

5  Old U.S. 30.

6  **Q.**    And did you continue following the car?

7  **A.**    Much to my chagrin, yes, I did.

8  **Q.**    And as you continued to follow the car, was it moving

9  toward the city of Plymouth?

10  **A.**    Yes, we were.

11  **Q.**    What happened as you approached Plymouth?

12  **A.**    As we approached Plymouth and got into some residential

13  areas of Plymouth, the vehicle conducted a cleaning movement on

14  me, which would be he would be going around in a circle,

15  circling a block to see if someone is following him.  I

16  continued on straight to an intersection and turned left and

17  turned around in a gas station parking lot and advised

18  Detective Quick that I had been made and that I was vacating

19  the area.

20          **MR. OTIS:**  Objection.  Speculation.

21          **THE COURT:**  No, I think he can tell what he told

22  Trooper Quick, so I'll allow the testimony.

23  **BY MS. DONNELLY:**

24  **Q.**    So, at that point, you had lost sight of Hammond's car?

25  **A.**    Correct.

1   **Q.**   And did you, at that point, stay in Plymouth or did you go

2   somewhere else?

3   **A.**   No, I headed back to DeKalb County.

4   **Q.**   And was that, in part, because you had something in court,

5   to testify for another case, the following morning?

6   **A.**   Yes, I had to testify in Paulding County Ohio in a

7   homicide trial the following day.

8          **MS. DONNELLY:**   One moment, Your Honor.

9          **(Discussion held out of reporter's hearing.)**

10         **MS. DONNELLY:**   No further questions for Detective

11  Sexton.

12         **THE COURT:**   Thank you, ma'am.

13         Any Cross, Mr. Otis.

14                       **CROSS-EXAMINATION**

15  **BY MR. OTIS:**

16  **Q.**   Detective Sexton, when did you learn about the cell

17  phone -- Mr. Hammond's cell phone records?

18  **A.**   That would have been October 30th.

19  **Q.**   That's a Monday?

20  **A.**   Yes, sir.

21  **Q.**   What time?

22  **A.**   I'm not sure.  It would have been in between the hours of

23  9:00 a.m. and 5:00 p.m.

24  **Q.**   Any time in between there; you can't recall?

25  **A.**   Correct.

1   **Q.**   How did you learn about them?

2   **A.**   Through Detective Quick.

3   **Q.**   What did he tell you about the cell phone records?

4   **A.**   He advised me that Michigan authorities were pinging

5   Mr. Hammond's phone.

6   **Q.**   Did you independently review any of Mr. Hammond's cell

7   phone records?

8   **A.**   No, I did not.

9   **Q.**   You solely relied on what Detective Quick told you?

10  **A.**   Correct.

11  **Q.**   And that was sometime between 9:00 a.m. and 5:00 p.m.,

12  correct?

13  **A.**   That's correct.

14  **Q.**   And, to your knowledge, neither you nor Detective Quick

15  obtained a search warrant or an arrest warrant for Mr. Hammond

16  that day, correct?

17  **A.**   I did not.

18  **Q.**   You're not aware that Detective Quick did, are you?

19  **A.**   No, I'm not aware.

20  **Q.**   He didn't relay that to you, correct?

21  **A.**   I'm sorry, sir?

22  **Q.**   He didn't inform you that he had retained a warrant,

23  correct?

24  **A.**   No, he didn't.

25  **Q.**   At what time did you learn that Mr. Hammond's cell phone

1    was pinging?

2    **A.**    Somewhere between the hours of 9:00 a.m. and 5:00 p.m.

3    **Q.**    Why was it relevant to you in the investigation that

4    Mr. Hammond's -- about Mr. Hammond's cell phone?

5    **A.**    I'm sorry?

6    **Q.**    What about Mr. Hammond's cell phone was relevant to your

7    investigation of the robbery in Auburn?

8    **A.**    Generally speaking, most people carry their cell phones

9    with them all the time when they're out and about, unless

10   they're in the shower or they're sleeping.  So if he had his

11   cell phone with him when he performed the Auburn robbery, it

12   would be a good idea that it was on and with him then, as well.

13   **Q.**    And the information that Detective Quick provided to you

14   on Monday, October 30th, was that Mr. Hammond's cell phone was

15   at the location of the Auburn robbery; is that correct?

16   **A.**    No, we did not know that.

17   **Q.**    You did not know that.

18          Well, what information was relevant to you on

19   October 30th about Mr. Hammond's cell phone then?

20   **A.**    That it was being pinged by Michigan.

21   **Q.**    Right.

22          But was he a suspect, in your mind, at that point?

23   **A.**    Yes, he was.

24   **Q.**    Why?

25   **A.**    Because the clothing that he had on had matched the

1  clothing from two other armed robberies, and the vehicle

2  matched, as well.

3  **Q.**   How was the cell phone evidence that you're referencing

4  October 30th relevant to your investigation in the Auburn

5  robbery?

6  **A.**   I'm sure -- I'm not sure I understand what your question

7  is.

8  **Q.**   Well, how did you determine -- I guess, why was it

9  relevant to you on Monday, October 30th, the whereabouts of

10  Mr. Hammond?  Why did you need to know that for purposes of

11  your investigation?

12  **A.**   We wanted to set up surveillance on him.

13  **Q.**   On Monday, October 30th, were you aware of anybody

14  obtaining a warrant for Mr. Hammond's cell phone records?

15  **A.**   No, I was not.

16  **Q.**   When did you leave Auburn to go to Elkhart, approximately

17  what time?

18  **A.**   I believe it was between 7:30 and 8:00 p.m.

19  **Q.**   And you said you had to leave at some point when you got

20  to Plymouth because you had to testify the next day; is that

21  correct?

22  **A.**   That's correct.

23  **Q.**   What time did you leave Plymouth?

24  **A.**   I think it would have been somewhere around 12:30 a.m.

25  **Q.**   Had Mr. Hammond been arrested yet?

 1   **A.**    No.

 2   **Q.**    So you were in a separate vehicle from Detective Quick; is

 3   that correct?

 4   **A.**    That's correct.

 5   **Q.**    Did Detective Quick stay there?

 6   **A.**    As far as I know, he did.

 7   **Q.**    And how long would it take you to get back to Auburn,

 8   Indiana from Plymouth, Indiana?

 9   **A.**    My best estimate would be an hour-and-a-half.  I think I

10   rolled into my driveway at 2:00 a.m.

11   **Q.**    Did you believe you had probable cause to arrest

12   Mr. Hammond that night?

13   **A.**    Yes.

14   **Q.**    For the Auburn robbery?

15   **A.**    Yes.

16   **Q.**    What are the facts that support your probable cause?

17   **A.**    The facts that the vehicle matched the description that

18   was given, and he was also wearing the same clothing in two

19   other robberies.

20   **Q.**    You say, "He."

21           How did you know it was specifically Rex Hammond,

22   though?

23   **A.**    Through the investigation from -- and from information I

24   had gathered from other officers.

25   **Q.**    What specific information?

**A.**   That he had sold the firearm to a subject.  I'm not sure what that subject's name is.  That subject gave the name of "Rex" and a phone number.  And then that phone number was ran through an app called Whooster by Detective Corey Heffelfinger. Corey Heffelfinger then advised Detective Quick that the phone returned back to -- that phone number returned back to Rex Hammond.

**Q.**   But, at that point, you didn't have evidence that the cell phone was pinging in locations where the robberies had occurred; is that correct?

**A.**   It wouldn't have been actively pinging at those locations because those were in the past.  It would give a real time, maybe ten to twenty minutes difference, of where it was at, but it wouldn't go back several days.  The actual ping that I was going off of would not go back several days to show at that time.  I would have to go through a cell phone history for that.

**Q.**   But just go back.

        What you believed to support probable cause was that the vehicle matched Mr. Hammond's -- the vehicle registered to Mr. Hammond matched the vehicle description in the Auburn robbery, correct?

**A.**   Yes.

**Q.**   And that he was wearing the same clothing at the Auburn robbery that he had worn at other robberies; is that correct?

1    **A.**    That's correct.

2    **Q.**    What other facts besides that?

3    **A.**    That's about it.

4    **Q.**    Did Detective Quick call you that night and ask you if you

5    had probable cause to arrest Rex Hammond?

6    **A.**    No.

7    **Q.**    Were you ever in communication with a detective from

8    Logansport Police Department?

9    **A.**    No, I was not.

10   **Q.**    Did you ever independently obtain Mr. Hammond's cell phone

11   records?

12   **A.**    No, I did not.

13   **Q.**    Have you ever obtained a telephonic warrant for an arrest

14   or search?

15   **A.**    For Mr. Hammond?

16   **Q.**    No, for anybody.

17   **A.**    Yes, I have.

18   **Q.**    How long does it take to obtain a telephonic warrant,

19   typically?

20   **A.**    Well, for the State of Indiana, it's an after-the-fact

21   type of deal, if we're going to do an active ping, so it would

22   be an after-the-fact type of warrant that we would file.  It

23   just depends upon the time of day and the amount of cases that

24   the court has to see for us to get any type of warrant.

25   **Q.**    But you've obtained a telephonic warrant prior to this

1   investigation, correct?

2   **A.**   Yes.

3   **Q.**   What's the quickest you've ever obtained a telephonic

4   warrant?

5   **A.**   Seventy-two hours.

6   **Q.**   Seventy-two hours?

7   **A.**   Yes.

8   **Q.**   I'm sorry.  That was a bad question, in light of the

9   evidence we're talking about here.

10          Have you ever obtained a warrant from a judge over

11   the telephone?

12   **A.**   Oh, no.

13   **Q.**   What's the quickest you've ever obtained a warrant from a

14   judge?

15   **A.**   About five hours.

16          **MR. OTIS:**  Okay.  No further questions.

17          **THE COURT:**  Thank you, sir.

18          Any Redirect, Ms. Donnelly?

19          **MS. DONNELLY:**  If I could have one moment,

20   Your Honor?

21          **(Discussion held out of reporter's hearing.)**

22                    **REDIRECT EXAMINATION**

23   **BY MS. DONNELLY:**

24   **Q.**   And just for purposes of the record, Corey Heffelfinger,

25   with the Auburn PD, is a different person than Cory

1    Ghiringhelli, with the Kalamazoo Department?

2    **A.**    Yes, he is.

3              **MS. DONNELLY:**  Nothing, other than that, Your Honor.

4              **THE COURT:**  Thank you.

5              Any Recross on that point?

6              **MR. OTIS:**  Let me just make sure.

7                          **RECROSS-EXAMINATION**

8    **BY MR. OTIS:**

9    **Q.**   So, can you explain that, just the two different

10   individuals, because they've got very similar names?  I just

11   want to make sure I understand.

12   **A.**    Corey Heffelfinger works for the Auburn Police Department,

13   and the other Cory, I believe, works for the Kalamazoo Police

14   Department.

15   **Q.**   The Corey that works at the Auburn Police Department, did

16   he ever obtain Mr. Hammond's cell phone records from AT&T?

17   **A.**    I have no idea.

18   **Q.**   You have no knowledge of that?

19   **A.**    I have no knowledge of that.

20             **MR. OTIS:**  I'm done.

21             **THE COURT:**  Thank you, sir.

22             You may step down, Detective Sexton.  Thank you.

23             **(Witness excused.)**

24             **THE COURT:**  The Government may call its next witness.

25             **MS. DONNELLY:**  Next witness is Detective Jay Quick.

```
 1                        JACOB J. QUICK

 2       Government's witness, sworn and testified as follows:

 3                       DIRECT EXAMINATION

 4   BY MS. DONNELLY:

 5   Q.    Can you, please, state and spell your name?

 6   A.    Jacob J. Quick.  J-a-c-o-b.  Q-u-i-c-k.

 7   Q.    And where do you work?

 8   A.    The Indiana State Police.

 9   Q.    How long have you been with ISP?

10   A.    Approximately twelve years.

11   Q.    What is your position there?

12   A.    I'm a detective.

13   Q.    Were you working as a detective back in October of 2017?

14   A.    I was.

15   Q.    And --

16            COURT REPORTER:  Sir, would you put the microphone in

17   front of you?

18            THE WITNESS:  (Complies.)

19   BY MS. DONNELLY:

20   Q.    In October, were you assigned, at some point, to

21   investigate an armed robbery that happened at the Speedway Gas

22   Station in Auburn on October 9th?

23   A.    I did.  I assisted in the investigation.

24   Q.    And did you -- during the investigation, was there

25   surveillance video, both from inside the Speedway, as well as
```

1    from a nearby business, that were relevant to the case?

2    **A.**    Yes.

3    **Q.**    And did you also learn, in the coming days, that there

4    were similar robberies that had happened both in Indiana, as

5    well as Michigan?

6    **A.**    Yes.

7    **Q.**    Now, on October 25th, did you attend a meeting in

8    Coldwater, Michigan?

9    **A.**    I did.

10   **Q.**    And, without getting into all of the specifics, did you

11   and the other law enforcement agencies there come to a

12   determination about whether the same suspect had committed a

13   number of armed robberies?

14   **A.**    Yes.   We exchanged information and believed that the same

15   suspect was involved in the armed robberies.

16   **Q.**    And did you all share surveillance video from your various

17   incidents in coming to that conclusion?

18   **A.**    We did.

19   **Q.**    And in terms of the robberies themselves, they covered a

20   fairly extensive geographic range; is that correct?

21   **A.**    Correct.

22   **Q.**    From as far south as Logansport and Peru, all the way up

23   to Kalamazoo, Michigan?

24   **A.**    Yes.

25   **Q.**    Now, you also learned -- did you also learn that a person

1   suspected of being the same person committed robberies on

2   October 25th and 27th?

3   **A.**   Yes.

4   **Q.**   Now, going to Saturday, October 28th, did ATF Special

5   Agent Andrew Badowski contact you with information about the

6   investigation?

7   **A.**   He did.

8   **Q.**   And what was the communication that the two of you had?

9   **A.**   He had told me that he had went to, I believe, South Bend

10   or the Elkhart area and spoke to a subject.  As we were doing

11   the e-trace, going back, trying to find out who purchased this

12   gun, sold it, he had talked to somebody that said that they had

13   sold the gun to a Rex and had a phone number for Rex.

14   **Q.**   Now, did you get that phone number from Special Agent

15   Badowski on the 28th or on a different day?

16   **A.**   I believe it was on Sunday.

17   **Q.**   That would have been the 29th?

18   **A.**   Correct.  It was either one of those days, Saturday or

19   Sunday, correct.

20   **Q.**   When you actually got the phone number from Special Agent

21   Badowski, what did you do with that phone number?

22   **A.**   I took the phone number; I contacted Auburn City Detective

23   Corey Heffelfinger, who has a program on his phone that's

24   called Whooster.  He was able to search the phone number, and

25   it will produce, most of the time, a name and a city associated

1    with that phone number.

2    **Q.**    And Whooster -- that's W-h-o-o-s-t-e-r -- is that,

3    essentially, an online search database?

4    **A.**    I thought it was W-o-o-s-t-e-r (sic), but I could be wrong

5    on that.

6             That's something that's maintained by him on his

7    phone.

8    **Q.**    One of those two spellings?

9    **A.**    Correct.

10   **Q.**    Now, did Detective Heffelfinger, from Auburn, get back to

11   you with a person associated with the phone number?

12   **A.**    Yes, fairly quickly, he responded back with a message that

13   was associated with a Rex Hammond, from the information from

14   Agent Badowski of Rex.  I then ran a name search through

15   Indiana through my post, who produced a driver's license return

16   for Rex Hammond.

17   **Q.**    And regarding that driver's license, did that include a

18   photograph?

19   **A.**    It did.

20   **Q.**    Was there any significance to your investigation of that

21   photograph?

22   **A.**    With a photograph, immediately, when I observed his

23   driver's license photo, from memory of the photo that we had

24   without his mask on in Kalamazoo, Michigan, I immediately

25   believed that was our suspect from our armed robberies.

1  **Q.**   Was there other information that you got about Rex

2  Hammond?

3  **A.**   We also obtained a criminal history, which showed he had

4  prior convictions for armed robbery and served prison time for

5  that.  We also obtained a vehicle associated with Mr. Hammond.

6  **Q.**   And what was the description on that vehicle relative to

7  what was suspected of being the getaway car from Auburn and

8  Kalamazoo?

9  **A.**   We believed that the vehicle -- the information that

10  returned to him on that vehicle could or would be consistent

11  with the vehicles that were seen in Kalamazoo and Auburn.

12  **Q.**   Now, with all of that information that you had gathered,

13  did you share that with other agencies?

14  **A.**   I did.  I contacted my command, along with Agent Badowski

15  and several other -- we had, I believe, seven different

16  agencies involved in this, disseminated that out to them.

17  **Q.**   And this would have been late on Sunday, the 29th?

18  **A.**   Correct.

19  **Q.**   On the following day, Monday the 30th, were you contacted

20  by Detective Ghiringhelli from Kalamazoo?

21  **A.**   Yes.

22  **Q.**   And prior to Detective Ghiringhelli getting in touch with

23  you, what were you doing on Monday, in terms of -- was locating

24  or trying to locate Rex Hammond something that was considered a

25  priority?

1    **A.**    It would be.   The information was sent out to other

2    detectives.   I myself am scheduled off on Mondays; therefore,

3    there was people doing things behind the scenes at their

4    respective agencies, trying to get information.

5    **Q.**    And when Detective Ghiringhelli contacted you on the 30th,

6    was that, if you recall, afternoon, evening, morning?

7    **A.**    I don't recall the exact time of the day, but he did

8    contact me to notify me of the cell phone ping that he was

9    doing on the phone.

10   **Q.**    So, you said he was doing a cell phone ping on his phone,

11   and that would have been for the phone number that you had

12   initially gotten from Special Agent Badowski?

13   **A.**    Correct.

14   **Q.**    Now, what did Detective Ghiringhelli say regarding that

15   phone number?

16   **A.**    In regards to the phone number, he told us that he had

17   obtained the cell phone ping.   He had an area that it was

18   pinging, up in, I believe, Elkhart.   Along with that, he also

19   obtained, I believe, cell phone history, which placed

20   Mr. Hammond or his cell phone at the scene of several of the

21   armed robberies.

22   **Q.**    Now, was this the first time you learned that Detective

23   Ghiringhelli had gotten the cell phone ping results or had made

24   that request?

25   **A.**    Correct, that he had them.

1  **Q.**   Now, when you had gotten Mr. Hammond's Bureau of Motor

2  Vehicles' information the previous day, was his listed

3  residence address actually in Elkhart, as well?

4  **A.**   I believe so.  I haven't seen that return in a while, but

5  I believe it was.

6  **Q.**   And what did -- when Detective Ghiringhelli contacted you

7  saying that these pings are coming in, in Elkhart, what did you

8  do?

9  **A.**   I contacted my command to let them know what was going on.

10  There was conversation with the detective in Kalamazoo,

11  Ghiringhelli, if I'm saying it correctly, where he had actually

12  said, if it was Michigan, he would make an on-site arrest, and

13  wanted us to go up and make an on-site arrest based upon his

14  investigation, as well.

15  **Q.**   And did you go anywhere?

16  **A.**   I did.

17       There was conversation with my first sergeant and

18  sergeant that asked me, basically, to head to South

19  Bend/Elkhart to see if we could locate the vehicle at that time

20  or the cell phone ping.

21  **Q.**   And who did you go with to try and locate the cell phone?

22  **A.**   Detective Sexton.

23  **Q.**   And he's from Auburn?

24  **A.**   Yes, ma'am.

25  **Q.**   Now, as you were leaving DeKalb -- you're going to try and

1    locate where the cell phone -- did you contact other

2    investigators?

3    **A.**   Yes.  The information had been sent out.  I had contacted

4    numerous people, several phone calls.  We tried to get other

5    people to go with us, other than just two, but there was not a

6    lot of people available at the time.

7    **Q.**   And did some of the people that you contacted include

8    Special Agent Badowski from ATF, as well as Detective Tyler

9    Preston from Logansport?

10   **A.**   Yes.

11   **Q.**   And those are also people that you had given the

12   information the previous day about everything you had learned

13   about Rex Hammond?

14   **A.**   Correct.  It's people I've talked to several times

15   throughout the several weeks of this case.

16   **Q.**   Now, as you and Detective Sexton headed to Elkhart, you

17   were in separate cars?

18   **A.**   Yes, ma'am.

19   **Q.**   And the direction that you were going to in Elkhart --

20   again, you've said this -- was based on what Detective

21   Ghiringhelli told you?

22   **A.**   Yes.

23   **Q.**   Now, once you got to Elkhart, were you able to locate

24   anyone or anything of value to your investigation?

25   **A.**   Eventually, we located the vehicle associated with

1   Mr. Hammond, I believe, at a Quality Inn in the area of the

2   Toll Road and 933, basically.

3   **Q.**   And was that in South Bend?

4   **A.**   Yes.

5   **Q.**   You had gone to Elkhart, first, though?

6   **A.**   Yes, ma'am.

7   **Q.**   And to get from Elkhart to South Bend, how did you -- what

8   information was it that you had that took you from one place to

9   the other?

10  **A.**   When we arrived in Elkhart in the area where the ping was

11  at, when we got there, the vehicle was not there.  Therefore, I

12  maintained contact with Detective Ghiringhelli, as far as the

13  updated pings, as it was moving.  I believe it was -- there's a

14  time frame in between there, ten-, fifteen-, twenty-minute

15  delay on when we would get the information.

16  **Q.**   And, eventually, once you got to South Bend, you had an

17  approximate location?

18  **A.**   Yes.

19  **Q.**   And what did you do once you got to the approximate area?

20  **A.**   Myself and Detective Sexton drove around the area.  I

21  entered the parking lot, and I observed the car associated with

22  Mr. Hammond, which I immediately identified, that I thought was

23  consistent with the video footage I had seen from the Auburn

24  armed robbery, in particular.

25  **Q.**   And what type of car was that?

1   **A.**   It was a Chrysler, light blue or gray in color.

2   **Q.**   And once you saw the car that you recognized from the

3   Auburn surveillance video, what did you do?

4   **A.**   I left the parking lot in my unmarked Charger and went to

5   a different parking lot directly across the road from there,

6   contacted my command to let them know that we had found the

7   vehicle.  Detective Sexton, I believe, went over and confirmed

8   the plate and then came back to my location.  And, at that

9   time, like I said, I called my command to let them know we

10  found the vehicle, what's our next step from here.

11  **Q.**   And in terms of Detective Sexton confirming the plate, was

12  that information that he went over to the car, looked at it,

13  and called you with the information?

14  **A.**   Correct.

15  **Q.**   And what did you -- who did you then call to confirm that?

16  **A.**   The Indiana State Police Post.

17  **Q.**   And did the Indiana State Police Post generate a printout

18  when you contacted them requesting that information?

19  **A.**   Correct.

20  **Q.**   Showing you what's been marked on the ELMO as Government's

21  Exhibit Number 9, do you recognize that?

22  **A.**   I do.  I do.

23  **Q.**   What is it?

24  **A.**   That's a return that we would get if we run a plate and

25  request a copy.

1  **Q.**   And is that -- the request that you got back, does that

2  essentially truly and accurately depict what you learned and

3  what dispatch printed out for you regarding that vehicle?

4  **A.**   Correct.

5  **Q.**   And the time -- there's a couple of times on there on the

6  bottom left, as well as the top left, when you contacted and

7  when it was printed out.

8         This was around 12:00 a.m.?

9  **A.**   Yes.

10         **MS. DONNELLY:**  Your Honor, I'd seek to admit this

11  into evidence.

12         **MR. OTIS:**  No objection.

13         **THE COURT:**  Without objection, Government Exhibit --

14  what exhibit was it?

15         **MS. DONNELLY:**  Nine.

16         **THE COURT:**  Nine.

17         We're on numbers now, instead of letters?

18         **MR. OTIS:**  We've always been numbers.

19         **MS. DONNELLY:**  I think it was numbers before, too.

20         **THE COURT:**  Oh, you're right.

21         **MS. DONNELLY:**  One, I had, A through E.

22         **THE COURT:**  Right.  That's what I was looking at.

23         Okay.  Without objection, Government's 9 is admitted

24  into evidence.

25  \\\

1  **BY MS. DONNELLY:**

2  **Q.**   And, Detective Quick, in fact, on this return, it shows

3  Rex Hammond's name, and it has an address, vehicle

4  registration, in Elkhart, Indiana; is that right?

5  **A.**   Correct.

6  **Q.**   Now, around 12:00 a.m., when you and Detective Sexton find

7  the car, who do you contact?  What are you doing, at that

8  point?

9  **A.**   My first phone call was to my sergeant, which is Deven

10 Hostetler, out of the Fort Wayne Post.  As I'm on the phone

11 with him, letting him know what's going on, the vehicle starts

12 to back out.

13 **Q.**   And as the vehicle is backing up, you said you were

14 contacting your sergeant.

15          Was that, in part, because you're trying to get more

16 people to assist you and Detective Sexton?

17 **A.**   Correct.  We didn't like the fact we were going with only

18 two people, to begin with, and, like I said, my instructions

19 were to see if we could locate the vehicle.  We knew that we

20 were behind on the ping, as far as where it was going, and,

21 obviously, to get more people there to assist us.

22 **Q.**   Now, as you follow -- it was you and Detective Sexton in

23 separate cars that start to follow the sedan as it leaves?

24 **A.**   Yes.  I got out of Detective Sexton's truck, entered my

25 car, and then he began following.

**Q.**   Now, as you're following Rex Hammond's car, during that

drive, what are you doing?

**A.**   We were unable to have radio contact with each other, so

I'm trying to keep in contact with Detective Sexton, where he's

at.  I'm trying to maintain a little bit further back, due to

having a Charger -- they're identified as police cars -- and,

also, trying to contact local police agents, including my State

Police Post and the Bremen Post, to try to see if we can get

police officers out there to assist us.

**Q.**   So you're making multiple phone calls?

**A.**   Multiple.

**Q.**   Now, as you're going south on 31, you said you're trying

to contact local police posts.

        Would that be for each of the counties that you're

passing through?

**A.**   Right.  I'm not completely familiar with the area that I

was in, so I was trying to find out, you know, where I'm at and

who dispatches for who.  Eventually, I contacted Marshall

County Sheriff's Department, their dispatch.

**Q.**   And as that car is driving south, as it's getting into

Marshall County, what did you think was going to happen?

**A.**   We believed -- due to the time of the morning/night and

where he was heading, heading south from that area, we believed

he was going to commit another armed robbery.

**Q.**   Now, you said you called dispatch once you got into

1    Marshall County?

2    **A.**    Yes.

3    **Q.**    And have you previously reviewed a recording of your --

4    listened to a recording from Marshall County's dispatch in

5    which you recognized your voice from that call?

6    **A.**    I did.

7              **MS. DONNELLY:**  Your Honor, permission to approach?

8              **THE COURT:**  You may.

9    **BY MS. DONNELLY:**

10   **Q.**    I'm showing you a disk that's been marked as Government's

11   Exhibit 10.  There's actually five recordings on here.

12             But the first one, is that the recording you've

13   previously listened to?

14   **A.**    Yes.

15   **Q.**    And does that truly and accurately reflect the

16   conversation that you had with dispatch on the morning, at that

17   point, of October 31st of 2017?

18   **A.**    It does.

19             **MS. DONNELLY:**  Your Honor, I would seek to admit

20   that, the entire disk, but, for now, the first recording, into

21   evidence.

22             **MR. OTIS:**  No objection.

23             **THE COURT:**  Without objection, Government's 10 is

24   admitted, understanding that it's being offered only for the

25   first recording, at this point.

 1            **MS. DONNELLY:**  And I would seek, Your Honor, to

 2   publish that recording at this time.

 3            **THE COURT:**  You may.

 4   **BY MS. DONNELLY:**

 5   **Q.**   And, Detective Quick, on there, it reflects the time of

 6   12:46:28 seconds in the morning?

 7   **A.**   Correct.

 8            **(Exhibit published.)**

 9   **BY MS. DONNELLY**

10   **Q.**   So, Detective Quick, obviously that dispatcher had some

11   confusion during the conversation you had with her?

12   **A.**   Yeah, they did.

13   **Q.**   But you had conveyed to her that you were about eight

14   miles from Plymouth, following a suspect who had committed

15   several armed robberies?

16   **A.**   Correct.

17   **Q.**   Now, within a few minutes of that call, were you actually

18   approaching the city of Plymouth?

19   **A.**   We were.

20   **Q.**   And what did you learn happened, at that point, through

21   what Detective Sexton told you?

22   **A.**   He exited 31, I believe, on -- I can't remember the name

23   of the road.

24   **Q.**   And as -- when you say, "He," do you mean Rex Hammond's

25   vehicle?

1   **A.**   Correct.

2   **Q.**   And what happened, from your understanding, at that point?

3   **A.**   From that point, I'm maintaining a visual, from quite a

4   ways back, where I could still see Detective Sexton's

5   taillights.  He's a little bit further back from that.  So I'm

6   following where Detective Sexton is going, and we ended up

7   going to -- and I apologize on the name of the road.  It's not

8   somewhere I'm familiar with.  We ended up going into the town

9   of Plymouth.

10  **Q.**   As you went into Plymouth, did Detective Sexton, at some

11  point, lose sight of Rex Hammond's car?

12  **A.**   Yes.  He had told me -- I was on the phone with him, and

13  he just said, "He just cleaned me," the remarks that he told

14  me.

15        We had both been through mobile surveillance school,

16  and it's a technique that's used if someone thinks they're

17  being followed, to make an evasive maneuver to see if somebody

18  is going to follow what they're doing.

19  **Q.**   So that was shortly after that 12:46 a.m. call to

20  dispatch?

21  **A.**   Yes, within probably five minutes, not even five minutes.

22  **Q.**   Did Detective Sexton, then, leave the area, go back

23  towards Auburn?

24  **A.**   He did.  At that point in time, we decided to let him go

25  and to not stay on what we we're doing -- we're in unmarked

1   vehicles, not in uniform -- and, basically, to wait on the next

2   ping.  He also had a prior engagement the next day, I believe,

3   for a trial in Ohio that he had to be present for, so he left

4   the area.

5   **Q.**   Now, did you talk to a Marshall County deputy by the name

6   of Brouyette, spelled B-r-o-u-y-e-t-t-e?

7   **A.**   I did.

8   **Q.**   And so you speak to him.

9        Were you also making other phone calls?

10  **A.**   I made several phone calls to my sergeant.  I had also

11  talked to Detective Preston, I believe it is, from Logansport,

12  a couple other people that I had called, let them know, in

13  updating them, "Hey, we lost this," including, I believe, Cory

14  Ghiringhelli, to let him know, "At this point, we're going to

15  need another ping from you because we're not seeing him no

16  more."

17  **Q.**   But that vehicle, Rex Hammond's vehicle, actually got

18  located before another ping came through; is that right?

19  **A.**   Correct.  I had not received any ping.  If it was sent to

20  me, I did not see it.  I was talking to Deputy, is it,

21  Brouyette, in a parking lot and, as I'm talking to him,

22  briefing him on what's going on, what the vehicle looks like,

23  he indicates, "I think the car just drove by going north."

24  **Q.**   So as you're in the parking lot talking to Detective

25  Brouyette, he sees the car or what he thinks is the car drive

1  by?

2  **A.**   Correct.

3  **Q.**   And since you were in the unmarked car, was it actually

4  Deputy Brouyette who goes after Rex Hammond's car?

5  **A.**   He did.

6         I never saw the car.  I saw that a vehicle had come

7  through, but I couldn't see what it was.  I believe he was in

8  an SUV, and it blocked my view from the road, so I told him,

9  you know, "Here's my cell phone number.  If you get him

10  stopped, let me know."

11  **Q.**   So as Deputy Brouyette is going after that car, you said

12  you had been in telephone contact, from time to time, with

13  other detectives.

14         What had Detective Preston, from Logansport, told

15  you?

16  **A.**   Detective Preston -- at this point, I had notified him

17  that we were heading south, at some point, during this, you

18  know, several phone calls and following him.  He knew we were

19  coming south, and he had told me that he was coming out.  He

20  said, "I'm going to be getting dressed.  I'll be coming out to

21  help you out."  He was another person that was assisting.

22  **Q.**   What did he tell you about the conversation that he had

23  with his prosecutor?

24  **A.**   That conversation came up after the vehicle had stopped by

25  the deputies of Marshall County.  They had called me and said,

1    "Hey, we've got him stopped.  What do you want us to do from

2    here?"

3              I said, "Stand by.  Let me make a phone call."

4              So I called --

5              **COURT REPORTER:**  Sir, would you slow down, please?

6              **THE WITNESS:**  I'm sorry.

7    **A.**    -- called Detective Preston and let him know the vehicle

8    was stopped.  He asked me what my game plan was, I said, "I'd

9    like to bring him in, you know, for questioning, and we'll go

10   from there."

11             And he had told me that he had talked to his

12   prosecutor in his county earlier in the day and that he wanted

13   an on-site arrest to be made and we'd bring him back to

14   Logansport to be interviewed.

15   **BY MS. DONNELLY:**

16   **Q.**   So, part of that is about -- when I say, "He," Rex

17   Hammond -- if he's staying in Marshall County, if he's going to

18   Logansport, or if he's going to one of the other cities in

19   which he's suspected of committing these offenses; is that

20   right?

21   **A.**   Correct.

22   **Q.**   Now, just to backtrack for a second, in terms of Deputy

23   Brouyette, did he contact you regarding the car that he had

24   gone after to get?

25   **A.**   Correct.  He had called me and said he had stopped the

1  vehicle.

2  **Q.**   And did you then go to the location where he said he had

3  stopped the car?

4  **A.**   I did.  As he called me, I started making my way to where

5  the traffic stop location was while I called Detective Preston.

6  **Q.**   Now, from the time that you had lost sight of the car

7  coming into Plymouth, or that Detective Sexton said he lost

8  sight of the car, to the time that Deputy Brouyette says he

9  thinks he sees it and goes after it in the parking lot, about

10 how much time has elapsed?

11 **A.**   Approximately thirty minutes, less than thirty.

12 **Q.**   And when you went to the location of the traffic stop

13 where Deputy Brouyette had pulled the car over, what did you

14 see, in terms of cars and people out there?

15 **A.**   I observed the same vehicle that we had been following

16 from South Bend, several police cars, and, at that time, when I

17 pulled up, I had told the deputies that Logansport wanted an

18 on-site arrest made; therefore, they conducted a felony stop at

19 that time.

20 **Q.**   So, the car that you saw, you said, was the one that you

21 had been following since South Bend.

22        When you actually got there, was the car parked with

23 Marshall County squad cars behind it?

24 **A.**   Correct.

25 **Q.**   And were there a couple Marshall County deputies by their

1  squad car?

2  **A.**   Correct.

3  **Q.**   And that's when you told them on-site arrest, for

4  Logansport, for the armed robberies that happened there?

5  **A.**   Correct.

6  **Q.**   Now, did you stay on scene as the driver of the car was

7  arrested?

8  **A.**   I did.  I observed him exit the vehicle.  And as he exited

9  the vehicle, I remember seeing the clothing that he was wearing

10 was consistent, if not identical, to the clothing in the

11 Decatur armed robbery that had recently occurred.

12 **Q.**   And when you say you saw him exit the driver's door, do

13 you see that person in court here today?

14 **A.**   I do.

15 **Q.**   Can you, please, point to that person and identify an

16 article of clothing that he or she is wearing?

17 **A.**   Blue shirt.

18       **MS. DONNELLY:**  Your Honor, I would ask that the

19 record reflect an in-court identification of Rex Hammond.

20       **THE COURT:**  Any objection, Mr. Otis?

21       **MR. OTIS:**  Other than it's a green shirt, no.

22       **THE COURT:**  The record will so show.

23 BY MS. DONNELLY:

24 **Q.**   Now, Detective Quick, had you, for some reason, been

25 unable to get in contact with Detective Preston, would Rex

1   Hammond have still been handcuffed and brought to a police

2   station?

3   **A.**   Yes.

4   **Q.**   And what was the reason behind that, relative to your

5   investigation?

6   **A.**   At this point in time in our investigation, we had, you

7   know, the gun that was recovered in Kalamazoo; the other

8   evidence, as far as who sold the gun to Rex, saying that it was

9   sold to him; the picture without his mask on; the consistency

10  of the gun, which was unique, in my opinion, to this

11  investigation, leading back to Rex Hammond.  He would be

12  brought in for questioning, at that time.

13  **Q.**   And, also, you had the information regarding his prior

14  criminal history?

15  **A.**   Correct.

16  **Q.**   And, at that point, you believed, at least, that there was

17  probable cause that he had committed these robberies,

18  specifically the Auburn one that you had helped investigate?

19  **A.**   Correct.

20  **Q.**   Now, was there also a female passenger from that car who

21  was arrested?

22  **A.**   Yes.  I believe her last name was Latendresse.

23  **Q.**   Now, I am going to show you on the ELMO a photograph.

24        You said you saw the car out there and you followed

25  it from South Bend.  It got stopped in Plymouth.

1          Showing you what's been marked as Government

2   Exhibit's 11, do you recognize that photograph?

3   **A.**    Yes.

4   **Q.**    What is it?

5   **A.**    I believe that's Rex Hammond's vehicle.

6   **Q.**    And does that truly and accurately depict the car that

7   we've been talking about from the night of October 30th into

8   the early-morning hours of October 31st?

9   **A.**    Yes.

10  **Q.**    Now, from the time that that car was spotted in South Bend

11  until the time that you came to the traffic stop and told

12  Marshall County to arrest Hammond, had you seen or relied on

13  any ping locations between specifically just that time period?

14  **A.**    No.  From the time that we left South Bend and the vehicle

15  began moving, I was no longer paying attention to any pings.

16  They may have been coming to me, but I was not relying on them.

17  **Q.**    Now, the vehicle itself, did you tell Marshall County that

18  there was something that you wanted them to do with it, in

19  terms of your investigation?

20  **A.**    Correct.  They -- I believe they wanted to bring the

21  vehicle back to the Sheriff's Department to inventory it, due

22  to the inclement weather at the time, but I requested that the

23  vehicle be secured and followed to the State Police Post in

24  Bremen so that we could apply for a search warrant.

25  **Q.**    You said, "Inclement weather."

1            What was going on with the weather?

2    **A.**    It was very windy and very, very cold.

3    **Q.**    Now, you yourself may not have recovered it, but were you

4    aware that an item was recovered in plain view on the driver's

5    floorboard?

6    **A.**    I was told that there was a revolver-style handgun, I

7    believe, black --

8            **MR. OTIS:**    Objection.  Hearsay, Your Honor.

9            **MS. DONNELLY:**    Your Honor, for purposes of this

10   hearing --

11           **THE COURT:**    Yeah, I think it would go to the scope of

12   what would be suppressed, if I grant the motion, so I'll allow

13   the question.

14   **A.**    I was told that there was a black-in-color revolver

15   handgun recovered, which I believe I was shown pictures of, at

16   some point, which was consistent with the Decatur armed

17   robbery.

18   **BY MS. DONNELLY:**

19   **Q.**    And that would be the surveillance video from the

20   October 25th Decatur armed robbery?

21   **A.**    Correct.

22   **Q.**    Now, on the morning of the 31st, did you speak with both

23   Rex Hammond, as well as the female passenger?

24   **A.**    I did.

25   **Q.**    And when you spoke with Rex Hammond, did he speak with you

1    at all, essentially?

2    **A.**    No.  He was read **Miranda**, and, at that point in time, I

3    believe, he asked myself where I was from, asked the other

4    detective, which was Detective Preston, what department he

5    worked for, and he said, "I'm not talking to you."

6    **Q.**    And, just in summary, did you speak with the female

7    passenger post-**Miranda** and what did she generally tell you?

8            **MR. OTIS:**  Same objection.  Hearsay.

9            **MS. DONNELLY:**  And again --

10           **THE COURT:**  I'll allow the question.

11           At some point, we're going to need to take the lunch

12   break, Ms. Donnelly, so if you want to find a place.

13           **MS. DONNELLY:**  Understood, Your Honor.  I think I

14   have approximately five more questions for Detective Quick.

15           **THE COURT:**  Go ahead.

16           You may answer as to what the female passenger told

17   you.

18   **A.**    During the interview, she told me a lot of things.  I have

19   not had the opportunity to go back and review the actual

20   interview with her.  I went through my report, some of the

21   things that she had said, but she had indicated basically that

22   he was en route or going that night to rob a place.  She knew

23   that he had a gun.  She had also made mention in the interview

24   of him losing a gun during one of his armed robberies.

25   \\\

```
 1   BY MS. DONNELLY:

 2   Q.   A previous one?

 3   A.   Correct.

 4   Q.   Did you obtain several search warrants in connection with

 5   this investigation?

 6   A.   I did.

 7        MS. DONNELLY:  And, Your Honor, with permission to

 8   approach, I'd like to show the witness what's been marked as

 9   Government's Exhibit 12, 13, 14, and 15?

10        THE COURT:  You may.

11        (Discussion held out of reporter's hearing.)

12   BY MS. DONNELLY:

13   Q.   And, Detective Quick, I'm showing you these four exhibits.

14        Are those four of the search warrants that you

15   applied for in this case?

16   A.   Yes, it appears so.

17   Q.   And the attached affidavits were completed and signed off

18   on by yourself?

19   A.   Yes, ma'am.

20        MS. DONNELLY:  Your Honor, I would seek to admit all

21   four of those search warrants and attached affidavits as

22   exhibits.

23        MR. OTIS:  No objection.

24        THE COURT:  Without objection, Government's 12

25   through 15 are admitted into evidence.
```

1    **BY MS. DONNELLY:**

2    **Q.**    And, Detective Quick, for the search warrants, 12 and 13,

3    for the car and for the clothing, was there items of

4    evidentiary value that were recovered as a result of those

5    search warrants?

6    **A.**    There was.

7    **Q.**    And Search Warrants 14 and 15 are for a Garmin device and

8    a cell phone.

9            Were those located in the car during the execution of

10   the vehicle search warrant?

11   **A.**    They were.

12   **Q.**    So, after the vehicle search warrant was executed, you

13   applied for those ones at a later date?

14   **A.**    Correct.

15   **Q.**    And what was the reason that there were search warrants

16   applied for on different dates for the same items?

17   **A.**    We had an issue, once the search warrant was secured.  I

18   believe the evidence was given to Agent Badowski, and there

19   were some issues there, as far as having the tech people get

20   the information off there, off the devices.  I was told the

21   phones and the devices ended up going to another location,

22   another state, I believe, to actually have the search warrant

23   executed on them.

24   **Q.**    So, essentially, the first time the search warrant was

25   attempted to be executed, it was unsuccessful, so you applied

1   for another one to try again?

2   **A.**   Correct.  After so many days had passed, we had applied

3   for another search warrant.

4           **MS. DONNELLY:**  Your Honor, I would seek to admit

5   Exhibit Number 11.  I believe I may have just shown that and

6   not sought to admit it.

7           **THE COURT:**  Is that the photo of the car?

8           **MS. DONNELLY:**  Correct.

9           **MR. OTIS:**  No objection.

10          **THE COURT:**  Without objection, Government's 11 is

11  admitted into evidence.

12          **MS. DONNELLY:**  And, otherwise, Your Honor, I have no

13  further questions for Detective Quick.

14          **THE COURT:**  We'll go ahead and take the lunch break

15  before we start with the Cross.  Why don't we plan to resume at

16  1:30, to give time to get Mr. Hammond some lunch.  We'll see

17  you at 1:30.

18          Two more witnesses after this?

19          **MS. DONNELLY:**  That's correct, Your Honor.

20          **LAW CLERK:**  All rise.

21          **(All comply; lunch recess taken.)**

22          **THE COURT:**  You can be seated.

23          **(All comply.)**

24          **THE COURT:**  Mr. Quick, you may come back up.

25          **THE WITNESS:**  (Complies.)

1    **THE COURT:**   And, Mr. Otis, you may cross-examine.

2    **CROSS-EXAMINATION**

3    **BY MR. OTIS:**

4    **Q.**   Detective Quick, you work for the Indiana State Police; is

5    that correct?

6    **A.**   Yes, sir.

7    **Q.**   And you're based out of the Auburn Post; is that right?

8    **A.**   Fort Wayne Post.

9    **Q.**   Fort Wayne Post.

10         Do you work in the same building as Detective Sexton?

11   **A.**   I do.  I share an office at the Auburn Police Department

12   with him.

13   **Q.**   And how long have you been at the Indiana State Police?

14   **A.**   Approximately twelve years.

15   **Q.**   And when did you become involved in the investigation of

16   these robberies?

17   **A.**   I believe it was a few days after the initial call-out

18   happened.  I cover that area for DeKalb County.  That's my

19   county of assignment.  I was unavailable the night -- or the

20   early-morning hours when it came in, so another detective took

21   the initial report.

22   **Q.**   When you say after it happened, which incident?  I'm

23   sorry.

24   **A.**   I'm sorry.  The Auburn armed robbery at the gas station on

25   Touring Drive.  Another detective from my post originally

1    responded to handle the call-out.

2    **Q.**   And what day was that?

3    **A.**   I believe that was on the 9th.

4    **Q.**   Of October?

5    **A.**   Of October, yes, sir.

6    **Q.**   And it was difficult to determine who the individual was

7    committing these robberies; is that correct?

8    **A.**   Yes, sir.

9    **Q.**   In fact, on October 25th, is that correct, a meeting of

10   various agencies was held in Coldwater, Michigan?

11   **A.**   Correct, sir.

12   **Q.**   And, at that point, the identification of the

13   individual -- the individual had not been identified who

14   committed these crimes, correct?

15   **A.**   That's correct.

16   **Q.**   There had been no forensic evidence identifying an

17   individual, correct?

18   **A.**   Not to my knowledge, no.

19   **Q.**   No witnesses to these crimes identified an individual,

20   correct?

21   **A.**   Not identified nobody, no.

22   **Q.**   Obviously, a gun was recovered from the Kalamazoo robbery,

23   correct?

24   **A.**   Correct, sir.

25   **Q.**   And the investigation was done by ATF, correct?

**A.**    Correct.  I was with the ATF on the e-trace investigation

on that gun, going back.

**Q.**    Were you involved in interviewing witnesses?

**A.**    Yes, sir.

**Q.**    Which witnesses did you interview?

**A.**    I would have to refer to my report for the exact names,

but I went with Agent Badowski, the original person, the guy in

Culver.  If you would like me to refer to my report, I can.

**Q.**    Yeah, feel free.

**A.**    This might take me a second.  It's fairly lengthy.

         I believe the first subject we spoke to is a

Mr. Sporner.

**Q.**    Sure.

         And he had indicated he sold the gun to Mr. Maxwell;

is that correct?

**A.**    I believe so.

**Q.**    Tommy Maxwell, does that sound right?

**A.**    I believe so.

**Q.**    And were you aware that Tommy Maxwell had just came off

federal probation?

**A.**    I was not.

**Q.**    Were you aware that he was prohibited from owning

firearms?

**A.**    No.

**Q.**    Were you part of the interview when they interviewed

1   Mrs. Maxwell?

2   **A.**    I believe so.

3           Is that a Wendy?

4   **Q.**    Yes.

5   **A.**    I believe so, yes.

6   **Q.**    Okay.  I believe you have it in your report:  We continued

7   to speak with Mrs. Maxwell.  She eventually admitted she gave

8   some false information and withheld information from us in

9   reference to other guns she had purchased.

10          So, she had not been completely truthful with your

11  investigation?

12  **A.**    From my memory, correct, she was not.

13  **Q.**    And, then, you ultimately learned that the gun had been

14  sold to Todd Forsyth, correct?

15  **A.**    That's where Agent Badowski would have taken over.  After

16  the original interviews had took place over there that day in

17  South Bend, Agent Badowski continued investigating the purchase

18  and the selling of the firearm.

19  **Q.**    So you didn't participate in the interview of Todd

20  Forsyth?

21  **A.**    I did not.

22  **Q.**    Were you aware that he was also a person prohibited from

23  owning firearms because of a felony conviction?

24  **A.**    In conversation with Agent Badowski, I believe it was

25  mentioned, he was a convicted felon.

**Q.**   As a result of that investigation, Mr. Forsyth identified an individual by his first name only, correct, Rex?

**A.**   From my knowledge, from Agent Badowski, correct.

**Q.**   And also provided a phone number, correct?

**A.**   Correct.

**Q.**   Who, then, ran the phone number through the system to determine where the phone number was -- what company had the cell phone?

**A.**   That would have been Detective Corey Heffelfinger, with Auburn Police Department, works with Detective Sexton, as well.

**Q.**   And it was determined that this was a phone number for AT&T; is that correct?

**A.**   I believe so, but I'm not positive on that.

**Q.**   Would you have provided that information to Detective Ghiringhelli in Kalamazoo?

**A.**   Which information, the AT&T?

**Q.**   Yes.

**A.**   I could have.  I'm not sure on that, if I did or not.

**Q.**   And I believe you testified that, on October 29th, you informed the various departments about the cell phone records, is that correct, or the cell phone number?

**A.**   I notified several people of the information that was learned over the course of that weekend, correct.

**Q.**   What specific information was learned that weekend?

**A.**   As far as Rex Hammond, the name, the phone number

1  associated with his last name, a driver's license, information,

2  criminal history, I believe a vehicle registration check, and

3  that would probably be it.

4  **Q.**   At this point, nobody had obtained the specific cell phone

5  records regarding location or pinging, correct?

6  **A.**   Not initially, no.

7  **Q.**   And this was over -- on a Sunday; is that correct?

8  **A.**   Saturday into Sunday, correct.

9  **Q.**   Have you ever obtained search warrants or arrest warrants

10  over the weekend?

11  **A.**   Yes.

12  **Q.**   Did anything prohibit you from obtaining an arrest or

13  search warrant over that weekend?

14  **A.**   No.

15  **Q.**   Prior to Detective Ghiringhelli obtaining the cell phone

16  location records, did you know he was going to do that?

17  **A.**   We had conversations about it, but I did not know that he

18  was going to ping the phone, no.

19  **Q.**   Would you have obtained a warrant prior to obtaining that

20  cell phone information?

21  **A.**   I can't say, as far as my investigation, as far as where

22  we were at, as far as pinging the phone.  I was on days off, at

23  the time, with information coming in.  Obviously, we've got a

24  lot of other agencies involved.  I can't say what I would have

25  done exactly, get a search warrant or get one after the fact,

1    if I was to ping it.

2    **Q.**   Had you obtained cell phone records like that in prior

3    cases?

4    **A.**   I have.

5    **Q.**   Do you typically obtain a warrant prior to doing that?

6    **A.**   The most recent that I can think of, I applied for a

7    search warrant, after the fact, for extended circumstances on a

8    homicide case.

9    **Q.**   And, then, on October 30th, you received a phone call from

10   Detective Ghiringhelli that he obtained the cell phone history

11   and pinging information; is that correct?

12   **A.**   Correct, on that Monday.

13   **Q.**   On Monday, October 30th.

14          Did he then provide you with the historical location

15   information that day, as well?

16   **A.**   He had told me, from my memory of this, that he had used

17   the cell phone history to obtain that he knew that he was in

18   Kalamazoo.  At that time, I do not believe that we had

19   information for the Auburn armed robbery, but that stuff was

20   being looked in while I'm going up there to locate Mr. Hammond.

21   **Q.**   Somebody else was looking at that information, not you?

22   **A.**   Correct.

23   **Q.**   Did you ever look at the specific cell phone, cell site

24   information on October 30th?

25   **A.**   I don't believe so.

1    **Q.**   You were relying on what other people are telling you?

2    **A.**   Correct.

3    **Q.**   Who else besides Detective Ghiringhelli would have been

4    looking at that information that day?

5    **A.**   There was a detective out of Peru -- I'd have to look at

6    the report to get his name -- who was also looking at stuff,

7    and I believe Ghiringhelli, and there was also another Michigan

8    agency, I believe, maybe, in Saint Joe, that also had an armed

9    robbery.

10   **Q.**   Did Detective Preston, from the Logansport Police

11   Department look at that information that day?

12   **A.**   I was told he was, yes, that he had looked at it.

13   **Q.**   Did you communicate with Detective Preston that day about

14   the cell phone information?

15   **A.**   On Monday, I'm not sure if I had talked to him, but I

16   know, Sunday, when I learned of the information, I had called

17   him on the phone.

18   **Q.**   So, you went along -- on Monday, October 30th, you and

19   Detective Sexton start driving to Elkhart, based off of the

20   pinging information you had received from Detective

21   Ghiringhelli; is that correct?

22   **A.**   It was based on a lot of different things, but that was,

23   obviously, the reason we were going over there.  We knew where

24   he was at.

25   **Q.**   If you didn't have the cell phone pinging information, you

1   wouldn't have known specifically where he was at, correct?

2   **A.**   Correct.

3   **Q.**   And this information, you were receiving it every fifteen

4   minutes; is that correct?

5   **A.**   I believe it's fifteen to twenty minutes, correct.

6   **Q.**   Is that being forwarded to you by Detective Ghiringhelli?

7   **A.**   Correct.

8   **Q.**   Was he getting that information, to your knowledge,

9   directly from AT&T?

10  **A.**   I believe so.

11  **Q.**   AT&T wasn't providing you directly with the information?

12  **A.**   Correct.

13  **Q.**   So, as he would receive it, would he just automatically

14  forward that to you?

15  **A.**   I'm not sure.  I just know that they were coming to me.

16  **Q.**   How were they coming to you, by e-mail?

17  **A.**   E-mail and text, different times, also phone conversations

18  with him.

19  **Q.**   When we say the pinging information, what is that

20  specifically?

21  **A.**   As far as you receive, I believe, a latitude/longitude of

22  an area where the cell phone is pinging.  Then you have to look

23  up the latitude/longitude, so, I remember, he actually assisted

24  with that because I was getting car sick at the time I was

25  trying to look at it and find the location that I was supposed

1    to be going to.  So he was assisting with that and basically

2    saying, "This is the area you need to be in."

3    **Q.**   So he's taking the latitude and longitude and like

4    throwing it into Google Maps, for example?

5    **A.**   I can't tell you if that's what he was doing or not.

6    **Q.**   Were you doing that?

7    **A.**   I had done that on a couple of them, correct.

8    **Q.**   Was Detective Sexton doing that?

9    **A.**   I don't know.

10   **Q.**   Was Detective Sexton, to your knowledge, getting the same

11   information you were?

12   **A.**   From my knowledge, I remember updating Detective Sexton,

13   most of the time.

14   **Q.**   So, based on what you knew, you're probably just passing

15   it on to Sexton, correct?

16   **A.**   Correct.

17   **Q.**   How long does it take you to get from Auburn, Indiana to

18   Elkhart?

19   **A.**   Probably an hour, approximately.

20   **Q.**   And, ultimately, you figure out he's not in Elkhart,

21   correct?

22   **A.**   Correct.

23   **Q.**   And then you get another ping, or information from

24   Detective Ghiringhelli based on a ping, that he's at -- that

25   Mr. Hammond's at a hotel in South Bend; is that correct?

**A.**    There were several more pings that came in.  I don't

believe he ever said he was at a hotel.  He gave us an area

that it was at, and we located it at a hotel.

**Q.**    And, of course, you wouldn't have been able to locate him

at that hotel if it weren't for the pinging information

Detective Ghiringhelli was giving you, correct?

**A.**    Correct.

**Q.**    Then, once you located the vehicle, Detective Sexton

confirmed that it was Mr. Hammond's vehicle, correct?

**A.**    Correct.

**Q.**    And both of you were in undercover vehicles?

**A.**    Correct.

**Q.**    Yours wasn't, I guess it's fair to say, as undercover

because it was a Dodge Charger?

**A.**    Correct.

**Q.**    After that, when Mr. Hammond came out with the other

individual, you began following him, correct?

**A.**    Correct.

**Q.**    Did you attempt to call anybody in Saint Joe County?

**A.**    I attempted to call my -- I did call my post, the Bremen

Post, which covers that area.

**Q.**    Now, obviously, at that point, you don't need to ping him

to know where he's at?

**A.**    (No response.)

**Q.**    You need to say "yes" or "no."

1   **A.**   Correct.

2   **Q.**   How long, approximately, is that drive from the hotel to

3   Plymouth, Indiana?

4   **A.**   Twenty, twenty-five minutes.

5   **Q.**   Is it the pretty normal route, to get from here to

6   Plymouth, you take 31?  Is that the route --

7   **A.**   That's the way I would take.

8   **Q.**   And, then, you and Mr. Sexton, Detective Sexton, followed

9   Mr. Hammond into downtown Plymouth; is that correct?

10  **A.**   Correct.

11  **Q.**   At some point, he turned off, and you couldn't follow him

12  anymore; is that correct?

13  **A.**   Correct.

14  **Q.**   Now, presumably, you could have followed him, but it would

15  have been extremely obvious that he was being followed; is that

16  fair to say?

17  **A.**   That's correct.

18  **Q.**   During this time, you communicate, as the audio played

19  earlier, with Marshall County dispatch?

20  **A.**   Correct.

21  **Q.**   And, ultimately, an officer from Marshall County -- you

22  met with an officer from Marshall County?

23  **A.**   Correct.

24  **Q.**   You provided him with information regarding the vehicle?

25  **A.**   Correct.

1  **Q.**   And you had indicated to him that you had been pinging the

2  vehicle; is that correct?

3  **A.**   Correct.

4  **Q.**   And you were waiting on another ping to come to relocate

5  Mr. Hammond, correct?

6  **A.**   Correct.

7  **Q.**   In that meantime, the officer had identified the vehicle

8  as driving up the street and began following it, correct?

9  **A.**   Correct.  He thought the vehicle had went by him.

10 **Q.**   And, to your knowledge, that officer, and no other officer

11 from Marshall County, was specifically watching that vehicle,

12 prior to you guys asking them to locate the vehicle, correct?

13 **A.**   Correct.

14 **Q.**   When did you talk -- at some point during that drive, you

15 talked to Detective Preston, correct?

16 **A.**   Correct.

17 **Q.**   Do you recall when that was, the first time you talked to

18 him?

19 **A.**   Like I said -- I was trying to remember.  I was making so

20 many phone calls -- it was either while we were following him

21 or after I had lost sight of him.  I made several phone calls

22 after I was no longer watching him.  It could have been both.

23 **Q.**   So, obviously, the Marshall County officer initiated a

24 traffic stop on Mr. Hammond, correct?

25 **A.**   Correct.

1  **Q.**   You didn't actually witness the initiation of the traffic

2  stop?

3  **A.**   I did not.

4  **Q.**   You later learned that the officer had identified, I

5  guess, two bases for the traffic stop, one being failure to use

6  turn signal and speeding, correct?

7  **A.**   I remember speeding and another moving violation.

8  **Q.**   And, then, during the traffic stop, you advised the

9  Marshall County officer to make an arrest because the

10 Logansport police officer, Detective Sexton, had probable cause

11 for an arrest; is that correct?

12 **A.**   Detective Preston, correct.

13 **Q.**   Yeah.

14         Detective Preston, during that phone conversation

15 with him, did he identify the reasons that supported his

16 probable cause?

17 **A.**   He did not.

18 **Q.**   So you relied solely on Detective Preston telling you that

19 he had probable cause, correct?

20 **A.**   Correct.

21 **Q.**   Did you continue receiving pings when you were in Marshall

22 County?

23 **A.**   I remember seeing -- the last ping, I believe, was where

24 his vehicle was stopped.  I don't remember when I received

25 that.  I was busy doing other things.  I wasn't paying

1    attention to the pings at that point.

2    **Q.**   It really wasn't necessary, at that point, correct?

3    **A.**   Correct.

4    **Q.**   You're not aware that Marshall County officers had any

5    other basis to arrest Mr. Hammond, correct?

6    **A.**   After the traffic stop was complete, I was told that they

7    did have -- they would have local charges on him.

8    **Q.**   But prior to making the arrest -- or prior to making the

9    traffic stop, Marshall County had no other information, other

10   than what you had provided them, regarding Mr. Hammond's

11   criminal history, correct?

12   **A.**   That would be correct.

13          **MR. OTIS:**   I'll pass the witness.

14          **THE COURT:**   Thank you, sir.

15          Any Redirect, Ms. Donnelly?

16          **MS. DONNELLY:**   If I could just have one moment,

17   Your Honor?

18          **(Discussion held out of reporter's hearing.).**

19          **MS. DONNELLY:**   Just to follow up, very briefly.

20                    REDIRECT EXAMINATION

21   BY MS. DONNELLY:

22   **Q.**   You mentioned that Marshall County -- you later learned

23   about local charges that they would have from the traffic stop.

24          Is that, to your understanding, methamphetamine that

25   was recovered from Rex Hammond following the traffic stop and

1  his arrest?

2  **A.**   Correct.

3         When they had conducted the felony stop on him, when

4  he exited the vehicle, I was told a handgun, which I described

5  earlier, and methamphetamine was found in the vehicle, and this

6  came up in conversation as far as where he was going to go, if

7  he was going to go back to Logansport.  And, at that time, we

8  knew he was going to Marshall County with local charges, and

9  that's where we conducted interviews and furthered our

10 investigation, there.

11         **MS. DONNELLY:**  Nothing further, Your Honor.

12         **THE COURT:**  Thank you, ma'am.

13         Any Recross, Mr. Otis?

14     **MR. OTIS:**  One second.

15                     **RECROSS-EXAMINATION**

16 **BY MR. OTIS:**

17 **Q.**   Detective, you had indicated you were not there when the

18 traffic stop was initiated, correct?

19 **A.**   That's correct.

20 **Q.**   You did come on the scene after it was initiated?

21 **A.**   Correct.

22 **Q.**   And, I guess, the weapons -- or the weapon and the drugs

23 that were found, those were not found until after Mr. Hammond

24 and the other individual in the car were detained, correct?

25 **A.**   To my understanding, correct.

1      **MR. OTIS:**  No further questions.

2      **THE COURT:**  Thank you, sir.

3      You may step down, Detective Quick.  Thank you.

4      **(Witness excused.)**

5      **THE COURT:**  The Government may call its next witness.

6      **MS. DONNELLY:**  Thank you, Your Honor.

7      The Government, next, calls Tyler Preston.

8                          **TYLER PRESTON,**

9      **Government's witness, sworn and testified as follows:**

10                     **DIRECT EXAMINATION**

11     **BY MR. REILANDER:**

12     **Q.**   Can you, please, state your name and spell your name for

13     the record?

14     **A.**   Tyler Preston.  T-y-l-e-r.  P-r-e-s-t-o-n.

15     **Q.**   And what do you do for a living?

16     **A.**   I am a detective with the Logansport Police Department.

17     **Q.**   How long have you been doing that?

18     **A.**   Almost eight years.

19     **Q.**   What are your duties in that capacity?

20     **A.**   I am in adult investigations, work crimes related to

21     theft, robbery, and up to murder.

22     **Q.**   Were you acting as a detective in that capacity in October

23     of 2017?

24     **A.**   I was.

25     **Q.**   Let me turn your attention to October 6th of 2017.

1              Was there a robbery at a location in Logansport?

2  **A.**    Yes, sir.

3  **Q.**    Did you start investigating that robbery?

4  **A.**    I did.

5  **Q.**    All right.  Following that, on October 25, 2017, did you

6  attend a meeting in Coldwater, Michigan?

7  **A.**    Yes, sir.

8  **Q.**    What was the purpose of that meeting?

9  **A.**    For all the agencies that were involved in investigation

10  to get together to try to figure out if we can come up with a

11  suspect.

12  **Q.**    So, by that point, were you aware that the suspect in your

13  October 6th Logansport robbery was suspected to have done other

14  robberies in other locations?

15  **A.**    Correct.

16  **Q.**    Following that meeting on October 25th, a couple days

17  later, on October 27th, was there another robbery at a location

18  in Logansport?

19  **A.**    There was.

20  **Q.**    Did you investigate that robbery?

21  **A.**    Yes, sir.

22  **Q.**    Based on your investigation there, did you come to believe

23  that the suspect in that robbery was also involved in the other

24  robberies, as well?

25  **A.**    I did.

**Q.**   What made you think that?

**A.**   With the similar clothing, similar build, similar weapon.

**Q.**   Did you share that information with the other law enforcement agencies investigating the series of robberies?

**A.**   I did.

**Q.**   Now, the weekend -- October 27th is a Friday, correct?

**A.**   I don't know.

**Q.**   You don't know, okay.  That's okay.

        Let me say this:  Following that second robbery, did you get additional information from Detective Jay Quick regarding a phone number and name associated with the suspected individual who had done the robberies?

**A.**   I did.

**Q.**   In particular, were you notified that -- well, let me back up.

        Were you familiar with the fact that a gun had been recovered from a previous robbery in Kalamazoo, Michigan?

**A.**   Yes.

**Q.**   And did you get notification that that gun had been traced to somebody named Rex?

**A.**   Eventually, down the line, it was to Rex, yes.

**Q.**   And did you also get information that the individual associated with the phone number of that sale was a Rex Hammond, based on his driver's license?

**A.**   Yes, sir.

1    **Q.**   And did you get information regarding a photo of that

2    driver's license?

3    **A.**   I did.

4    **Q.**   Now, by this point, having an identity of a suspect and

5    then the fact that suspect had been, you know, involved in all

6    these different robberies, in your mind, did you think you had

7    probable cause to make an arrest of Mr. Hammond?

8    **A.**   I did.

9    **Q.**   Now, at some point during the weekend, following that

10   second robbery at Logansport, did you have communication with

11   Detective Quick regarding tracking of the cell phone in

12   question?

13   **A.**   Yes, sir.

14   **Q.**   Well, actually, I should -- and was that on Monday,

15   October 30th, to the best of your memory, regarding the

16   tracking?

17   **A.**   Yes.

18   **Q.**   All right.  Before you got notice that there was tracking

19   of the cell phone, did you have a phone conversation with your

20   local prosecutor regarding possible charges on Mr. Hammond?

21   **A.**   I did.

22   **Q.**   And do you recall when that conversation was?

23   **A.**   I don't recall the date.

24   **Q.**   Okay.  What was the nature of that conversation?

25   **A.**   Basically, explaining to the prosecutor the similarities

1   between all the robberies and talking about if I had enough

2   probable cause to make an arrest if we're able to locate

3   Mr. Hammond.

4   Q.   Did you have that conversation before you received notice

5   that Mr. Hammond had actually been stopped?

6   A.   Yes.

7   Q.   So, Monday, when Detective Quick is notifying you that

8   they're tracking Mr. Hammond via his cell phone -- correct?

9   A.   Correct.

10  Q.   -- did you have several conversations with Detective Quick

11  during that day?

12  A.   I did, off and on.

13  Q.   At some point, did you start to drive toward Detective

14  Quick's location?

15  A.   Yes, sir.

16  Q.   And what was the purpose of doing that?

17  A.   I was going to meet with them to make an arrest for

18  robbery.

19  Q.   Was it your understanding that Detective Quick was

20  pursuing or following Mr. Hammond's vehicle at that time?

21  A.   Yes.

22  Q.   Were you driving towards Plymouth during that time period?

23  A.   Yes.

24  Q.   And this was on the night or early-morning hours of the

25  night of October 30th, going into the 31st?

**A.**    Yes, sir.

**Q.**    Okay.  At some point, do you get another phone call from Detective Quick indicating that the car that they had been pursuing had been pulled over?

**A.**    Yes.

**Q.**    Did you have a conversation with Detective Quick at that point?

**A.**    I did.

**Q.**    And what was the nature of that conversation?

**A.**    I advised Detective Quick to detain him, reference my investigation.

**Q.**    What did you do, next, after that conversation?

**A.**    I drove to Plymouth, to the Marshall County Jail.

**Q.**    And did you go to the location where Mr. Hammond had been stopped?

**A.**    Not to where he was stopped.  I went to the jail.

**Q.**    Was Mr. Hammond there, at that point?

**A.**    He was.

**Q.**    At that time, did you try to interview Mr. Hammond with Detective Quick?

**A.**    Yes, sir.

**Q.**    And, then, later that same morning -- this would be October 31st -- did you meet with your deputy prosecutor back in Cass County?

**A.**    I did.

**Q.**   And what was the purpose of that meeting?

**A.**   We went before the judge in an attempt to get an arrest warrant for Mr. Hammond.

**Q.**   And did you get an arrest warrant?

**A.**   We did.

**Q.**   Was it for the two counts of armed robbery, the two different robberies that occurred in Logansport?

**A.**   Yes, sir.

     **MR. REILANDER:**   One moment, Your Honor.

     **(Discussion held out of reporter's hearing.)**

     **MR. REILANDER:**   One final clarification.

**Q.**   That final phone call that you had with Detective Quick when he's told you that Mr. Hammond's been stopped, that phone call was after your conversation with your local prosecutor; is that right?

**A.**   Yes.  Yes.

**Q.**   And when you talked to Detective Quick, I think you mentioned that -- well, did you tell Detective Quick that he should arrest or have Mr. Hammond arrested for the robberies in Logansport?

**A.**   Yeah.  Mr. -- I'm sorry -- Detective Quick asked me if I believed I had enough probable cause for an arrest, and I advised him, "Yes."

**Q.**   Very good.

     **MR. REILANDER:**   That's all, Your Honor.

1        **THE COURT:**  Thank you, sir.

2        Any Cross, Mr. Otis?

3        **MR. OTIS:**  Yes.

4                    **CROSS-EXAMINATION**

5   **BY MR. OTIS**

6   **Q.**   Detective Preston, you work at, is it, Cass County or

7   Logansport?

8   **A.**   Logansport Police Department.

9   **Q.**   And there were two robberies separated by twenty-one days,

10  is that correct, that happened in Logansport?

11  **A.**   Yes, sir.

12  **Q.**   And did you become involved in the first robbery on

13  October 6th?

14  **A.**   I did.

15  **Q.**   Did you get called out to the scene of that?

16  **A.**   Yes, sir.

17  **Q.**   And no witnesses were able to positively identify the

18  individual that committed that robbery, correct?

19  **A.**   Correct, sir.

20  **Q.**   And there was no forensic evidence linking the robbery to

21  any specific individual, correct?

22  **A.**   At that point, no, sir.

23  **Q.**   The same with the October 27th robbery in Logansport; no

24  witnesses were able to identify the person that committed the

25  robbery, correct?

1  **A.**    One victim advised that he appeared to be similar to a

2  photograph that I had showed her, but that was it.

3  **Q.**    Okay.  But nobody had linked -- prior to the cell phone

4  information, nobody had directly linked Mr. Hammond to either

5  of the Logansport robberies, correct?

6  **A.**    No, sir.

7  **Q.**    And there was no forensic evidence linking Mr. Hammond to

8  the October 27th robbery, correct?

9  **A.**    No, sir.

10  **Q.**    What day did you learn that Rex Hammond may have been

11  involved in this?

12  **A.**    I don't recall the date, sir.  It was a few days prior to

13  him being detained.

14  **Q.**    Was it over a weekend?

15  **A.**    I don't recall the exact date.

16  **Q.**    How did you learn about it?

17  **A.**    I received a phone call from Detective Quick.

18  **Q.**    And what did he tell you?

19  **A.**    He told me that he had come up with a phone number which

20  was associated with the name and provided Mr. Hammond's

21  information.

22  **Q.**    What specific information did he provide you about

23  Mr. Hammond?

24  **A.**    I don't recall if he sent me a photograph through a text

25  message with the driving status and a photo ID of Mr. Hammond

1    or if he had just told me.  I don't recall.

2    **Q.**   And it was at that point, it's your testimony, that you

3    had probable cause to arrest Mr. Hammond for the Logansport

4    robberies?

5    **A.**   Yes, sir.

6    **Q.**   What specific facts, at that point, supported your

7    position that you had probable cause?

8    **A.**   All the similarities, sir, between all the robberies

9    collectively; I believed that there was enough probable cause

10   for Mr. Hammond's arrest.

11   **Q.**   Which robberies?

12   **A.**   The Logansport, the Peru, and, I believe, the Auburn, and

13   even into Michigan were the same clothing, same white bags,

14   same weapon, appeared to be the same shoes, same build.

15   **Q.**   So, at that point, you had reason to believe that the same

16   person was committing these crimes, correct?

17   **A.**   Correct.

18   **Q.**   But what specifically pointed you to Mr. Hammond?

19   **A.**   I would say the weapon returning back to him would be one

20   of the indicators.

21   **Q.**   Obviously, the second robbery involved a different weapon,

22   correct?

23   **A.**   Correct.

24   **Q.**   And the investigation, at that point,  had just revealed

25   that an individual named Rex may have owned the weapon, at one

 1  point, correct?

 2  **A.**   Correct.

 3  **Q.**   Did you do any independent investigation into tracing the

 4  weapon?

 5  **A.**   No, sir.

 6  **Q.**   Were you aware that individuals with felony convictions

 7  who are prohibited from owning firearms may have been involved

 8  in that weapon, in owning that weapon?

 9  **A.**   I'm not familiar with the history of the weapon, sir.

10  **Q.**   Okay.  Would that have an effect on whether or not you had

11  probable cause, if individuals providing evidence regarding the

12  weapon had felony convictions?

13  **A.**   No, sir.

14  **Q.**   They're not less trustworthy, in your experience?

15  **A.**   I don't know what you're asking, sir.  I'm sorry.  Could

16  you repeat it?

17  **Q.**   People with felony histories, are they less trustworthy

18  than people without felony history, in your experience?

19  **A.**   Yes, most of the time.

20  **Q.**   So, would that have been -- when was it, specifically,

21  that you developed probable cause that Rex Hammond committed

22  the two robberies in Logansport, how many days before he was

23  arrested?

24  **A.**   I would think maybe four to five days, possibly, close to

25  that, when I received information on the name and the license

1    number.

2    **Q.**    And you received that from Detective Quick?

3    **A.**    Correct.

4    **Q.**    And prior to Detective Quick informing you of that, you

5    had no knowledge of the cell phone or the gun, correct?

6    **A.**    I had knowledge of his cell phone.

7    **Q.**    When did you obtain that knowledge?

8    **A.**    Mr. Quick.

9    **Q.**    Prior to Mr. Quick telling you that, you didn't know about

10   the cell phone number or who it was assigned to, correct?

11   **A.**    No.

12   **Q.**    Which specific prosecutor did you communicate with

13   regarding the probable cause?

14   **A.**    Deputy Prosecutor Schaffer.

15   **Q.**    What day was that; do you recall?

16   **A.**    I don't recall the exact date, no, sir.

17   **Q.**    How many days prior to Mr. Hammond's arrest did you

18   communicate with Deputy Prosecutor Schaffer regarding probable

19   cause?

20   **A.**    A couple times over the phone, sir.

21   **Q.**    How many days?

22   **A.**    Maybe a day, sir.  I don't know.

23   **Q.**    Did anything prohibit you, in the, I guess -- you had

24   indicated one day, up to three or four days, is that fair to

25   say, somewhere in that time frame, prior to his arrest?

1   **A.**   Yes, sir.

2   **Q.**   Did anything, in those one to four days, prohibit you and

3   the prosecutor from going before a judge in Cass County and

4   obtaining a search warrant or an arrest warrant for

5   Mr. Hammond?

6   **A.**   Not until -- I didn't know a name to get an arrest warrant

7   for a certain individual.

8   **Q.**   But you said that, three or four days prior to his arrest,

9   you had probable cause to arrest Rex Hammond?

10  **A.**   Not until I knew his name, no.  I had believed that I had

11  probable cause with the same involvements, same clothing, and

12  all the description that I provided you.

13  **Q.**   Right, but when -- you can't have probable cause that one

14  person committed multiple armed robberies.

15          When did you determine he, Mr. Hammond, had committed

16  these robberies and you had probable cause to arrest him?

17  **A.**   I believe once he was identified through photographs in

18  his BMV --

19  **Q.**   Which photographs?

20  **A.**   I recall a photograph with Mr. Hammond walking without a

21  hat on prior to one of the incidents.

22  **Q.**   Neither of those incidents were the Logansport robberies,

23  correct?

24  **A.**   No, sir.

25  **Q.**   You prepared a report, a supplemental narrative, as a part

1   of this; is that correct?

2   **A.**   Yes, sir.

3   **Q.**   Let me just ask you if you can look at that screen.

4         Is that the cover page of that report?

5   **A.**   It appears to be so.

6   **Q.**   Is that a report that you prepared?

7   **A.**   Yes.

8   **Q.**   I'm going to flip to the third page of that report.   I've

9   highlighted some text.

10         You learned that Detective Ghiringhelli of Kalamazoo

11  Police Department had obtained Mr. Hammond's cell phone

12  records; is that correct?

13  **A.**   Yes.

14  **Q.**   And you stated:   I, Detective Preston, contacted AT&T and

15  advised them that I was working an investigation regarding the

16  cell number and requested the same information for October 6th,

17  2017, due to our robbery occurring on October 6th, 2017.   I was

18  granted that information reference Logansport Case Numbers --

19  and you identify the two case numbers.

20         So, you obtained information directly from AT&T; is

21  that correct?

22  **A.**   I contacted AT&T and advised them I was requesting the

23  same information the Kalamazoo detective was.

24  **Q.**   Prior to obtaining that information from AT&T, did you

25  obtain a search warrant?

1    **A.**    No.

2    **Q.**    Did anything prohibit you from obtaining a search warrant?

3    **A.**    No.

4    **Q.**    Then, the next paragraph:  Through speaking with other

5    officers that were in attendance at the Coldwater meeting, it

6    was brought to the attention that the other departments had

7    received latitudes and longitudes provided from AT&T that

8    coincided with time frames from their robberies.  That

9    information provides that Rex's phone number hits towers in

10   their respective areas at the time of their robberies.  It

11   should be noted that I also looked up the time of the two

12   Logansport robberies, and it provides that Rex's phone was in

13   the immediate area during the dates and times of the Logansport

14   robberies.

15           Is that what you said?

16   **A.**    Yes, sir.

17   **Q.**    And you knew all of that information prior to Detective

18   Quick contacting you on the night of October 31st; is that

19   correct?

20   **A.**    Yes, but I can't recall the date of this report, again.

21   **Q.**    But you knew that information prior to Detective Quick

22   reaching out to you on October 31st regarding the arrest of Rex

23   Hammond, correct?

24   **A.**    Yes.

25   **Q.**    When you discussed -- and you indicated you discussed this

1    case with Deputy Prosecutor Schaffer on various occasions,

2    correct?

3    **A.**    I believe a couple, yes.

4    **Q.**    Would you have -- and I'm sorry.  Is Deputy Prosecutor

5    Schaffer a he or a she?

6    **A.**    He.

7    **Q.**    When talking with Deputy Schaffer, did you discuss the

8    cell phone records with him?

9    **A.**    I don't recall if I did, at that point, yet, or not.

10   **Q.**    But you agree that you knew about the cell phone

11   information and the location coordinates prior to speaking with

12   Detective Quick regarding the arrest, correct?

13   **A.**    Yes.

14   **Q.**    And you would not have included that information in your

15   report if you didn't think it was important, correct?

16   **A.**    Yes, sir.

17   **Q.**    Did that information form the basis for -- part of the

18   basis for probable cause to arrest Rex Hammond on October 31st,

19   2017?

20   **A.**    A part of it, yes, but not all of it, no.

21   **Q.**    You would agree; it was used as a basis to tell Detective

22   Quick that you had probable cause to arrest Rex Hammond on

23   October 31st, 2017; is that correct?

24   **A.**    That was in totality of all the other stuff, yes.

25   **Q.**    But it was a basis, part of the basis that --

1  **A.**    Yes, sir.

2          **MR. OTIS:**  No further questions.

3          **THE COURT:**  Thank you, Mr. Otis.

4          Any Redirect, Mr. Reilander?

5          **MR. REILANDER:**  One moment, please.

6          **(Discussion held out of reporter's hearing.)**

7          **MR. REILANDER:**  Nothing further, Your Honor.

8          **THE COURT:**  Thank you, sir.

9          You may step down, Detective Preston.  Thank you.

10         **THE WITNESS:**  Thank you.

11         **(Witness excused.)**

12         **MS. DONNELLY:**  The Government, next, calls Ryan

13  Hollopeter.

14                    **RYAN HOLLOPETER,**

15    **Government's witness, sworn and testified as follows:**

16                    **DIRECT EXAMINATION**

17  BY MS. DONNELLY:

18  **Q.**   Can you, please, state and spell your name?

19  **A.**   My first name is Ryan, R-y-a-n; middle initial C; my last

20  name is Hollopeter.  It's H-o-l-l-o-p-e-t-e-r.

21  **Q.**   Where do you work?

22  **A.**   I work for the Marshall County Sheriff's Department.

23  **Q.**   And how long have you been there?

24  **A.**   Ten years.

25  **Q.**   What's your current position there?

**A.**    Patrolman.

**Q.**    And how long have you been a patrolman?

**A.**    I've been a patrolman now for almost thirteen years.

**Q.**    Now, what do your general duties entail as a Marshall County patrolman?

**A.**    General duties would include enforcing local ordinances, state statutes, investigating crashes, responding to emergencies.

**Q.**    And Marshall County -- Plymouth is one of the cities within Marshall County?

**A.**    Yes, ma'am, it is.

**Q.**    Is there also a Plymouth -- for the actual city itself, a Plymouth Police Department?

**A.**    Yes, there is.

**Q.**    Fair to say that the Marshall County Sheriff's Department, for which you work, and Plymouth Police Department sometimes, but not always, will have overlapping incidents, just based on locality?

**A.**    Absolutely.

**Q.**    Now, were you working as a patrolman in October of 2017?

**A.**    Yes, I was.

**Q.**    Specifically, late on the night of October 30th into the early-morning hours of October 31st, were you working then?

**A.**    I was.  I was assigned to midnight shift patrol.

**Q.**    Now, while you were on patrol, on that night, were you in

1   a marked or an unmarked squad car?

2   **A.**   I had a marked police car.

3   **Q.**   And were you in a uniform or plain clothes?

4   **A.**   It would have been a uniform, marked uniform.

5   **Q.**   Now, as the early-morning hours of October 31st unfolded,

6   was there a traffic stop that you were a part of?

7   **A.**   Yes, there was, ma'am.

8   **Q.**   And are there certain -- prior to and during and even

9   after the stop itself, were there communications that you heard

10  through dispatch that informed your actions on that evening?

11  **A.**   Yeah, it would have been just before 1:00 a.m.  There was

12  some radio traffic between another patrolman and the dispatch

13  center, and they were trying to get hold of another supervisor

14  for the Plymouth Police Department.

15  **Q.**   And, specifically, I'm holding up and showing you a disk

16  that's been previously marked as Government Exhibit 10.

17         Have you listened to the final four of five

18  recordings on that disk?

19  **A.**   Yes, I have.

20  **Q.**   And do those, all four, accurately reflect dispatch

21  recordings, as you heard them and, in some, participated in

22  them, during those early-morning hours?

23  **A.**   Yes, they do.

24         **MS. DONNELLY:**  Your Honor, I would seek to admit

25  Government's 10.

1      **MR. OTIS:**  The final four?

2      **MS. DONNELLY:**  Correct.

3      **MR. OTIS:**  No objection.

4      **THE COURT:**  Without objection, the balance of

5  Government's Exhibit 10 is admitted into evidence.

6      You may publish.

7      **MS. DONNELLY:**  Thank you, Your Honor.

8  **Q.**  Turning, first -- now, turning, first, to the first one,

9  you mentioned it was around 1:00, specifically playing

10  1:03:38 a.m.

11  **A.**  (No response.)

12      **(Exhibit published.)**

13  BY MS. DONNELLY:

14  **Q.**  Now, it's hard for me to understand exactly what was going

15  on during that transmission.

16      Can you explain to the Court what it is that was said

17  on both ends of that conversation?

18  **A.**  Yeah.

19      So, basically, Patrolman Brouyette -- he's 5013.

20  He's the unit that first calls in.  He's calling in to my

21  dispatch center.  He's asking which unit would be the

22  supervising unit for the Plymouth Police Department that night.

23  I think he specifically said, "Sergeant," but dispatch knew

24  what he meant, as far as their highest-ranking unit.

25  **Q.**  And, so, essentially, he's calling in for information on

1  who the highest ranking Plymouth Police officer working that

2  evening is?

3  **A.**   Yes, ma'am.

4  **Q.**   And why is that something that would catch your attention

5  from the typical radio traffic that you hear on any given

6  night?

7  **A.**   It catches my attention as another patrolman working

8  because typically calls are dispatched to a certain unit.  It's

9  only those special situations where it has to go directly to

10  the supervising unit and then conferred with another

11  supervising unit from Plymouth.  That's what caught my

12  attention.

13  **Q.**   So, after that radio traffic caught your attention, what

14  did you do to try and look into the situation further?

15  **A.**   Typically, dispatch enters information for an initial call

16  before they start sending a unit to whatever it is.  So, in

17  this situation, the dispatch report is on my computer, also, in

18  my car, and I was able to pull that up and see what exactly

19  they were talking about and what exactly the call was related

20  to.

21  **Q.**   Okay.  So you turned to your in-car computer to look up

22  what that radio communication might have been about?

23  **A.**   Yes, ma'am.

24  **Q.**   And since the 31st, have you, in fact, printed out a copy

25  of the event report or the log that was what was running in

1   your in-car computer on that night?

2   **A.**   Yes, I have.

3   **Q.**   And I'm showing you, at this time, on the ELMO, the first

4   page of a three-page document marked Government's Exhibit 16.

5        Do you recognize this three-page document?

6   **A.**   Yes, ma'am.  That's the same one I provided.

7   **Q.**   And do the printouts from this that you printed out

8   accurately reflect what you saw on your in-car computer on the

9   early-morning hours of October 31st?

10  **A.**   They do accurately depict the same, with the exception

11  that there was obviously some added notes that I did not see at

12  the beginning.  At the very bottom of that document, you can

13  see the initial notes that were entered by a dispatcher.

14  Everything above that would have been stuff that happened, and

15  it was time stamped as the event took place.

16        **MS. DONNELLY:**  Your Honor, I would seek to admit

17  Government's 16.

18        **MR. OTIS:**  No objection.

19        **THE COURT:**  Without objection, Government's Exhibit

20  16 is admitted into evidence.

21  **BY MS. DONNELLY:**

22  **Q.**   So, Patrolman Hollopeter, you said that that first note on

23  the bottom, the one that's marked at 12:58 a.m., that's the one

24  you saw in your car after you had heard the transmission, and

25  then you go back to see what's going on?

**A.**   That's correct, ma'am.

**Q.**   And what did that say?  What did you learn, at that point?

**A.**   Word for word, they were requesting a unit to call reference a southbound, U.S. 31, and want a marked squad car to initiate a traffic stop.  They're following the suspect for a string of burglaries in the northeast part of the state.

**Q.**   So, after you saw that information, what did you do?

**A.**   I ended up contacting another patrol officer that was working at the same time, just making sure he saw the same thing.  We really weren't sure what was needed for us, at this point in time.  I hadn't had any communication with the other senior patrol officer, so we just generally headed towards the center of the county, assuming that they were southbound on 31 area.

**Q.**   So, essentially, just getting yourself in place in case your services and assistance were needed?

**A.**   Absolutely.

         **MS. DONNELLY:**  DeAndra -- I apologize -- can I switch back to the computer?

         **COURTROOM DEPUTY:**  (Complies.)

**BY MS. DONNELLY:**

**Q.**   You mentioned Deputy Brouyette.

         Did he, in fact, contact you a little bit later, seeking your assistance, as you thought might have happened?

**A.**   Yes, he did.

1      **MS. DONNELLY:**  And publishing the recording marked

2   1:21:30.

3      **(Exhibit published.)**

4   BY MS. DONNELLY

5   **Q.**   Now, again, sometimes these dispatch recordings can be a

6   little hard to understand.

7           Who were the two participants in that conversation?

8   **A.**   It would have been the other mentioned senior patrolman.

9   Patrolman Brouyette and myself were conversing back and forth

10  about -- he was basically explaining to me what I kind of

11  already knew a little bit about from the dispatch record, that

12  he's giving me the location that he's at.

13  **Q.**   And what was he saying about where he wanted you to go and

14  what his plan for what he was doing was?

15  **A.**   Yeah.

16          In this part of the county, Michigan Road and U.S.

17  31, they parallel each other.  He is coming from Michigan Road

18  on a road that connects the two called Veterans Parkway, and

19  he's on Veterans Parkway heading towards 31.  He's giving me

20  his location.  He's indicated to me that he's going to end

21  up -- he ends up indicating he's going to make a traffic stop,

22  and he's asking me to meet him there.

23  **Q.**   So, did you start, in fact, heading in the direction to

24  essentially meet up with him where -- in the area of where he

25  was planning and doing that traffic stop?

1   **A.**   Yeah.   Yeah, at 30 and 31.   I was approximately a mile

2   south of where this traffic stop ends up happening, and so I

3   had started northbound towards him.

4   **Q.**   Now, when Deputy Brouyette, in fact, initiated the traffic

5   stop -- and when I say, "Initiate the traffic stop," that

6   means, you know, put on the lights and actually pull him over,

7   right?

8   **A.**   Right.

9   **Q.**   -- at that point, did he call in, again, to dispatch with

10  the actual vehicle information?

11  **A.**   Yes, he did.

12          **MS. DONNELLY:**   And publishing 1:23:04.

13          **(Exhibit published.)**

14  **BY MS. DONNELLY:**

15  **Q.**   So, that was just the license plate number and location

16  for the stop?

17  **A.**   Yeah.   He's actually advising that he has made the traffic

18  stop, at that point.

19  **Q.**   Now, Veterans Parkway and 31, is that actually an overpass

20  there?

21  **A.**   Yeah, 31 actually -- I'm sorry.   Veterans Parkway actually

22  goes over 31, and there's on-ramps on each side onto the

23  highway.

24  **Q.**   Now, as you parked your car up on the overpass, did you

25  join Deputy Brouyette in the traffic stop?

1  **A.**   I did.

2  **Q.**   And which side of the car was Deputy Brouyette on?

3  **A.**   Deputy Brouyette was speaking with the driver as I

4  approached, and I went to the passenger's side?

5  **Q.**   Who was the passenger?  Did you speak to that person?

6  **A.**   The passenger's name is Latendresse, I think is how you

7  say it, a female by that last name.  I ended up speaking with

8  her, just asking for identification stuff.

9  **Q.**   So there's a female passenger.

10           And the driver, who Deputy Brouyette was talking to,

11  male or female?

12  **A.**   Male.

13  **Q.**   And did Deputy Brouyette get that person's driver's

14  license and registration?

15  **A.**   Yes, he did.

16  **Q.**   Now, did you and Deputy Brouyette -- where did the two of

17  you then go?

18  **A.**   Basically, after initially making contact with who was in

19  the vehicle, we both stepped back to his police car, which

20  would have been the one directly behind the suspect vehicle.

21  We basically are just conversing back and forth as far as

22  what's actually going on, what was -- you know, he explained to

23  me why he stopped the vehicle and so forth.

24  **Q.**   And he had the driver's license, at that point,

25  essentially, in part, confirming to see if the person in the

1    car was, in fact, Rex Hammond?

2    **A.**    That's correct.

3    **Q.**    And was the person Rex Hammond?

4    **A.**    Yes, it was.

5    **Q.**    While you and Deputy Brouyette are talking, had Deputy

6    Travis O'Neal also come to the scene, by that point?

7    **A.**    At that point in time, yeah, another deputy had pulled up.

8    **Q.**    And was he the person you mentioned in your testimony

9    earlier that you had contacted after the initial dispatch call

10   that, "Hey, something might be going on"?

11   **A.**    Yes, that's the same.

12   **Q.**    Now, was there anyone else who drove up on scene while you

13   and Deputy Brouyette are near Deputy Brouyette's car behind the

14   vehicle for the traffic stop?

15   **A.**    Detective Quick, from the Indiana State Police,

16   ultimately, pulls up.  There may have been another patrolman

17   that also showed up just because of what was going on, as far

18   as Plymouth's aspect.

19   **Q.**    And what does Deputy -- I'm sorry -- Detective Quick tell

20   you once he gets on scene?

21   **A.**    Ultimately, he basically asks us if we have the -- you

22   know, who we're with, as far as asking if this is, in fact, Rex

23   Hammond, and then he says that Logansport Police Department has

24   asked to go ahead and detain him for their investigation.

25   **Q.**    Now, once you had that information from Detective Quick,

1   that Logansport was asking that Rex Hammond, the driver, be

2   detained, how did you proceed in terms of actually detaining

3   him?

4   **A.**   Yeah.

5          There had been some information that had been passed

6   on to Patrolman Brouyette, that the suspect might have been

7   armed, and I think -- I'm assuming that came from Detective

8   Quick.  Basically, we repositioned our police cars to conduct a

9   high-risk traffic stop, assuming that he may be armed, and then

10  he was -- he would have been called out back to our police cars

11  and then handcuffed.

12  **Q.**   And, ultimately, were both Rex Hammond and the female

13  passenger taken into custody?

14  **A.**   Yes, ma'am.

15  **Q.**   As to the female passenger, was she taken into custody, in

16  part, because of narcotics located on her person?

17  **A.**   Yes, ma'am.

18  **Q.**   Now, in addition to the robbery investigation, did you

19  learn there was another reason why Deputy Brouyette had stopped

20  Rex Hammond?

21  **A.**   Yeah.  Deputy Brouyette had told me that he had the

22  vehicle on two traffic violations.  One of them was speeding.

23  The other one was a turn signal violation, I believe.

24  **Q.**   Now, while on scene -- I understand you may not yourself

25  have recovered it -- was it your understanding there was a

1   firearm recovered from the driver's floorboard?

2   **A.**   Yes, that was my understanding.

3   **Q.**   And that information was also reflected later in

4   Government's 16, the event report from the evening?

5   **A.**   Yes, ma'am.

6   **Q.**   Now, at that point, it's somewhere between or

7   approximately 1:00 to 2:00 in the morning; is that right?

8   **A.**   Yes, ma'am.

9   **Q.**   And Rex Hammond and the female are both now in custody.

10           Had there been anyone else in the car?

11  **A.**   No, there was just those two people in the car.

12  **Q.**   So, the car, at that point, there's no one to take it,

13  essentially, from the scene where it's parked on the side of

14  this overpass?

15  **A.**   That's correct, yes.

16  **Q.**   What is Marshall County's typical impound procedures?

17  **A.**   Typical impound procedures are to fill out an impound form

18  and to request a local wrecker service to come, remove the

19  vehicle from the roadway.

20  **Q.**   And based on the location of the car, time, and other

21  factors, would this have been a situation that the car could

22  have been a risk to other drivers, had it just been left on the

23  side of the road?

24  **A.**   Absolutely.

25  **Q.**   Now, were you, in fact, the patrolman who called for

1   impound of the car?

2   **A.**    I believe so.

3           **MS. DONNELLY:**  Now publishing 1:49:55.

4           **(Exhibit published.)**

5   **BY MS. DONNELLY:**

6   **Q.**   Now, there you're calling in for the tow?

7   **A.**   Yes, ma'am.  I had called -- Reichert's was the name of

8   the tow company.

9   **Q.**   As you called in for the tow, where in that call was the

10  initial place where the vehicle was going to be towed to?

11  **A.**   Yeah, the vehicle was initially going to be taken to the

12  sheriff's department, to our intake garage, just to get us out

13  of the weather so we could actually properly inventory the rest

14  of the vehicle.

15  **Q.**   And when you say, "The weather," what was it like out

16  there?

17  **A.**   Very cold, blowing wind.  We were up in an elevated

18  position on the overpass there.

19  **Q.**   Was there a change from the car being taken from Marshall

20  County to somewhere else?

21  **A.**   Yeah, the car inevitably ended up going to the Bremen

22  State Police Post in Bremen, Indiana.  That was at the request

23  of Detective Quick.  He advised he was going to seek a search

24  warrant for the vehicle, and that was how it was then secured

25  there.

1   **Q.**   So, essentially, on scene, he let you all know that the

2   vehicle was evidence in the ongoing investigation?

3   **A.**   Yes, ma'am.

4   **Q.**   And that's why it went to a different location?

5   **A.**   Yes, ma'am.

6   **Q.**   Now, did you read Rex Hammond his **Miranda** rights on scene?

7   **A.**   Yes, I did.

8   **Q.**   And, on scene, is there, in fact, a squad car video from

9   your squad unit?

10  **A.**   Yes, my issued commission has an in-car camera.

11  **Q.**   And were there some brief statements that Rex Hammond made

12  to you after you read him **Miranda**?

13  **A.**   Yes, there was.

14  **Q.**   And, in summary, briefly, what were those statements?

15  **A.**   In summary, basically, he wanted me to know that

16  everything that was in the vehicle, drugs and guns, were all

17  his.

18           **MS. DONNELLY:**  No further questions, Your Honor.

19           **THE COURT:**  Thank you, Ms. Donnelly.

20           Mr. Otis, any Cross?

21           **MR. OTIS:**  Yes.

22                       **CROSS-EXAMINATION**

23  BY MR. OTIS:

24  **Q.**   Officer, prior to Detective Quick contacting the Marshall

25  County Dispatch Center on Tuesday morning, October 31st, 2017,

1  at approximately 12:48, were you familiar at all with Rex

2  Hammond?

3  **A.**   I don't believe so, sir.

4  **Q.**   Prior to the call from Detective Quick, were you or any

5  other officer from Marshall County watching for a Chrysler --

6  light-colored Chrysler Concord?

7  **A.**   No, sir.

8  **Q.**   So, it's safe to say, if Marshall County dispatch had not

9  been contacted by Detective Quick, neither you nor Officer

10  Brouyette would have been looking for the Chrysler Concord,

11  correct?

12  **A.**   That's correct.

13  **Q.**   Your report doesn't state it, but were you aware that

14  Detective Quick had been pinging Mr. Hammond's cell phone?

15  **A.**   No, sir.  That was something I learned later on.

16  **Q.**   Would you agree; it's unlikely that Mr. Hammond would have

17  been followed that night by Officer Brouyette, had it not been

18  for Detective Quick making that request?

19         **MS. DONNELLY:**  Objection.  Speculation.

20         **THE COURT:**  I'll allow the question.

21  **A.**   I'm sorry.  Could you rephrase that?  I want to make sure

22  I answer correctly.

23         **MR. OTIS:**  Yeah.  No, that's fair.

24  **Q.**   Had it not been for --

25         **MR. OTIS:**  Let me make sure.

1    　　　　　Can it be read back to him?

2    　　　**(Record read.)**

3    **A.**   I would agree with that.

4    **BY MR. OTIS:**

5    **Q.**   You weren't on the scene when the traffic stop was

6    initiated, correct?

7    **A.**   That's correct.

8    **Q.**   So you didn't see him speeding or failing to use a turn

9    signal, correct?

10   **A.**   No, sir, I did not.

11   **Q.**   When you arrived, Patrolman Brouyette was already out of

12   his vehicle and speaking with Mr. Hammond, correct?

13   **A.**   That's correct.

14   **Q.**   Did you get out of the vehicle at that time?

15   **A.**   Yes.  I would have, yeah.

16   **Q.**   Did you talk to Patrolman Brouyette before you went to the

17   passenger's side?

18   **A.**   No, I did not.

19   **Q.**   You went straight to the passenger's side?

20   **A.**   Yes, sir.

21   **Q.**   To your knowledge, Mr. Hammond didn't do anything out of

22   the ordinary during -- prior to his arrest during the traffic

23   stop did he?

24   **A.**   To my knowledge, no.  I had limited visibility of him.

25   **Q.**   He appeared to be complying with everything that had been

1    requested by Patrolman Brouyette?

2    **A.**    Yes, sir.

3    **Q.**    Did you have any direct communication with Detective Quick

4    prior to Mr. Hammond being arrested?

5    **A.**    The only direct communication I had was right there at the

6    traffic stop when Detective Quick arrived.  I would have went

7    back.  I was speaking with him while he was talking with all of

8    us, and it would have been that quick communication as far as

9    Logansport Police Department wanted him detained.

10    **Q.**    Had Mr. Hammond and the female already been detained, at

11    that point?

12    **A.**    No.  They were still in their vehicle, at that point.

13    **Q.**    Your report states -- oh, I'm sorry.  Strike that.  That

14    makes sense still.

15            Detective Quick advised you to detain Mr. Hammond for

16    Logansport Police Department; is that correct?

17    **A.**    Yes, sir.

18    **Q.**    When he advised you of that, was Mr. Hammond and the

19    female still in the vehicle?

20    **A.**    Yes, sir.

21    **Q.**    How long between the time of the traffic stop until you

22    and Patrolman Brouyette initiated the arrest?

23    **A.**    I would be estimating.  Anywhere from ten minutes, fifteen

24    minutes, maybe, something in that area.

25            That dispatch log would actually probably have a

1    custody time and so forth that we could reference there.

2    **Q.**    If you could, just guide me here.  If I'm not on the right

3    page, I'm happy to flip it.

4    **A.**    If you could, go ahead and flip it to the next page.

5    **Q.**    (Complies.)

6    **A.**    There it goes.

7    **Q.**    Want me to go up?

8    **A.**    Go ahead and flip to the last page where there's notes

9    entered by the dispatcher.

10   **Q.**    (Complies.)

11   **A.**    Okay.  So, at 1:33, this would have been where 5014

12   advises felony stop.  The one about four lines up from the

13   bottom, 5014, ADV felony stop, that would have been the point

14   in time of the felony stop, the actual felony portion of the

15   traffic stop was committed, and that's the high risk, where we

16   would have called them back and handcuffed them.  That's

17   probably the closest that I can give you there.

18           Just above that, then, it says:  Subject in custody.

19   Subject in custody.  The first one, at 1:39:11, that would be

20   Rex Hammond.  At 1:39:19, that would have been the female

21   passenger.

22   **Q.**    That's when they were arrested?

23   **A.**    That's when they were actually placed in handcuffs and we

24   were advising the dispatcher that we were in handcuffs.

25   **Q.**    When was the -- when was the traffic stop initiated, based

1    on that?

2    **A.**    It would have been maybe ten minutes before I advised that

3    we were doing a felony stop.  It doesn't look like they have it

4    in there on that particular page.  On the other pages, there's

5    probably a change of location notation and a time stamp, and

6    that's probably the best I could come up with for a time for

7    the actual traffic stop.

8    **Q.**    Is it safe to say, you would not have arrested Mr. Hammond

9    for speeding or failing to use a turn signal, had it not been

10   for Detective Quick making that request?

11   **A.**    With only that information, yes, sir, I would agree with

12   that, that he would not have been arrested with just --

13   **Q.**    And the only information that you had for the basis for

14   the arrest was to be detained for Logansport Police Department,

15   correct?

16   **A.**    Correct.

17   **Q.**    Would you agree, had it not been at the request of

18   Detective Quick, that Mr. Hammond and the female would not have

19   been pulled out of the car?

20   **A.**    Assuming that everybody's driver's license status --

21   nobody was wanted or anything like that, that's -- I don't

22   recall that, right off hand.  But assuming that everybody was

23   good to drive, they probably would have went on their way.

24   **Q.**    Typically, people aren't arrested just for speeding,

25   correct?

1    **A.**    Correct, sir.

2             **MR. OTIS:**  Pass the witness.

3             **THE COURT:**  Thank you, Mr. Otis.

4             Ms. Donnelly, any Redirect?

5             **MS. DONNELLY:**  Just briefly, Your Honor.

6                        **REDIRECT EXAMINATION**

7    BY MS. DONNELLY:

8    **Q.**   The call that we listened to, the dispatch recording of

9    Deputy Brouyette calling in the traffic stop with the plate

10   number and location, was at 1:23 a.m.?

11   **A.**   Uh-huh.

12   **Q.**   Yes?

13   **A.**   Yes.  I'm sorry.  I'm sorry.  Yes.

14   **Q.**   And so then the note that the felony stop was initiated at

15   1:33 a.m., you would have gotten the information from Detective

16   Quick shortly before that 1:33 a.m.?

17   **A.**   Yes, ma'am.

18            **MS. DONNELLY:**  Nothing further, Your Honor.

19            **THE COURT:**  Thank you, Ms. Donnelly.

20            Any Recross?

21            **MR. OTIS:**  No further questions.

22            **THE COURT:**  You may step down, Patrolman Hollopeter.

23   Thank you.

24            **(Witness excused.)**

25            **THE COURT:**  Any further evidence for the Government?

  1          **MS. DONNELLY:**  No, Your Honor.

  2          **THE COURT:**  Any evidence for the Defense?

  3          **MR. OTIS:**  No, Your Honor.

  4          **THE COURT:**  Okay.  Argument.

  5          **MS. DONNELLY:**  Your Honor, I believe that this is,

  6  largely, for the Court, a legal question.  The factual basis is

  7  not really in dispute between the parties.

  8          In our response, we had laid out case law in depth in

  9  our argument, so I don't want to get too far in to repeating

 10  what we've already said.  I would just emphasize the two key

 11  areas.

 12          First, we're dealing with two different types of

 13  evidence here.  The first thing that Mr. Hammond is seeking to

 14  suppress is the AT&T records.  Here, the only -- there's two

 15  sets of records.  There are the AT&T records that Ghiringhelli

 16  obtained, which are for a different time period than the

 17  records obtained from the 2703(d) order.  We are not seeking --

 18          **THE COURT:**  Let me back you up because I heard

 19  something today that -- because that's what I thought we had,

 20  but Detective Preston's report indicates that he had been

 21  getting information from AT&T as to where the phone was on the

 22  dates of the two Logansport robberies and that other

 23  investigators had made similar inquiries.

 24          What do I do with that?

 25          **MS. DONNELLY:**  Well, Your Honor, regarding -- I think

1    that information is not something that the parties have in

2    their possession.  That information has been sought.  If it

3    exists, we have not been able to locate that information.

4           The Kalamazoo records and any type of records from

5    Logansport that they got, if they got them, I believe, fall

6    into one type of records, and the 2703(d) records fall into

7    another.

8           **THE COURT:**  So, whatever Detective Preston may have

9    gotten, the Government doesn't intend to use?

10          **MS. DONNELLY:**  Correct, Your Honor.  Correct.

11          The only thing, at trial, we would be attempting to

12   admit into evidence would be the 2703(d) orders, which span a

13   different time period than -- specifically, they start with

14   September 6th, as opposed to October 7th, which is when the

15   Kalamazoo or Logansport records begin.  October 7th doesn't

16   even cover the first robbery that's committed here, which was

17   committed on October 6th.

18          As for the 2703(d) records that we would be

19   attempting to get into evidence, we believe that there is an

20   independent source for those records, as explained throughout

21   the application which has been admitted into evidence; that the

22   application itself in no way references anything that was

23   learned after, essentially, Detective Ghiringhelli would have

24   applied for his order to Kalamazoo.  So I believe that this

25   Court, without even determining whether Detective

1    Ghiringhelli's request was proper under the exigent

2    circumstances, the 2703(d) order have an independent source for

3    how and why they were obtained.  And if --

4          **THE COURT:**  Are the records obtained in Kalamazoo a

5    subset of the 2703(d)?  All of that is in what you got pursuant

6    to the warrant?

7          **MS. DONNELLY:**  I believe so, Your Honor, yes.

8          One thing that we did not get pursuant to the 2703(d)

9    order was any type of ping information.  Obviously, that's

10   more -- when we talk about the cell site location information,

11   there's the historical and the, essentially, real time.  The

12   2703(d) order was only interested in historical records.

13         **THE COURT:**  So it discloses, at least what AT&T

14   shows, where the phone was at different periods?

15         **MS. DONNELLY:**  Correct, Your Honor, from

16   September 6th through October 31st of 2017.

17         As the application explains, the September 6th is

18   sought, in part, to either include or exclude someone who maybe

19   does go to all of these various convenience stores on a regular

20   basis.  That would show up or one would hope that that would

21   show up in the cell site location information.

22         So, the records that were obtained from the 2703(d)

23   order, those were obtained via an independent source.  And if

24   that is the case, which we contend that it was, then the

25   question from that is:  Were they obtained in a way that is

1    permissible now that **Carpenter** has been decided and says that,

2    should we have gone about getting those records now, we would

3    have to get a search warrant?  They were obtained five months

4    before the **Carpenter** decision, in good faith, on a statute that

5    was then constitutional.

6          Based on what the Seventh Circuit said in **Curtis**, a

7    little over a month ago, we believe that is a valid basis for

8    those records coming in, without this Court having to decide

9    the question of whether the Kalamazoo or the Logansport records

10   were obtained properly under the exigent circumstances

11   provisions.

12         The second set of evidence is, obviously, that which

13   is associated with the traffic stop.  Essentially,

14   Mr. Hammond -- anything that happens, we'll say, after midnight

15   on October 31st through that, there's evidence in the vehicle,

16   the revolver, the grocery bags, the partial masks, other items

17   of evidentiary value, as well as what Mr. Hammond himself was

18   wearing at the time.

19         Now, as for that, we believe that the arrest here was

20   proper and that the evidence from Mr. Hammond and from the car

21   is admissible, excluding, obviously, methamphetamine or things

22   that we would not be seeking to get into evidence for the

23   charges which Mr. Hammond is facing here.

24         Prior to Detective Ghiringhelli making his request,

25   prior to the information that he got from AT&T, there was

1   probable cause to arrest Rex Hammond before Detective Quick had

2   ever contacted Kalamazoo.  The only -- that's based on the gun

3   from the fifth robbery that came back to having been purchased

4   by Rex Hammond, based on the Bureau of Motor Vehicles' photo

5   that appeared to match the unmasked suspect from Kalamazoo,

6   based on what contributed to the investigators' beliefs was

7   Mr. Hammond's criminal history of multiple prior armed

8   robberies, as well as the vehicle appearing to match the Auburn

9   and Kalamazoo getaway vehicles that was similar in description

10  and appearance to the vehicle registered to Mr. Hammond.  There

11  was probable cause to arrest him.  It's a matter that we're

12  talking about how he was located.

13          Based on the **Patrick** decision, this was -- he was

14  located here by different means than was used there.  That was

15  a cell site simulator device.  Here is cell phone pings.  Based

16  on that decision, we do believe that, regardless of the

17  propriety of Detective Ghiringhelli's obtaining the exigent

18  circumstances order, that, essentially, even if those records

19  were improperly obtained, there was probable cause to arrest

20  him.  This was just a matter of how he was located.

21          However, beyond that, more importantly, there's a lot

22  of circumstances that happened here that attenuate any taint

23  from those records, even if they were improperly obtained.

24          Again, I think this Court can come to a decision,

25  without ultimately having to decide the exigent circumstances

     1    question, because the ping results -- what were they used for?

     2    At most, they were used to assist in locating a general area of

     3    where Mr. Hammond might be in South Bend.  From that point,

     4    Detectives Sexton and Quick searched a couple of parking lots,

     5    find the car, call the description of the car in.  It is Rex

     6    Hammond's car.  It does match the Auburn surveillance video.

     7    They then -- before they can get back up to come and help them

     8    out, the car takes off.  They end up following it for almost

     9    thirty miles, trying to get other cars, trying to get back-up,

    10    ultimately get to Plymouth where they lose the vehicle for

    11    approximately thirty minutes, and it's only by happenstance

    12    that Deputy Brouyette, at that point, sees the car matching the

    13    description go passed.  There is attenuation there from how the

    14    ping -- how he was located in South Bend to how he's ultimately

    15    located over an hour later in Marshall County.  And there's a

    16    basis for not only arrest, but also for a **Terry** stop, based on

    17    everything explained by the agent and the detectives and the

    18    patrolman, regarding current criminal activity, that they

    19    suspected this was someone who was a felon possessing possibly

    20    one, possibly more firearms, who is on his way, at that point,

    21    to commit another robbery.

    22            There's, obviously, more information contained within

    23    the response, but, Your Honor, those would be the two main

    24    arguments as to the types of evidence as to why we believe they

    25    are both admissible.

         1             **THE COURT:**  Thank you, Ms. Donnelly.

         2         Mr. Otis.

         3             **MR. OTIS:**  Judge, I would generally agree with

         4    Ms. Donnelly.  I don't know that the facts themselves are much

         5    in dispute.  How we interpret those facts is, though.

         6             I will start with the AT&T records.  As far as I

         7    could tell from the evidence we heard today, two officers

         8    directly contacted AT&T to obtain the cell phone records of Rex

         9    Hammond.  Neither of them obtained a search warrant to do that.

        10    Neither of them went to a court and even attempted to comply

        11    with the Stored Communications Act.  Instead, they used a

        12    different part of that act, Section 2702(c)(4), which, again,

        13    provides:  A provider, described in Subsection (a), may divulge

        14    a record or other information pertaining to a subscriber or a

        15    customer of such to a governmental entity, if the provider, in

        16    good faith, believes that an emergency involving danger of

        17    death or serious physical injury to any person requires

        18    disclosure without delay of information relating to the

        19    emergency.

        20             So, we have both this statute and the Fourth

        21    Amendment at play.  And applying both of them, I believe that

        22    Detective Ghiringhelli and Detective Preston violated both the

        23    Stored Communications Act and the Fourth Amendment because

        24    there were, certainly, no exigent circumstances.

        25             Detective Ghiringhelli halfheartedly attempted to

 1  identify exigent circumstances.  But as we pointed out in

 2  Cross-Examination, they weren't so exigent that he could not

 3  leave his daughter's soccer tournament on the weekend that he

 4  learned of this incident.

 5        Detective Preston presented no evidence whatsoever of

 6  an exigent circumstance.  He just simply contacted AT&T and

 7  obtained the subscriber information, without a search warrant

 8  or identifying any exigent circumstance whatsoever, and so I

 9  believe that any information that those officers obtained needs

10  to be suppressed.

11        Detective Preston -- in addition, we cited an Indiana

12  Code statute that requires officers to obtain probable cause or

13  identify an exigent circumstance, and we believe that Indiana

14  law is applicable here and applied to Detective Preston when he

15  obtained this information.

16        The Government argued, in their response brief, that

17  state law is not applicable here and cited a Seventh Circuit

18  opinion, which, then, in turn, cited a U.S. Supreme Court

19  opinion.

20        Give me one second here.

21        The Supreme Court opinion, U.S. Supreme Court

22  opinion, is **Virginia v. Moore**.  553 U.S. 164 is the cite.  And,

23  effectively, what that U.S. Supreme Court opinion says is that,

24  when a state law creates more protections beyond what the U.S.

25  Constitution allows, that those aren't applicable in federal

 1   Court.

 2           My argument here is that the Indiana Code that

 3   requires probable cause or exigent circumstances to obtain

 4   geolocation information on a cell phone is that it simply goes

 5   to the same standard as the Fourth Amendment, and none of the

 6   officers, Detective Quick nor Detective Preston, complied with

 7   that statute in obtaining that information.

 8           Detective Preston is additionally troubling because

 9   of the traffic stop.  You heard the testimony from Marshall

10   County officer that the officers would not have been looking

11   for this vehicle, had it not been for the request by Detective

12   Quick; that Mr. Hammond's vehicle likely would not have been

13   stopped, had it not been at the request of Detective Quick; and

14   that, further, an arrest would not have been made, unless at

15   the request of Detective Quick, for a traffic stop such as

16   speeding  or failing to use a turn signal.

17           So, that was the basis that Detective Quick

18   identified for the probable cause to support the arrest.  It

19   goes back to Detective Preston.  Detective Preston told

20   Detective Quick, "I have probable cause to support that

21   arrest."

22           You heard the testimony today from Detective Preston

23   that the illegally-obtained cell phone information was a basis

24   to support his telling Detective Quick that he had probable

25   cause.  That taints the arrest right there.

1    And, of course, we have the traffic stop.  You heard

2    the testimony that Mr. Hammond complied and did everything

3    appropriately during the traffic stop.  Detective Quick then

4    orders the Marshall County officers to make the arrest.  They

5    make the arrest.  Then they find a gun and drugs and have

6    statements from the female and Mr. Hammond.

7    All of that information needs to be suppressed

8    because Detective Preston, in my opinion, lacked probable

9    cause.  But if the Court found probable cause, it was based, in

10   part, on the illegally-obtained cell phone information.

11   I'd, next, like to address the 2703 order that the

12   Government obtained in this matter.

13   First, in the application, Paragraph 18:  Rex Hammond

14   was arrested on October 31st, 2017, and has been in Indiana

15   state custody since that time.  Partial phone records for the

16   target phone were obtained by Kalamazoo, Michigan Department of

17   Public Safety investigators.

18   Admittedly, not a lot of detail in that application

19   regarding the information that Detective Ghiringhelli had

20   obtained, but it's certainly referenced as a part of their

21   petition.

22   Additionally, Paragraph 12 and Paragraph 16 both

23   reference:  The driver's license photograph of Hammond appears

24   to match the subject captured by security camera systems during

25   the armed robberies in Logansport; Peru; Auburn; Portage,

 1   Michigan; and Kalamazoo, Michigan.

 2          You heard testimony today that that is simply not

 3   accurate, that the information obtained from the security

 4   camera footage during the armed robberies, the assailant was

 5   wearing a mask, and you could not identify -- compare the

 6   photograph of Hammond in his license to the individual in

 7   committing these crimes.

 8          Ms. Donnelly then argued that, even prior to

 9   obtaining the -- prior to the officers illegally obtaining the

10   cell phone information, officers still had probable cause.

11          Except, one, no officer attempted to obtain an arrest

12   warrant or a search warrant prior to the cell phone records so

13   we'll never know if probable cause really existed at that

14   point.

15          Second, Detective Preston's basis for probable cause

16   for the arrest was made after he learned of the cell phone

17   records, placing the cell phone in the location near both of

18   the Logansport robberies.

19          And so the probable cause is too tainted here, in my

20   opinion, to support probable cause, and, therefore, all of the

21   cell phone records obtained from AT&T, from Detective

22   Garingelli and Detective Preston, should be suppressed, and all

23   the evidence obtained as a result of that should be suppressed,

24   including everything in the arrest, including all the evidence

25   and all the statements.

1           And, then, additionally, the 2703(d) order, any

2    information from that should be suppressed because of an

3    inaccurate statement twice included in there, and then also it

4    references the arrest and the partial obtaining of cell phone

5    records.

6           Additionally, the Government raises a good-faith

7    argument, and I want to go on the record regarding two Supreme

8    Court opinions that, I believe, necessitate finding there was

9    not good faith.

10          In January 23rd, 2012, **United States v. Jones**, the

11   U.S. Supreme ruled that it was a violation -- the U.S. Supreme

12   Court determined that the Government's installation of a GPS

13   device on a defendant's vehicle and its use of that device to

14   monitor the vehicle's movements constituted a search.

15          **THE COURT:**  Do you have a cite on that?

16          **MR. OTIS:**  I do.  565 U.S. 400.

17          June 25th, 2014, **Riley v. California**.  That cite,

18   134 S. Ct. 2473.  Officers must get a search warrant prior to

19   searching cell phones incident to an arrest.  While, of course,

20   the facts in both of those cases are different, in the GPS

21   case, they literally placed a GPS device on a car, and the

22   **Riley v. California** case involved an individual being arrested,

23   and then they searched his cell phone incident to that.

24          Taking those cases together, though, I believe they

25   support the notion that there's not a good-faith exception

1   here, that the law required at the time of these incidents for

2   the officers to obtain a search warrant for the cell phone

3   records, and the same is applicable to the Government's

4   application under 2703(d).

5          **THE COURT:**  Help me square that.  I've got the cite

6   here, but help me square that with the case the Seventh Circuit

7   decided a month ago.

8          How do I --

9          **MR. OTIS:**  Well, that case speaks for itself, and I

10  don't know what the defendant raised as arguments in that case,

11  so I can't speak to whether he -- what he attempted to do, I

12  believe, is slightly different.  I did not see any reference to

13  arguing these two U.S. Supreme Court cases, which, again, are

14  slightly factually different, how we arrive there, but I think

15  those cases, taken together, I think, negate the good-faith

16  argument, in my opinion.

17         I also do want to, briefly, address exigent

18  circumstances because there is plenty of case law in the

19  Seventh Circuit on this.

20         The Government, in their response motion, cited cases

21  from outside the Seventh Circuit.

22         I want to start, first, right out of the Northern

23  District of Indiana, Judge Lozano, in **United States v. Romero**,

24  967 F. Sup. 1093.  Exigent circumstances exist when there is a

25  compelling need for official action but no time to obtain a

1   warrant.  That's Judge Lozano, citing **Michigan v. Tyler**, U.S.

2   Supreme Court case.

3           You heard some testimony today of alleged exigent

4   circumstances, but no facts to support that there was no time

5   to obtain a warrant in this case.  The Government has the

6   burden of showing that exigent circumstances exist that justify

7   a warrantless entry.

8           In that case, the agent waited thirty minutes to

9   enter a house, which by itself demonstrates the lack of exigent

10  circumstances.  That's Judge Lozano's finding in that case.

11          He cited a Seventh Circuit case that is really kind

12  of the -- **United States v. Patino**, 830 F. 2d. 1413, which is

13  kind of the gold standard for exigent circumstances in the

14  Seventh Circuit, and that, under very similar facts, frankly,

15  found that exigent circumstances did not exist.  One fact alone

16  demonstrates the lack of exigent circumstances and the

17  consequent unreasonableness of the entry of Patino's residence

18  without a search warrant.  An agent returning alone after lunch

19  observed Richard outside Patino's apartment house at about 1:00

20  p.m., and he called for back-up assistance to make the arrest

21  because he thought that Richard might be armed.  The magistrate

22  found that these agents were, at the time, thirty minutes away.

23  The agent at the scene waited for re-enforcements before making

24  any attempt to enter Patino's home in search of Richard.

25  Inexplicably, during the thirty-minute period, he did not

1    attempt to arrange for a telephonic search warrant, despite the

2    provision for such warrants under the Federal Rules.

3           Five years earlier, the Supreme Court recognized, in

4    **Steagald**, that the availability of a telephonic search warrant

5    minimized the burdens of Steagald's requirements of a search

6    warrant to enter a third person's house to seize a fugitive.  A

7    telephonic search warrant should have been sought during the

8    thirty-minute period the agents waited for the officers.

9           I think the overwhelming evidence supports

10    suppressing all of the information obtained from AT&T by

11    Detectives Ghiringhelli and Preston, supports suppressing the

12    arrest during the traffic stop and all evidence obtained after

13    that and suppressing any evidence obtained as a result of the

14    2703(d) order.

15           **THE COURT:**  Thank you, sir.

16           Ms. Donnelly, the Government has the burden of proof,

17    so you have the right to close, as well.

18           **MS. DONNELLY:**  Thank you, Your Honor.

19           Much of what was raised by Mr. Otis is raised in our

20    response, so I'm just going to keep it to three points that I

21    wish to follow up on.

22           First, regarding the good-faith argument, I think

23    we're talking about two different areas of good faith here,

24    **Jones** and **Riley** talking about the installation of a GPS device

25    on a vehicle or the search of a cell phone incident to arrest

 1    and the officers relying on that.

 2              What we're arguing, in terms of the 2703(d) order, is

 3    that the Government relied, in good faith, on a then

 4    constitutional statute that was later declared

 5    unconstitutional, so it's different areas of good faith that

 6    we're talking about there.

 7              Additionally, regarding the 2703(d) order itself, the

 8    initial motion did not raise any argument regarding the

 9    sufficiency of the 2703(d) application itself.  To the extent

10    that there was a portion included, a sentence essentially

11    saying that partial records were obtained, that was disclosed

12    so that the Court was aware of the full circumstances so

13    there's not some issue that was being withheld from the

14    magistrate judge in coming to his determination.

15              And looking at the one sentence regarding the

16    driver's license photograph appearing to match the subject,

17    that is what many orders or search warrants are, a summary of

18    the full information known regarding each of the videos; each

19    of what's seen, what's known about the weight, build; what's

20    known about the unmasked Kalamazoo -- it's a summary of all of

21    the information.  That in and of itself -- and the Court has

22    the opportunity to read the entirety of the application -- does

23    not make the application insufficient.

24              Third, regarding the question of probable cause, the

25    argument that we'll never know whether there was probable cause

```
 1   to arrest, Your Honor can come to the determination whether

 2   there was probable cause to arrest.  Whether or not a state

 3   court judge would have issued an arrest warrant or would have

 4   issued a search warrant, ultimately, it rests on this Court and

 5   the determination, in all of the evidence, whether there was

 6   probable cause to arrest, which, here, based on all of the

 7   information, there was.

 8           THE COURT:  Thanks to both sides.  It's been a very

 9   interesting presentation and an interesting issue of law.  I

10   wouldn't begin to try to rule from the bench on this one, even

11   if I knew how I was going to rule, at this point, so I will get

12   a ruling out in writing to you as soon as possible.  I know

13   time is limited and will do it as quickly as I can, so thanks

14   to both sides.

15           MR. OTIS:  Thank you.

16           LAW CLERK:  All rise.

17           (All comply; proceedings concluded.)

18                              ***

19                          CERTIFICATE

20      I, DEBRA J. BONK, certify that the foregoing is a
     correct transcript of the record of proceedings in the
21   above-entitled matter.

22      DATED THIS 20th DAY OF DECEMBER, 2018.

23                          S/S DEBRA J. BONK

24                          DEBRA J. BONK
                            FEDERAL CERTIFIED REALTIME REPORTER

25
```